UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| SOLOMON CHAU, Derivatively on Behalf of TESLA, INC., | § § § | Case No.:  1:22-cv-00592 |
| Plaintiff, | § § § | |
| v. | § § § | |
| ELON MUSK, ROBYN DENHOLM, KIMBAL MUSK, IRA EHRENPREIS, JAMES MURDOCH, LAWRENCE J. ELLISON, KATHLEEN WILSON-THOMPSON, HIROMICHI MIZUNO, ANTONIO J. GRACIAS, STEPHEN T. JURVETSON, BRAD W. BUSS, and LINDA JOHNSON RICE, | § § § § § § § § § § § § § | |
| Defendants, | § § § | |
| -and- | § § | |
| TESLA, INC., a Delaware Corporation, | § § | |
| Nominal Defendant. | § § § § | <u>DEMAND FOR JURY TRIAL</u> |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR
BREACH OF FIDUCIARY DUTY, UNJUST ENRICHMENT, AND
<u>VIOLATION OF SECURITIES LAW</u>**

Plaintiff Solomon Chau, by his attorneys, submits this Verified Stockholder Derivative

Complaint for Breach of Fiduciary Duty, Unjust Enrichment, and Violation of Securities Law.

Plaintiff alleges the following on information and belief, except as to the allegations specifically

pertaining to plaintiff which are based on personal knowledge.  This Complaint is also based on

the investigation of plaintiff's counsel, which included, among other things, a review of documents

provided to plaintiff for inspection in response to his inspection demand pursuant to 8 *Del. C* §220

(the "Section 220 Documents"), a review of public filings with the U.S. Securities and Exchange

Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## <u>NATURE AND SUMMARY OF THE ACTION</u>

1.     This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Tesla, Inc. ("Tesla" or the "Company") against certain of its officers and directors for breach of fiduciary duty, unjust enrichment, and violations of law.  These wrongs resulted in significant damages to Tesla's reputation, goodwill, and standing in the business community. Moreover, these actions have exposed Tesla to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.     Founded in 2003 and headquartered in Austin, Texas, Tesla is an American electric vehicle manufacturer and clean-energy company.  Tesla has a market value of approximately $740 billion, making it the most valuable manufacturer of electric cars in the world.  The Company is known for its technological idealism and forward-thinking rhetoric, as well as the unconventional leadership of its eccentric Chief Executive Officer ("CEO")-turned-celebrity, defendant Elon Musk ("E. Musk").  Tesla produces the majority of its electric vehicle lineup at its Fremont, California, factory (the "Fremont factory"), which is home to over 20,000 employees working just outside the progressive San Francisco Bay Area.  Tesla touts the Fremont factory as "one of the world's most advanced" car manufacturing facilities.

3.     Unfortunately, the Company's idealistic sheen obscures a disturbing and regressive reality for its workers.  Tesla has created a toxic workplace culture grounded in racist and sexist abuse and discrimination against its own employees.  This toxic work environment has gestated internally for years, and only recently has the truth about Tesla's culture emerged, leading to legal

action from government regulators and private parties alike.  Tesla's toxic workplace culture has caused financial harm and irreparable damage to the Company's reputation.

4.      Tesla is the subject of numerous private suits from current and former Tesla employees that have revealed the disturbing litany of sexual harassment and racist abuse employees must contend with at the Company.  Recently, a San Francisco jury awarded a former Tesla elevator operator nearly $137 million (subsequently reduced to $15 million) for the racist treatment and abuse he experienced at the Fremont factory.  In addition, after receiving hundreds of complaints from Tesla employees, California's Department of Fair Employment and Housing (the "DFEH") conducted a three-year long investigation into workplace harassment and discrimination at Tesla, finding evidence that the Fremont factory is a racially segregated workplace. The DFEH found that Black workers at Tesla are subjected to racial slurs and discriminated against as to job assignments, discipline, pay, and promotion.  On February 9, 2022, the DFEH filed a lawsuit calling the Company to answer for its violations of California law.

5.      Although Tesla's former Vice President of People, Valerie Capers Workman, has claimed that the "Tesla of 2015 and 2016 ... is not the same as the Tesla of today," the Company has continued to see an uptick in lawsuits and regulatory scrutiny regarding its treatment of its employees since that time, including both the DFEH investigation and a concurrent investigation by the U.S. Equal Employment Opportunity Commission (the "EEOC").  Equally troubling is Tesla's apparent refusal to cooperate with regulators by failing to produce complete and accurate employment and personnel records despite being required to do so by law.

6.      Tesla's Board of Directors (the "Board") and executive officers have known about, allowed, and even encouraged this workplace culture which minimizes the severity of racial and sexual harassment in the workplace and discourages victims from coming forward.  In particular,

Tesla's CEO, defendant E. Musk, has directly advised Tesla employees to be "thick-skinned" when confronted with workplace harassment.  Through the same channels he has used to announce Tesla products, relay corporate changes to the public, and comment on the financial status of the Company, defendant E. Musk has also made numerous sexually objectifying statements that multiple complainants have cited as direct influences on the culture of harassment they endured at Tesla.  Critically, it also appears from the Company's production of the Section 220 Documents that, even when presented with widespread claims of sexual harassment and racial discrimination at its manufacturing facilities, the Board itself did little to address the misconduct.  The Section 220 Documents show that ████████████████████████████████████ ████████████████████████████████████████████ Despite the severity of the harassment experienced by Tesla employees, however, the Board knowingly ignored red flags and failed to take appropriate action in response.  Tesla's officers and directors have exposed the Company to enormous and ongoing liability as a result of their failings, and the Company must be made whole.

## JURISDICTION AND VENUE

7.     Jurisdiction is conferred by 28 U.S.C. §1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8.     This Court also has jurisdiction under 28 U.S.C. §1331 because the claims asserted herein arise under section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  This Court has exclusive subject matter jurisdiction over the federal securities law claims under section 27 of the Exchange Act.  This Court has supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. §1367.

9.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Tesla maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Tesla, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

11.     Plaintiff Solomon Chau was a stockholder of Tesla at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Tesla stockholder.  Plaintiff is a citizen of New Jersey.

**Nominal Defendant**

12.     Nominal defendant Tesla is a Delaware corporation with principal executive offices located at 13101 Tesla Road, Austin, Texas.  Accordingly, Tesla is a citizen of Delaware and Texas.  Tesla designs, develops, manufactures, and sells fully electric vehicles and energy storage products as well as related services.  Tesla has established its own network of vehicle sales

and service centers and supercharger stations globally.  The Company operates as two reportable segments: automotive and energy generation and storage.  Tesla currently produces and sells four fully electric vehicles, the Model S; Model X; Model 3; and Model Y.  As of December 31, 2021, Tesla had 99,290 full-time employees.

**Defendants**

13.     Defendant E. Musk is Tesla's CEO and has been since October 2008, and a director and has been since April 2004.  Defendant E. Musk was also Chairman of Tesla's Board of Directors from April 2004 to November 2018.  Defendant Kimbal Musk ("K. Musk") is defendant E. Musk's brother.  Defendant E. Musk knowingly, recklessly, or with gross negligence permitted and deliberately enabled a culture of discrimination, harassment, and retaliation against women and people of color at Tesla.  Tesla paid defendant E. Musk the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Total |
|------|--------|-------|--------------|---------------|-------|
| 2019 | $23,760 | - | - | - | $23,760 |
| 2018 | $56,380 | - | - | $2,283,988,504 | $2,284,044,884 |
| 2017 | $49,920 | - | - | - | $49,920 |
| 2016 | $45,936 | - | - | - | $45,936 |
| 2015 | $37,584 | - | - | - | $37,584 |
| 2014 | $35,360 | - | - | - | $35,360 |
| 2013 | $33,280 | - | $10,620 | $26,089 | $69,989 |
| 2012 | $33,280 | $6,000 | - | $78,110,730 | $78,150,010 |

Defendant E. Musk is a citizen of Texas.

14.     Defendant Robyn Denholm ("Denholm") is Tesla's Chairman of the Board and has been since November 2018, and a director and has been since August 2014.  Defendant Denholm is the Chair of Tesla's Audit Committee and a member of that committee and has been since August 2014.  Defendant Denholm knowingly, in bad faith, or in conscious disregard for her duties permitted and deliberately enabled a culture of discrimination, harassment, and retaliation against

women and people of color at Tesla.  Tesla paid defendant Denholm the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Other Compensation | Total |
|---|---|---|---|---|
| 2020 | $86,250 | $5,630,509 | $46,752 | $5,763,511 |
| 2019 | $191,257 | $2,524,440 | $27,982 | $2,743,679 |
| 2018 | $42,670 | $6,838,600 | $9,812 | $6,891,082 |
| 2017 | $45,000 | $4,876,810 | - | $4,921,810 |
| 2016 | $45,000 | - | - | $45,000 |
| 2015 | $45,000 | $4,934,785 | - | $4,979,785 |
| 2014 | $17,486 | $7,163,580 | - | $7,181,066 |

Defendant Denholm is a citizen of Australia.

15.     Defendant K. Musk is a Tesla director and has been since April 2004.  Defendant E. Musk is defendant K. Musk's brother.  Defendant K. Musk knowingly, in bad faith, or in conscious disregard for his duties permitted and deliberately enabled a culture of discrimination, harassment, and retaliation against women and people of color at Tesla.  Tesla paid defendant K. Musk the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Other Compensation | Total |
|---|---|---|---|---|
| 2020 | $20,000 | - | - | $20,000 |
| 2019 | $20,000 | - | - | $20,000 |
| 2018 | $20,000 | $6,838,600 | $1,924 | $6,860,524 |
| 2017 | $20,000 | - | $1,721 | $21,721 |
| 2016 | $20,000 | - | $4,535 | $24,535 |
| 2015 | $20,000 | $4,934,785 | $9,596 | $4,964,381 |
| 2014 | $20,000 | - | $15,423 | $35,423 |
| 2013 | $20,000 | - | $6,661 | $26,661 |
| 2012 | $20,000 | $821,877 | $7,960 | $849,837 |

Defendant K. Musk is a citizen of Colorado.

16.     Defendant Ira Ehrenpreis ("Ehrenpreis") is a Tesla director and has been since May 2007.  Defendant Ehrenpreis knowingly, in bad faith, or in conscious disregard for his duties permitted and deliberately enabled a culture of discrimination, harassment, and retaliation against

women and people of color at Tesla.  Tesla paid defendant Ehrenpreis the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2020 | $37,500 | - | $37,500 |
| 2019 | $37,500 | - | $37,500 |
| 2018 | $37,500 | $9,872,745 | $9,910,245 |
| 2017 | $37,500 | - | $37,500 |
| 2016 | $37,500 | - | $37,500 |
| 2015 | $37,500 | $7,202,183 | $7,239,683 |
| 2014 | $37,500 | - | $37,500 |
| 2013 | $37,500 | - | $37,500 |
| 2012 | $37,500 | $1,225,629 | $1,263,129 |

Defendant Ehrenpreis is a citizen of California.

17.     Defendant James Murdoch ("Murdoch") is a Tesla director and has been since July 2017.  Defendant Murdoch is a member of Tesla's Audit Committee and has been since at least September 2018.  Defendant Murdoch knowingly, in bad faith, or in conscious disregard for his duties permitted and deliberately enabled a culture of discrimination, harassment, and retaliation against women and people of color at Tesla.   Tesla paid defendant Murdoch the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2020 | $32,500 | - | $32,500 |
| 2019 | $32,500 | - | $32,500 |
| 2018 | $25,536 | $9,005,547 | $9,031,083 |
| 2017 | $10,000 | $1,916,972 | $1,926,972 |

Defendant Murdoch is a citizen of New York.

18.     Defendant Lawrence J. Ellison ("Ellison") is a Tesla director and has been since December 2018.  Defendant Ellison knowingly, in bad faith, or in conscious disregard for his duties permitted and deliberately enabled a culture of discrimination, harassment, and retaliation

against women and people of color at Tesla.  Tesla paid defendant Ellison the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2020 | $20,000 | - | $20,000 |
| 2019 | $20,000 | $5,848,976 | $5,868,976 |

Defendant Ellison is a citizen of California.

19.     Defendant Kathleen Wilson-Thompson ("Wilson-Thompson") is a Tesla director and has been since December 2018.  Defendant Wilson-Thompson knowingly, in bad faith, or in conscious disregard for her duties permitted and deliberately enabled a culture of discrimination, harassment, and retaliation against women and people of color at Tesla.  Tesla paid defendant Wilson-Thompson the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2020 | $30,000 | - | $30,000 |
| 2019 | $27,005 | $7,329,733 | $7,356,738 |

Defendant Wilson-Thompson is a citizen of Michigan.

20.     Defendant Hiromichi Mizuno ("Mizuno") is a Tesla director and has been since April 2020.   Defendant Mizuno is a member of Tesla's Audit Committee and has been since at least May 2020.  Defendant Mizuno knowingly, in bad faith, or in conscious disregard for his duties permitted and deliberately enabled a culture of discrimination, harassment, and retaliation against women and people of color at Tesla.   Tesla paid defendant Mizuno the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2020 | $18,963 | $9,209,853 | $9,228,816 |

Defendant Mizuno is a citizen of Japan.

21.     Defendant Antonio J. Gracias ("Gracias") was a Tesla director from May 2007 to October 2021, and also Lead Independent Director from September 2010 to April 2019. Defendant Gracias was a member of Tesla's Audit Committee from at least May 2020 to at least August 2021, and also from April 2012 to at least April 2018.  Defendant Gracias knowingly, in bad faith, or in conscious disregard for his duties permitted and deliberately enabled a culture of discrimination, harassment, and retaliation against women and people of color at Tesla.  Tesla paid defendant Gracias the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Other Compensation | Total |
|---|---|---|---|---|
| 2020 | $26,346 | $1,160,462 | - | $1,186,808 |
| 2019 | $25,240 | - | - | $25,240 |
| 2018 | $37,500 | $13,286,158 | - | $13,323,658 |
| 2017 | $37,500 | - | - | $37,500 |
| 2016 | $37,500 | - | - | $37,500 |
| 2015 | $37,500 | $9,753,005 | - | $9,790,505 |
| 2014 | $37,500 | - | - | $37,500 |
| 2013 | $37,500 | - | $23,457 | $60,957 |
| 2012 | $37,500 | $1,679,850 | $16,156 | $1,733,506 |

Defendant Gracias is a citizen of Illinois.

22.     Defendant Stephen T. Jurvetson ("Jurvetson") was a Tesla director from June 2009 to September 2020.  Defendant Jurvetson was a member of Tesla's Audit Committee from at least April 2019 to at least May 2020, and also from April 2012 to at least April 2017.  Defendant Jurvetson knowingly, in bad faith, or in conscious disregard for his duties permitted and deliberately enabled a culture of discrimination, harassment, and retaliation against women and people of color at Tesla.  Tesla paid defendant Jurvetson the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2020 | $20,027 | - | $20,027 |
| 2019 | $19,265 | $1,184,605 | $1,203,870 |
| 2017 | $27,500 | - | $27,500 |
| 2016 | $27,500 | - | $27,500 |
| 2015 | $27,500 | $6,068,484 | $6,095,984 |

| | | | |
|---|---|---|---|
| 2014 | $27,500 | - | $27,500 |
| 2013 | $27,500 | - | $27,500 |
| 2012 | $27,500 | $1,023,753 | $1,051,253 |

Defendant Jurvetson is a citizen of California.

23.     Defendant Brad W. Buss ("Buss") was a Tesla director from November 2009 to June 2019.   Defendant Buss was a member of Tesla's Audit Committee from at least April 2018 to at least April 2019, and also the Chair of Tesla's Audit Committee and a member of that committee from at least April 2012 to August 2014.   Defendant Buss knowingly, in bad faith, or in conscious disregard for his duties permitted and deliberately enabled a culture of discrimination, harassment, and retaliation against women and people of color at Tesla.  Tesla paid defendant Buss the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $15,310 | - | - | $15,310 |
| 2018 | $37,500 | $6,838,600 | $1,303 | $6,877,403 |
| 2017 | $28,750 | $3,328,252 | - | $3,357,002 |
| 2016 | $20,000 | - | - | $20,000 |
| 2015 | $20,000 | $4,934,785 | - | $4,954,785 |
| 2014 | $38,750 | - | - | $38,750 |
| 2013 | $45,000 | - | - | $45,000 |
| 2012 | $45,000 | $1,477,974 | $433 | $1,523,407 |

Defendant Buss is a citizen of Nevada.

24.     Defendant Linda Johnson Rice ("Rice") was a Tesla director from July 2017 to June 2019.  Defendant Rice knowingly, in bad faith, or in conscious disregard for her duties permitted and deliberately enabled a culture of discrimination, harassment, and retaliation against women and people of color at Tesla.  Tesla paid defendant Rice the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $11,196 | - | - | $11,196 |
| 2018 | $22,858 | $8,026,030 | - | $8,048,888 |
| 2017 | $10,000 | $1,916,972 | $6,942 | $1,933,914 |

Defendant Rice is a citizen of Illinois.

25.     The defendant identified in ¶13 is referred to herein as the "Officer Defendant." The defendants identified in ¶¶13-24 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶14, 17, 20-23 are referred to herein as the "Audit Committee Defendants."  Collectively, the defendants identified in ¶¶13-24 are referred to herein as the "Individual Defendants."

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

**Fiduciary Duties**

26.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Tesla and its stockholders fiduciary obligations of care and loyalty, and were and are required to use their utmost ability to control and manage Tesla in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Tesla and not in furtherance of their personal interest or benefit.

27.     To discharge their duties, the officers and directors of Tesla were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Tesla were required to, among other things:

(a)     ensure that the Company operated in a diligent, honest, and prudent manner in compliance with all laws, rules, and regulations;

(b)     ensure that the Company complied with its legal obligations and requirements and refrained from engaging in discriminatory conduct;

(c)     ensure processes were in place for maintaining the integrity and reputation of the Company and reinforcing a culture of ethics and compliance;

(d)      conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(e)      remain informed as to how Tesla conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

28.      Tesla ostensibly holds its fiduciaries to specific corporate principles.   In the Company's Corporate Governance Guidelines, Tesla describes the duties undertaken by the Board and the active oversight role the Board plays in the Company's business affairs.   The Corporate Governance Guidelines state that the Board is tasked with the following responsibilities, among others:

> To Oversee Management and Evaluate Strategy.  The fundamental responsibility of the Board is to exercise their business judgment to act in what they reasonably believe to be the best interests of Tesla and its stockholders.  It is the duty of the Board to oversee management's performance to ensure that Tesla operates in an effective, efficient and ethical manner.   Additionally the Board has the responsibility for risk oversight, with reviews of certain areas being conducted by the relevant board committees.

29.      The Individual Defendants, as officers and directors of Tesla, are also bound by the Company's Code of Business Ethics (the "Code") The Code sets out basic principles to guide all directors, officers, and employees of Tesla who are required to know and conduct themselves in accordance with the Code, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.  In particular, the Code provides:

**Why We Have a Code of Business Ethics**

Tesla has been, is and always aspires to be a Do the Right Thing company—in other words, engaging in conduct that you and your family would be proud of.

*       *       *

That is why we wrote this Code.  This Code doesn't cover every ethical issue that may arise.  Rather, it sets out basic principles and provides an overview of the laws, regulations, and company policies that apply to us and our work.  This Code reinforces that Tesla is committed to following the law everywhere we operate.

You should review this Code, together with our Employee Handbook, company policies, and other work rules.  All are intended to serve as resources when you face ethical or compliance issues or have questions about what to do in specific situations.

The Code applies to all directors, officers, and employees of Tesla.  Anyone who violates this Code may be subject to discipline, even termination.

*       *       *

**No Harassment, Discrimination, or Retaliation**

We expect everyone at Tesla to be treated with respect and dignity.  So, we must all create and maintain a respectful and inclusive workplace.  We do not tolerate bullying at any level of the organization (whether physical, verbal, or visual).

We proudly employ people of all backgrounds who possess the energy and drive to accelerate our vision forward.  As with trustworthiness, hiring those committed to excellence—no matter where they come from, look like, or the beliefs they hold— is essential to achieving Tesla's mission.  We do not discriminate against anyone, at any time.

We provide equal opportunities to everyone without regard to race, color, religion, marital status, age, national origin, ancestry, physical or mental disability, mental condition, pregnancy (including childbirth, lactation, or related medical conditions), genetic information, gender, sexual orientation, gender identity or expression, veteran status, or any other protected status.

30. ██████████████████████████████

████████████████████████████

████████████████████████████████
████████████████████████████████



**Additional Duties of the Audit Committee Defendants**

31.     Under its Audit Committee Charter, the Audit Committee Defendants, defendants Buss, Denholm, Gracias, Jurvetson, Mizuno, and Murdoch, owed specific duties to Tesla to assist the Board in overseeing the Company's compliance with legal and regulatory requirements, among other things.   In particular, the Audit Committee Charter states that the principal recurring responsibilities of the Audit Committee include:

> Reviewing the reports of management, internal audit and the independent auditors concerning the design, implementation and maintenance of the Company's internal controls and procedures for financial reporting, including meeting periodically with the Company's management, internal audit and the independent auditors to review their assessment of the adequacy of such controls and to review, before release, the disclosure regarding such system of internal controls required under SEC rules to be contained in the Company's periodic filings and the attestations or reports by the independent auditors relating to such disclosure;

> \*     \*     \*

> Discussing guidelines and policies with respect to risk assessment and risk management with the Company's management and overseeing financial risk exposures, including monitoring the Company's financial condition and

---

[1] All references to "TSLA-Janklow 220_____" are the Section 220 Documents produced in response to plaintiff's inspection demand.

investments, the integrity of the Company's financial statements, accounting matters, internal controls over financial reporting, the independence of the Company's independent auditor and guidelines and policies with respect to risk assessment and risk management[.]

Moreover, according to a statement from the Board at Tesla's October 9, 2021 Annual Stockholders Meeting, the Audit Committee has specific oversight duties pertaining to human capital risks, stating, in particular:

As part of its broad oversight of Tesla's material risks and compliance burdens, the Audit Committee of the Board also regularly receives updates from and provides feedback to management relating to various workforce issues including environmental, health and safety incident metrics and enterprise risk assessments pertaining to human resources.

**Breaches of Duties**

32.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Tesla, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

33.     The Individual Defendants breached their duty of loyalty by allowing defendants to cause, or by themselves causing, the Company to create a culture of racial and sexual discrimination and harassment and make improper statements to the public, improper practices that wasted the Company's assets, and caused Tesla to incur substantial damage.

34.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Tesla, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Tesla has expended, and will continue to expend, significant

sums of money.

## **FACTUAL BACKGROUND**

35.     Tesla operates six manufacturing facilities: four in the United States; one in China; and one in Germany.  Among Tesla's U.S.-located automotive plants is the Fremont factory in California.  The Company purchased the Fremont factory in 2010 and extensively refurbished it prior to commencing the manufacture of its flagship Model S sedan in 2012.  The Company also operates a lithium-ion battery production facility, known as the "Gigafactory," in Sparks, Nevada, as well as numerous vehicle service centers throughout the United States.

36.     With 5.3 million square feet of space at its disposal, the Fremont factory now staffs approximately 22,000 employees.  As a result, Tesla is one of the largest manufacturing employers in the state of California.  Every Tesla Model S, Model X, and Model 3 that the Company sells is assembled by workers at the Fremont factory, and the vast majority of the vehicles' components are also produced there.

**Tesla Promotes Itself as a Company Committed to Workplace Diversity and Inclusion**

37.     Tesla's brand is built on a reputation of innovation and social responsibility.  The entrance to the Fremont factory touts the Company's mission statement: "Our mission: to accelerate the world's transition to sustainable energy."  Accordingly, Tesla markets its line of electric vehicles—the Model 3, Model S, Model X, and Model Y—to socially and environmentally conscious consumers who identify with its forward-thinking, idealistic rhetoric.

38.     In keeping with this image, Tesla has emphasized its supposed commitment to workplace diversity, equity, and inclusion in its public-facing statements.  For example, in its 2020 Diversity, Equity, and Inclusion Impact Report (the "DEI Report"), Tesla stated:

> We value talented individuals at the experience and career levels who are passionately committed to our mission.

We insist on equitable practices not just because it's the right thing to do, but because fair processes allow our team members to bring their whole selves to work.

We value and include underrepresented communities at all levels of our company.

We do the work required to ensure that our culture is as diverse and inclusive as it is collaborative and driven.

We leverage our differences to build the most innovative products in the world and our shared mission to accelerate the world's transition to sustainable energy unites us in our commitment to creating a future that is good for all humanity.

39.     Tesla has also acknowledged the importance of maintaining a diverse and inclusive workplace environment to the maintenance of the Company's workforce and its business.  For example, in Tesla's Annual Report on Form 10-K for the fiscal year ended December 31, 2021 (the "2021 Form 10-K") filed with the SEC on February 7, 2022, the Company stated:

Our key human capital objectives in managing our business include attracting, developing and retaining top talent while integrating diversity, equity and inclusion principles and practices into our core values.

*        *        *

We also believe that our ability to retain our workforce is dependent on our ability to foster an environment that is sustainably safe, respectful, fair and inclusive of everyone and promotes diversity, equity and inclusion inside and outside of our business.

40.     Tesla has also highlighted glowing statements and testimonials from select members of its executive and management teams in order to put forth the image of Tesla as a diverse, open, and forward-thinking place to work.  For example, the DEI Report includes a statement from Tesla's Director of Inclusion, Talent, and Learning, Kristen Kavanaugh, who claimed: "Tesla is not a company that rests on past successes or settles for the status quo.  We set high standards for everything we do and we are committed to bringing that same bias for excellence to Diversity, Equity and Inclusion at Tesla."  Similarly, the DEI Report included a testimonial from

the Company's former Vice President of People, Valerie Capers Workman ("Workman"), who stated:

> My promotions are illustrative of one of the things I love most about Tesla; here you are never type-cast into doing just one thing.  At Tesla, excellence is seen as the core competency for any role and this perspective gives leadership the flexibility to provide employees with new opportunities to plug into the areas where there talents are needed.  I also love the fact that we are a flat organization.  Anyone, anywhere in the company is empowered to connect with everyone, including Elon, if employees are facing roadblocks.  We don't believe in hierarchy.  We believe in getting things done.

41.     Workman, who is Black, later resigned from Tesla in January of 2022, shortly before the DFEH publicly announced that it was suing the Company based on findings from its multi-year investigation into the systemic racism at the Fremont factory.

### THE INDIVIDUAL DEFENDANTS FOSTER AND PERMIT A CULTURE OF HARASSMENT, DISCRIMINATION, AND RETALIATION ON THE BASIS OF RACE AND GENDER

42.     The Individual Defendants have internally fostered and permitted a culture of discrimination, harassment, and retaliation at the Company that is in direct contradiction to Tesla's express claims that it is an equal opportunity employer and in violation of federal and state laws and regulations.

43.     The Civil Rights Act of 1866, codified as 42 U.S.C. §1981 ("Section 1981"), is a federal law that provides broad remedies for individuals who have been subjected to racial harassment and discrimination.  Among other things, Section 1981 prohibits an employer from depriving an individual of their right to the enjoyment all of the benefits, privileges, terms, and conditions of employment on the basis of race.  Section 1981 also makes it illegal to retaliate against a person who complains about racial discrimination in the workplace.

44.     Employment discrimination is also prohibited in California, where Tesla operates the Fremont factory and where its business was headquartered until December of last year.  *See*

Cal. Gov. Code §12920 ("It is hereby declared as the public policy of this state that it is necessary to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgment on account of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or military and veteran status.").  Pursuant to this public policy, the state of California enacted the Fair Employment and Housing Act ("FEHA") in 1959, which prohibits an employer from discriminating against individuals on the basis of race, sex, and gender, among other protected categories.  FEHA also makes it illegal to retaliate against an individual who complains about discrimination.

45.     Although the Company has publicly committed to promoting a culture of diversity and inclusion in the workplace, Tesla's leaders have, for years, permitted the Company to engage in systemic and unlawful discriminatory practices on the basis of race and gender by instituting policies and procedures that encouraged harassment and discrimination to continue, while simultaneously discouraging reporting from victims.

46.     Indeed, Tesla's own anti-harassment employee training materials reflect the fact that the Company purposefully eschewed concrete policies and procedures that would otherwise guide employee conduct and enable employees facing harassment and discrimination to have their concerns properly addressed by the Company.

47.     ███████████████████████████████████████████

███████████████████████████████████████████████████

████████   ████████████████████████   ████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████

48.     ████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

49.     ████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

50.     ████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████

51.     Tesla further instituted a policy of forcing employees to sign mandatory arbitration agreements as a condition of their employment with Tesla.  Leadership at Tesla maintained this policy in order to shield the Company from employees wishing to hold the Company accountable for the rampant racist and sexist harassment at the Company, and to keep the unfavorable details

of the investigations into employee claims out of the public eye and away from unbiased judges and juries.  Tesla's mandatory arbitration policy had the effect of discouraging and suppressing reporting of discrimination and harassment at the Company.  According to the EEOC, mandatory arbitration policies limit employees' remedies for wrongdoing, keep misconduct a secret, preclude employees from suing in court when discrimination and harassment occur, and prevent employees from learning about their shared concerns.  Although Tesla has been able to successfully hide behind these policies in the past, an Alameda County, California, Superior Court Judge recently determined that Jessica Barraza, whose lawsuit detailing the widespread sexual harassment she experienced at Tesla's Fremont factory, discussed *infra*, could proceed with her claims against the Company in open court regardless of the fact that she signed an arbitration agreement as a condition of her employment.

52.    The catastrophic failure at Tesla's highest levels to adopt and enforce common-sense procedures designed to prevent and/or address discrimination, harassment, and retaliation against its Black and female employees has opened the litigation floodgates, exposing Tesla to millions of dollars in liability.

**The DFEH Investigation Reveals Racial Discrimination, Harassment, and Retaliation at Tesla's Fremont Factory**

53.    On February 9, 2022, California's DFEH—the state agency charged with the protection of state residents from employment, housing, and public accommodation discrimination, and hate violence—filed a complaint against Tesla detailing Tesla's violations of California's FEHA and Equal Pay Act at the Fremont factory.   The DFEH is seeking injunctive and monetary relief and damages in the public interest for the State and for Tesla's Black employees.  As the complaint states, "[a]ll actions of all Defendants were taken by workers, supervisors, executives, *officers, and directors* during employment with all Defendants, were

taken on behalf of all Defendants, and were engaged in, authorized, ratified, and approved of by all other Defendants."

54.     The DFEH initiated its investigation in 2019.  Over the course of its approximately three-year inquiry into working conditions at Tesla's Fremont factory, the DFEH found evidence that the defendants discriminated against Black employees in virtually every aspect of employment (including pay), that Black employees were continuously subject to racial harassment, and that the defendants failed to take steps to prevent unlawful discrimination, harassment, and retaliation. Defendants also foster a "segregated" work environment that relegates Black employees "to the lowest levels."  This segregated work environment "has left many complaints of rampant racism unchecked for years."  The investigation further found that Tesla "turned, and continue[s] to turn, a blind eye to years of complaints from Black workers."

**Racial Harassment**

55.     The DFEH investigation found that Black workers endured a sometimes-daily barrage of racial slurs and comments from their fellow workers, leads, supervisors, and managers. Slurs and racist language used by Tesla employees include the N-word, "porch monkey," "monkey toes," "boy," "hood rats," and "horse hair."  Production leads and supervisors, among others, made racist jokes and statements, including "[N-word] out of the hood," "from the ghetto," "Tesla [was] hiring lazy coons," and "go back to Africa."

56.     Tesla's Fremont factory was racially segregated.  Tesla's workers reportedly referred to areas with Black employees as the "porch monkey station."  Tesla employees openly displayed tattoos with racist iconography, including the Confederate flag, for the purposes of intimidating Black workers.  Tesla employees referred to the factory itself as the "slave ship" and

"the plantation," where Tesla production leads "crack[ed] the whip."   Some Black workers reportedly heard these slurs and phrases as often as 100 times per day.

57.     Black employees were also directly called the N-word and other slurs.  One was told by Tesla production associates to "Shut the fuck up, [N-word]," and "all blacks look alike." A separate Black employee reported that on multiple occasions Tesla employees taunted him for eating watermelon during lunch and accused him of being lazy, speculated about his genitals, and levied various racial epithets toward him, including "Mandingo" and "big black guy."   When confronted about this behavior by another Black employee, a production associate informed the employee that they were only jokes.  When yet another Black employee took issue with being called racial slurs and asked Tesla production associates, leads, and supervisors to refer to him by his name, they responded by saying, "this [N-word] is crazy," or "this [N-word] is tripping."

58.     Tesla leads, supervisors, and managers were participants and witnesses to the racial harassment of Black workers.  Indeed, Black employees stated that their superiors at Tesla frequently said, "that stupid [N-word] over there" or "that fucking [N-word], I can't stand them." In reference to a group of Black production workers, a Tesla supervisor remarked that "there [was] too many of them in there.  They are not Tesla material."  Tesla supervisors further remarked about where Black employees were stationed in the factory, stating, "[m]onkeys work outside," and "[m]onkeys need a coat in cold weather."  One Tesla supervisor confronted a Black subordinate with the question, "do most Africans have bones through their noses?"  A group of Tesla production leads often ridiculed another Black employee, laughing and remarking under their breath to her as she walked past, "[N-word]" or "[s]hut up, [N-word]."  After she began to receive performance-related awards and acknowledgments, the production leads openly called her racist slurs.

59.     Each day, Black employees were exposed to racist writing during their time at Tesla.   This included racist graffiti written on restroom walls, toilet stalls, lockers, benches, workstations, tables, in the break room, and even on Tesla machinery.   The writings and iconography ranged from Confederate flags, white supremacist skulls, and phrases and slurs like "go back to Africa," and "mayate."  One Black employee saw "hang [N-word]" written next to an image of a noose in a Tesla bathroom, as well as the statements, "all monkeys work outside" and "fuck [N-word]s" written on breakroom walls.  This racist graffiti was reportedly left in plain view for months, with no one at Tesla bothering to remove it from Company property.

60.     At Tesla, Black employees were often subject to taunts and racial epithets designed to bait them into verbal and physical confrontations.   In turn, Black employees were disciplined and their personnel files were amended with notes describing their ostensibly "aggressive" or "threatening" behavior.   These write-ups hurt those same Black employees' opportunities for promotion and advancement.   Moreover, some Black employees reportedly resigned because they had little faith in Tesla's HR department's ability to evaluate their cases fairly and without bias.

**Tesla Enforced Discriminatory Employment Practices and Terms of Employment**

61.     Tesla discriminated against Black employees by subjecting them to discriminatory terms and conditions of employment.  The DFEH investigation found that Black Tesla employees were assigned to the most physically arduous tasks and positions in Tesla factories when compared with those assigned to their non-Black counterparts.   One employee reported seeing only Black employees cleaning the factory floor on their hands and knees, yet no other groups were made to do the same.  A second employee overheard Tesla's workers complain about their heavy workloads and suggest that the Company "need[ed] to get some [B]lacks on this line," implying that Black employees should be assigned to the difficult menial tasks to ease the burden of the presumably

more valuable non-Black employees.  Another Black employee began working for Tesla as a production lead, but after he introduced himself in person to his white manager, he was relegated that same day to a production associate.  His supervisor explained this abrupt demotion by informing him that the manager believed the Black employee to be "better suited" in the lesser position.  When the same Black employee applied for a transfer to Tesla's Lathrop factory, he was further told by his manager that he shouldn't "get [his] hopes up," all while a white coworker was approved for the same transfer.  Numerous other Black employees reported that the Fremont factory was segregated by race, with Black-staffed areas referred to routinely as "the dark side" of the factory.

62.     Tesla also subjected Black employees to more severe disciplinary measures for the same behavior when compared to their non-Black counterparts.  For example, Black employees were written up or fired for comparatively minor infractions, including a Black employee who was fired for being late, while a non-Black employee faced no consequences for the same infraction.  One Black employee described how his supervisor engaged in a pattern of behavior designed to intimidate him, including staring him down and speaking to him in an aggressive manner.  This supervisor also ignored the Black employee's safety concerns when the employee raised them, and further negatively evaluated the employee on a performance review without cause.  Another Black employee missed several opportunities for salary increases because she was flagged by management for using profanity and "being aggressive," while non-Black employees faced no such consequences for similar behavior.

63.     Tesla further withheld promotions from Black employees on a much more frequent basis than their non-Black counterparts.  Tesla management relied on informal and nontransparent procedures and processes to make promotion and salary decisions.  Because of these practices,

Black employees rarely received promotions to production lead, supervisory, or managerial positions.  According to the DFEH investigation, Black employees were overrepresented at Tesla as low-level "operatives," which include engine and other machine assemblers, but severely underrepresented as officials and managers, executives/senior officials and managers, first/mid-officials and managers, professionals, and administrative support staff.  Black employees at Tesla reported more frequently being passed over for professional advancement, denied bonuses, equity, and raises in comparison to non-Black employees.  A Black employee, for example, reported that his e-mails requesting information about a promotional position were never responded to by his supervisor.  The same supervisor later falsely claimed to have never received the job posting, and by the time the Black employee gained access to the information, the job had been filled.

### Tesla Failed to Prevent Discrimination, Harassment, and Retaliation

64.     Tesla management knew of the harassment and discrimination that plagued Black employees thanks to the numerous complaints they filed in protest of Tesla's working conditions since at least 2012.  Black employees exhausted all options in an effort to be heard, including by repeatedly addressing their grievances with Tesla leads, supervisors, managers, staffing agency representatives, and the HR department.  These complaints described pervasive and ongoing racial abuse and harassment, including regular use of the N-word and other racial slurs by Tesla employees, racist graffiti in bathrooms and other communal spaces, racially segregated work areas, and the division of work conditions, work assignments, performance reviews, advancement opportunities, and disciplinary actions along racial lines.  However, not only did Tesla's management turn a blind eye toward these problems, they punished Black employees for speaking up by retaliating against them.

65.     According to information uncovered by the DFEH investigation, Tesla management retaliated against Black employees who spoke up by denying bonuses, promotions, and a plethora of other advancement opportunities.  Complainants were falsely accused of being late, written up for unsubstantiated infractions, denied transfers when requested, assigned physically demanding tasks or undesirable posts, constructively discharged, or even fired simply for speaking out.  Further, complainants' requests for reasonable accommodations were denied as a consequence, worsening complainants' injuries and disabilities.

66.     Moreover, in some instances, Tesla's HR representatives relayed complainants' grievances to the perpetrators prior to opening their investigations, thereby increasing the likelihood of retaliatory behavior.  For example, one Black employee reported that a Tesla HR representative immediately contacted her supervisor about the employee's accusations of harassment against that very same supervisor, who then retaliated by writing the employee up, confronting her at work, and reporting her to security.  Further, even upon transfer to a new area of the factory, complainants were still subject to harassment because management could find and access the complainants regardless of where they were stationed.

67.     Tesla's HR department was understaffed and poorly equipped to handle these complaints, and, as a result, failed to take reasonable steps to address the issues raised by Black employees.  According to information uncovered by the DFEH investigation, in 2016, Tesla had only thirty-three HR professionals and managers serving 19,916 workers in California, or one HR officer for every 604 workers.  By 2020, that ratio had increased to approximately one HR officer for every 740 workers.

68.     Tesla's HR department either ignored or nominally investigated the complaints of Black employees.  HR investigations were rife with inconsistent investigatory methods and

analyses, often coming to contradictory conclusions and taking multiple months to wrap up.  In one case discussed by the DFEH, the investigation of a racial discrimination complaint took nearly six months to complete.  Other investigations conducted by HR officers belied a lack of sensitivity or understanding of racial issues and what constitutes racial harassment.

69.     For example, one HR investigation concluded that "banana boy" was merely a "nickname" for the Black complainant and not a racial slur, despite the fact that the Black employee identified it as such and the perpetrator had been previously coached regarding issues with the way he spoke to other employees.  Another HR investigation concluded that a Black complainant's harassment claims could not be substantiated because there were no corroborating witnesses despite the fact that the perpetrator had admitted to the harassment.  Moreover, in many of the cases where HR investigations determined that harassment had occurred, the offending employees nonetheless retained their jobs or were even promoted.

70.     By at least 2012, Tesla started hiring workers through a number of staffing agencies in an effort to progressively reduce the amount of employees it hired directly.  Tesla further required the staffing agencies it engaged with to require all of the workers it sourced for Tesla— referred to as "subcontractors"—to sign arbitration agreements.  Tesla's arrangements with staffing agencies further provided that if an employee sourced from a staffing agency filed a complaint, it would be the responsibility of the staffing agency, not Tesla, to investigate the allegations.  In 2021, Tesla contracted with at least fourteen staffing agencies in this manner to ensure that it would have less oversight and legal responsibility for its workforce.

71.     Annalisa Heisen, a HR administrator at Tesla's Fremont factory, confirmed that Tesla required staffing agencies to train subcontractors on the Company's workplace harassment policies and investigate allegations of racial harassment made by or against subcontractors.

However, Tesla itself had no written procedures for coordinating investigations of racial harassment involving subcontractors, nor did it provide training to its supervisors on how to conduct such investigations.  Tesla's understaffed HR department and their inadequate complaint and investigation procedures for subcontractors foster and permit a toxic work environment rife with racial harassment, discrimination, and retaliation at Tesla.

72.     Finally, the Company unlawfully refused to cooperate with the DFEH investigation by refusing to produce complete and accurate records relating to its applicant and hiring records; personnel records related to compensation, assignment, and promotion decisions, and complaints and investigation information.  The Company also failed to produce complete and accurate records related to complaints and complaint investigations information to the DFEH.

73.     Based on the foregoing, the DFEH sought injunctive, declaratory, and equitable relief and damages on thirteen causes of action: (i) employment discrimination because of race – harassment; (ii) employment discrimination because of race – assignment; (iii) employment discrimination because of race – compensation; (iv) employment discrimination because of race – discipline; (v) employment discrimination because of race – promotion; (vi) employment discrimination because of race – termination; (vii) employment discrimination because of race – constructive discharge; (viii) retaliation; (ix) failure to prevent discrimination and harassment (on behalf of the group); (x) failure to prevent discrimination and harassment (on behalf of the DFEH); (xi) unequal pay; (xii) waiver of rights, forums, or procedures and release of claims; and (xiii) failure to retain and produce records (on behalf of the DFEH only).

**Three Former Tesla Employees Detail the Racial Discrimination and Retaliation at the Fremont Factory**

74.     Owen Diaz ("Diaz") began work at Tesla's Fremont factory as an Elevator Operator in the summer of 2015 after being hired through staffing company Citistaff Solutions, Inc.

("Citistaff") and HR intermediary, nextSource, Inc. ("nextSource"). Initially, Diaz was excited to be working at Tesla. He liked the idea of working for the Company because he "was going to be a part of something that was bigger than" himself.

75.    However, Diaz's excitement was short lived. On his second day of work, Diaz saw the N-word etched into a bathroom stall. Diaz reported this sighting to one of his supervisors. However, the amount of racist graffiti—including swastikas and racially charged threats—that Diaz saw in bathrooms and other communal areas at Tesla would only increase during the course of his employment with the Company.

76.    Within a month, Diaz was promoted by an Asian-American supervisor to an elevator lead position. However, the supervisor also warned Diaz that Tesla management wouldn't want "someone like him"—that is, a Black person—in a lead position at the Fremont factory. This prediction quickly proved to be true, as Diaz experienced constant racial harassment from Tesla employees on a daily basis, including being called the N-word and other racial epithets as well as being told to "go back to Africa." For example, one conveyance supervisor frequently spoke to him in a demeaning tone and referred to him as "boy" or by the N-word when instructing him to perform tasks.

77.    One of Diaz's coworkers, Judy Timbreza ("Timbreza") (who is male), frequently called Diaz "mayate," the Spanish equivalent of the N-word. Timbreza also called Diaz a "porch monkey" in Spanish. On July 31, 2015, Diaz and Timbreza became embroiled in a verbal altercation that involved Timbreza calling Diaz the N-word in English and laughing at him. When Tesla Supervisor Tamotsu "Tom" Kawasaki ("Kawasaki") arrived, he separated the two men and asked nearby witnesses what happened. Witnesses informed Kawasaki that "some racial slurs [were] thrown" by Timbreza. Diaz further told Kawasaki that Timbreza had called him the N-

word and referred to him as a "coon."    Kawasaki then reported the incident to Tesla Supervisor Ed Romero ("Romero"), who self-described his own investigation into the incident as "minimal."

78.    Another coworker, Tesla Supervisor Ramon Martinez ("Martinez"), frequently harassed Diaz.  Martinez reportedly called Diaz the N-word more than thirty times, referred to him as "mayate," and told him, "I hate you [N-word]."

79.    In October of 2015, Diaz was training a new employee when Martinez interrupted them and began to curse at Diaz, calling him the N-word and telling him that "[N-word]s are shit." Martinez continued to approach Diaz, clenching his fists and threating Diaz with violence, even as Diaz threw his hands up in a neutral position.  After Diaz reminded Martinez that he was on surveillance, Martinez left.  On October 17, 2015, at approximately 6:00 a.m., Diaz wrote an e-mail to complain that he felt unsafe around Martinez as a result of the incident.  He further identified the employee he was training as a witness and directed the recipient to review the security footage to confirm what had taken place.  However, Tesla concluded that it did "not need to do any formal investigation" into the matter, and HR did not interview the employee that Diaz was training, nor did they review the security footage.  Instead, both Martinez and Diaz were given verbal warnings and sent on their way.

80.    Diaz further witnessed racist caricatures and white supremacist imagery that were drawn or etched in various communal spaces at the Fremont factory, in full view of both himself and Tesla management. One of the drawings relied on early twentieth-century racial stereotypes about Black people, and featured a dark-skinned figure with oversized lips and a bone in its hair. The drawing, placed in an area near Diaz's workstation, included a racist caption, "Booo," suggesting that Black individuals are undesirable or unpleasant.

81.     In January of 2016, Diaz discovered this particular drawing near his workstation. Diaz immediately recognized it as a "picaninny," a racist depiction of a black child.   Diaz further discovered that the source of the drawing was the same Tesla supervisor that had previously harassed him, Martinez.   Diaz subsequently confronted Martinez, asking him to remove the drawing.  Martinez admitted that he made the drawing but refused Diaz's request, dismissing the drawing as "just playing" and admonishing Diaz for taking offense, complaining that "you people can't take a joke."  Diaz reported this behavior to Tesla Supervisor Michael Wheeler.  However, because Tesla hired Diaz as a subcontractor by using Citistaff and nextSource as intermediaries, he was told that he could not complain directly to Tesla's HR department.  Diaz then wrote an e-mail to his Supervisor, Romero, as well as liaisons at nextSource and Citistaff, informing them about the image, calling it a "racist effigy and drawing."  He further noted that Martinez admitted to drawing it.  In response, a liaison for nextSource recommended that Martinez be fired.  However, Tesla Supervisor Victor Quintero ("Quintero"), in consultation with others, decided only to suspend Martinez and issue a written warning.  Later, Quintero stated that he could not recall if he had ever seen the written warning he purportedly gave.

82.     Diaz further experienced racist harassment from Tesla Supervisor Robert Hurtado ("Hurtado"), who referred to Diaz as "N-word" more than thirty times and also addressed him as "boy."  Hurtado further told Diaz that "[y]ou [N-word]s are lazy."  Diaz reported this behavior to Joyce DelaGrande ("DelaGrande"), Hurtado's Supervisor at Tesla.   However, instead of reprimanding or otherwise disciplining Hurtado, DelaGrande determined that the real problem was instead with Diaz's "customer service," citing the fact that her own leads thought Diaz had a "huge attitude" and was not sufficiently "approachable."  On February 16, 2016, DelaGrande wrote an e-mail to Diaz's Manager, Romero, and communicated to him that she would "prefer that [Diaz] is

placed somewhere else." Romero responded that he was "in the process of doing that real soon." Several days later, DelaGrande pressed the issue further, notifying Romero that Diaz was still working in the same position and wanting to know when he would be replaced.

83.     In the spring of 2016, Diaz was demoted from his supervisory position, despite the fact that he had no negative performance reviews or prior disciplinary issues. Diaz believed this demotion occurred in retaliation for his complaints alleging racial harassment by Tesla employees. Finally, unable to stand the constant abuse and racial harassment and discouraged by Tesla's refusal to investigate, Diaz resigned from his position at Tesla in May of 2016.

84.     Diaz's son, Demetric Di-az ("Demetric"), also faced similar issues during his time at the Fremont factory. In August of 2015, Diaz informed Demetric that a staffing agency, West Valley Staffing Group ("West Valley"), had listed openings for positions at Tesla's Fremont factory, and encouraged Demetric to apply. That same month, Demetric started work at the factory as a production associate after signing an employment contract through the agency.

85.     Although initially excited to be working for Tesla, Demetric began to experience daily racial harassment in the form of slurs and epithets, including being called the N-word, as well as observing other Black employees called the same. For example, when Demetric's father, Diaz, brought him lunch at work, Demetric's own shift supervisor remarked, "All you fucking [N-word]s – I can't stand you motherfuckers."

86.     When Demetric complained to West Valley, the staffing agency did nothing, so Demetric complained directly to his supervisor about the harassment he had received from him and others at the factory. However, the supervisor simply told Demetric that he would be fired if he didn't like the way he was being treated at Tesla. After this confrontation, the racial harassment significantly increased, and Demetric was suddenly issued disciplinary warnings for alleged

misconduct that had never presented an issue prior to his complaint.  Finally, within a week of making his complaint, Demetric was fired for "breaking the rules."  Employees who had been accused of similar infractions were not terminated, however.

87.     Lamar Patterson ("Patterson") joined Tesla in January of 2016 as an Elevator Operator.   Patterson also faced many of the same issues that Diaz and Demetric encountered as Black employees of Tesla and discussed herein.  The racist harassment he encountered at the Fremont factory included repeated use of the N-word and other racist epithets, racist caricatures drawn or etched onto objects in communal spaces, and racist effigies.  Patterson likewise reported this behavior to Tesla Supervisor Romero, but nothing was done to stop the abuse.  Indeed, after Patterson complained, the abuse he suffered only increased in magnitude.  Facing a choice between suffering daily racist harassment and leaving Tesla, Patterson chose the latter, quitting his job in August of 2016.

88.     On December 26, 2018, Diaz, Demetric, and Patterson jointly filed an amended complaint for damages in California federal court against Tesla and several staffing agencies, alleging racial discrimination, racial harassment (hostile work environment), retaliation, failure to investigate and prevent discrimination and harassment, wrongful termination, and constructive discharge in violation of Section 1981, among other claims, based on the conduct described herein.

89.     After the parties stipulated to arbitration and dismissal of the claims brought by Patterson and Demetric, respectively, the remaining parties took the case to trial.  On October 4, 2021, the jury ordered Tesla to pay $6 million in compensatory damages and an additional $130 million in punitive damages to Diaz.  In its verdict, the jury found that, among other things, (i) Tesla subjected Diaz to a racially hostile work environment; (ii) Diaz was subject to a hostile work environment caused by a  non-immediate supervisor or coworker; (iii) Tesla committed a civil

rights violation in a contractual relationship; (iv) Tesla failed to take all reasonable steps necessary to prevent Diaz from being subject to racial harassment; and (v) Tesla negligently supervised or negligently continued to employ Martinez and that action harmed Diaz.

90.     In a public response posted to Tesla's website, Tesla's former Vice President of People, Workman, essentially admitted that Tesla employees engaged in the reprehensible conduct during Diaz's tenure, acknowledging that "we do recognize that in 2015 and 2016 we were not perfect."   Workman further admitted that Diaz "made written complaints" that were "well-documented in the nine months he worked at our factory."

91.     Tesla immediately appealed the jury's verdict, seeking judgment as a matter of law or, in the alternative, a new trial and a reduction in the amount of damages.   In an order dated April 13, 2022, U.S. District Court Judge William H. Orrick denied Tesla's motion for judgment as a matter of law and refused to order a new trial.   While Judge Orrick agreed to reduce the amount of compensatory damages awarded by the jury, he specifically declined to reduce the award to Tesla's requested amount of $300,000, instead remitting the award to $1.5 million.

92.     Similarly, Judge Orrick refused to reduce the punitive damages amount to Tesla's requested "one-to-one ratio" to compensatory damages, instead opting to reduce the award just enough to ensure that it "stays within constitutional guardrails."   In his punitive damages analysis, Judge Orrick noted that, "[d]espite Tesla's attempts to characterize it any other way, *its treatment of Diaz—and the treatment of its supervisors and employees (or contractors)—falls high on the reprehensibility scale, requiring a high ratio*."   Judge Orrick thus concluded that "the Constitution permits a 9:1 ratio," and reduced the punitive damages award to $13.5 million accordingly.

93.     In his order denying Tesla's motion for judgment as a matter of law, Judge Orrick further noted that the extent and severity of the racist abuse suffered by Diaz "was disturbing," and

that Tesla's Fremont factory was "saturated with racism."  Judge Orrick also highlighted the fact that Tesla "supervisors, and Tesla's broader management structure, did little or nothing to respond" and even "joined in on the abuse."

**A Former Project Manager Details Racial Harassment and Retaliation at Tesla**

94.     Marc Cage ("Cage") is an accomplished Quality Control and Quality Assurance specialist with over a decade of wide-ranging experience in the construction industry.  Cage has previously worked as a Project Manager for U.S. Department of Defense contractors in Afghanistan, and as a Quality Field Manager for a top engineering firm where he was twice recognized for his accomplishments.  Cage is Black.

95.     Tesla hired Cage in November of 2018 as a Staff Construction Quality Assurance/Quality Control Project Manager at Tesla's Sparks, Nevada, Gigafactory.  Cage oversaw procedures on all new construction operations, and was required to ensure that all new construction at Tesla complied with applicable laws, regulations, and codes.

96.     However, Cage quickly learned that Tesla was only concerned with production speed, even if it meant cutting corners on compliance issues.  During his time at Tesla, Cage identified and reported numerous safety and building code violations, the use of unqualified inspectors to perform sham inspections, and improper maintenance of pressure vessels.  When Cage reported these myriad issues to his superiors at Tesla, they repeatedly ignored him.

97.     From the beginning of his employment at Tesla, Cage was also subjected to hostile and racist treatment by Tesla employees.  For example, in November of 2018, a white construction superintendent accused Cage, who was one of only two Black employees on a thirty-person team, of stealing his property.  Instead of asking him politely about the stickers, however, the superintendent chose instead to break into Cage's locked filing cabinet to search for them himself.

This action was witnessed by numerous other Tesla employees and was highly embarrassing for Cage and had no legitimate justification.  When Cage reported the incident to the Director of Construction and the Quality and Commissioning Manager, they took no action.

98.     Weeks later, in December of 2018, a construction manager handed out construction engineering team jackets to everyone on Cage's team of roughly twenty-five people, with the exception of Cage.  Cage further noted that three members who joined the team later were still given jackets, while two other employees were given the jacket size that Cage had requested. When Cage asked the construction manager why he had been singled out and not given a jacket, the construction manager screamed at Cage and threatened to fire him.  Cage reported this incident to the Director of Construction, who again took no action.

99.     Further, Tesla's Quality and Commissioning Manager, who was also Cage's Supervisor in 2019, routinely referred to Cage's few Black colleagues at the factory as Cage's "brothers."  The manager was aware that these colleagues were not biologically related to Cage, and the manager never referred to any individuals of a different race in the same way.

100.    Cage further saw that the bathrooms at both the Gigafactory and the Fremont factory were covered in racist graffiti during his tenure at the Company.  Indeed, Cage noted that virtually every restroom in Tesla's Fremont factory in particular contained writings or carvings of racist symbols or slurs, including swastikas and various iterations of the N-word.  Cage further noted that Tesla did nothing to obscure or otherwise remove the graffiti for months at a time. Because the restrooms were used by most Tesla employees, including managers, the Company was undoubtedly aware of the graffiti but took no remedial action.

101.    Around January 2020, at Tesla's Fremont factory, Cage stopped work on a project that was not proceeding in compliance with the applicable regulations.  A subcontractor for Tesla

was carrying out the project, with Tesla managers overseeing it.  The subcontractor became enraged at Cage and referred to him as "boy" as he threatened him with violence.

102.    When Cage nonetheless persisted in reporting safety and code violations to responsible parties at Tesla, including Tesla's Director of Construction, Tesla transferred Cage out of the quality department entirely with little explanation.  In February of 2020, Tesla demoted Cage to the position of Superintendent at the Gigafactory in an effort to halt his reporting activities, where he was responsible for closing out building permits for inactive projects.  In May of 2020, Tesla again transferred Cage to the Education Department as a construction educator, again with little to no explanation.

103.    During this time, members of Tesla management further discriminated against and harassed Cage on the basis of his race.  After Cage had repeatedly pointed out construction deficiencies to his new manager and been berated or screamed at in response, the manager resorted to making a racist comment about the appearance of "BBQ" on Cage's expense report.  The manager's comment was an unnecessary and intentional reference to a racial stereotype about the purported eating habits of Black people.  When Cage reported this transgression to Tesla's Director of Construction, he received no response.

104.    In September of 2020, shortly after Cage reported this incident, the same manager placed Cage on a Performance Improvement Plan, citing nonexistent deficiencies in Cage's teaching methods as a construction educator.  Believing this rationale was merely a pretext to retaliate against Cage for reporting his manager's earlier racist harassment, Cage challenged the stated basis for the Performance Improvement Plan.  After Cage did so, Tesla management quickly altered the stated rationale, instead citing communication issues with other employees, which confirmed Cage's suspicions.

105.    In November of 2020, a Tesla HR Director named Vincent Woodard called Cage to tell him that "things had changed," and there was no longer a position for him at Tesla.  Tesla subsequently terminated Cage on December 5, 2020, about one month after this call.

106.    On February 18, 2022, Cage filed a lawsuit for damages alleging racial discrimination, racial harassment, retaliation, failure to prevent discrimination and harassment, wrongful termination, whistleblower retaliation, negligent infliction of emotional distress, and intentional infliction of emotional distress in violation of FEHA and California public policy based on the conduct described herein.

**Additional Employees Detail Widespread Sexual Harassment and Retaliation at Tesla**

**Jessica Barraza**

107.    Jessica Barraza ("Barraza") began working at Tesla as a Production Associate on the Fremont factory floor.  Throughout her three years of employment with the company, she experienced near daily instances of workplace sexual harassment.  Moreover, Tesla leads, supervisors, and HR either participated in or knew about the harassment but did nothing to prevent or address it.  When Barraza reported or rebuffed this conduct, she was retaliated against by being denied certain privileges and benefits that were afforded to other female employees who tolerated the harassment.

108.    Specifically, Barraza experienced ogling and overheard sexually suggestive commentary from male employees either directed to her or made about her appearance to others. Comments directed at her include the phrases: "Go on, sexy," "Damn, girl," "Hey mama," and "What's your name," while comments directed at others about her include the phrases: "That bitch hella thick," "Look at those titties," "She's got cakes," "She's got fat-cakes," "She's got fat titties,"

"Girl has an onion booty," "She has a fat ass," or "Oh, she looks like a coke bottle."  Other times, male employees would make whistling noises or simply stare at her suggestively.

109.    Employees at Tesla have also repeatedly and aggressively propositioned Barraza at various times during the course of her employment.  For example, a factory lead sent her flirtatious text messages calling her "sexy" and commenting suggestively about her body.  When she rejected his advances and informed him that she was married, he simply responded, "You know this only makes me want you more, right?"  Another male coworker offered to be her "king at work," and told her that he didn't mind that she was married.

110.    Yet another coworker persistently made sexual comments to her throughout the day, including, "Oh, you're sexy," and "Damn, girl."  Tired of the constant harassment, Barraza reported this last coworker's behavior to her Lead, Daniel Mays ("Mays"), in mid-to-late 2019. Mays told her he would speak to the harasser about the behavior.  However, the coworker's conduct did not stop, and Barraza was eventually forced to confront the coworker herself.  Tesla later promoted that same coworker to a lead position.  Around the same time, Barraza complained to Mays about another male coworker's practice of getting uncomfortably close to her while they were working on the production line.  To her knowledge, however, no disciplinary action against the coworker was taken by Tesla management.

111.    In addition to harassment by her coworkers, Barraza was sexually harassed and objectified by her superiors at Tesla as well.  At the beginning of 2020, Barraza was informed by her former Supervisor, Josh Canelas, that her current Supervisor, Ernie Tambo ("Tambo"), referred to her and other women under his supervision as "bitches."  Later that year, Tambo reassigned Barraza to work near Tambo's friend, a man named Skylar.  Barraza learned after the fact that the

only reason Tambo had assigned her to this post was because he was attempting to set her up with Skyler, who had a "crush" on Barraza, as a favor to his friend.

112.    This sexually objectifying behavior from Tesla supervisors continued throughout 2020.  For example, in August of that year, another coworker began repeatedly and openly staring at Barraza's chest.  When Tesla Supervisor Karlos Tapia ("Tapia") overheard Barraza tell the harasser to stop, Tapia informed her that she was the one to blame for wearing "shirts that draw attention to [her] chest."  Barraza, however, was simply wearing the work-shirt that was issued to her by Tesla as part of her uniform.  Another Tesla Supervisor, Kris Panera ("Panera"), flirted overtly with the women under his supervision, including Barraza.  For example, when Barraza was waiting for a meeting to start, Panera walked up behind her and said, "Hey girl."  When she turned to look in his direction, he stated, "That's not a married woman's reaction."  Panera further used his status as a Tesla supervisor in an attempt to coerce Barraza to accept these advances, telling her, "You know I control your job, right?  I'm basically in charge of your career."

113.    The sexual harassment Barraza experienced began to escalate in severity, eventually becoming physical.  During one instance, a male coworker followed Barraza into the factory parking lot while she walked back to her car after a night shift, despite the fact that the employee had no vehicle of his own to walk back to.  In other instances that occurred up to several times per week, male coworkers would purposefully brush up against Barraza's body, including by pressing their groins or hands against her backside.

114.    Tesla supervisors remained ambivalent and dismissive of Barraza's complaints, while others retaliated against her in various ways.  In one particularly egregious instance, a coworker refused to make room for Barraza to move past him down a narrow stairwell that he was blocking.  As she attempted to squeeze by, he grabbed her by the sides of her waist, lifted her into

the air with his hands pressing against her torso and under her breasts, and set her down on his other side.  Barraza complained about this incident to her then Supervisor, Tambo, but no disciplinary action was taken.  When Barraza complained to Tambo again about a male coworker cursing and yelling at her, he simply moved Barraza to a new and less desirable location at the factory rather than discipline the harasser.  This move negatively affected her conditions of employment and career prospects at Tesla.

115.    In another instance, a female employee began to flirt with Barraza, culminating in an incident wherein the employee placed her hand on Barraza's backside.  When Barraza reported this to her then Supervisor, Panera, he concluded that it was merely a "cultural difference," and told her that he would not be reporting the incident to HR despite her request that he do so.

116.    Another employee surreptitiously positioned one of his legs in between Barraza's own as she clocked in from her lunch break.  When Barraza stepped back from the clock, she felt his leg brush against her inner thighs and became startled.  Clearly intending this reaction, the coworker simply laughed at her surprise and offered a half-hearted apology.  Feeling anxious and violated, Barraza reported this incident to her acting Supervisor, Manny Yepiz ("Yepiz"), and to her Lead, Tony Davis ("Davis").  Barraza further reported the incident via e-mail to Tesla's HR department.  However, Barraza received no follow-up regarding the incident from Yepiz, Davis, or HR, despite being told by Yepiz that he would speak with her to document her account of the incident the next day.  To Barraza's knowledge, no action was taken to address her complaint, disciplinary or otherwise.  This same supervisor later disciplined Barraza for "job abandonment" after she went to the hospital for a panic attack triggered by the harassment she experienced at Tesla.

117.    Barraza also reported that David Ihley ("Ihley"), her most recent Supervisor at Tesla, engaged in sex discrimination against her and other female employees.  As part of an investigatory interview into Ihley's conduct, Barraza told Tesla HR representatives that she witnessed Ihley showing favoritism toward women who dressed scantily and acted flirtatiously. For example, she noted that Ihley allowed those women to use their cellphones while working, leave work early, and receive otherwise lenient treatment in comparison to other women.  Barraza further stated that it was generally understood among her and her female colleagues that tolerating sexually inappropriate behavior from Ihley and other supervisors was a way to gain access to these benefits.  Moreover, doing the opposite—that is, refusing or complaining about the unwanted advances and flirtatious comments from supervisors, as Barraza did—resulted in the denial of these benefits.  During this same HR interview, Barraza further told them that she experienced near-daily episodes of sexual harassment by male coworkers.  When she asked whether her numerous complaints about this behavior had been received by HR, the representatives simply told her that the e-mail address she had been instructed to send complaints to—hr@tesla.com—was no longer active, and therefore Tesla had either never read or never received her complaints.

118.    On November 18, 2021, Barraza filed a lawsuit against Tesla seeking injunctive and declaratory relief and damages for sexual harassment, failure to prevent sexual harassment, sex discrimination, retaliation, and wrongful termination in violation of FEHA based on the conduct described herein.

**Alisa Blickman**

119.    Another employee detailing her harrowing experience at Tesla was Alisa Blickman ("Blickman").  Tesla hired Blickman in late February of 2021 as a Production Associate working on the Fremont factory floor of the Company's seat-making facility.

120.     Blickman was immediately confronted with a toxic culture in which men in the factory openly ogled and loudly commented on the bodies of female employees.  For example, on her first day of work, Blickman witnessed male employees openly taking photographs of a female colleague's backside, and then circulating those photos around the factory.  Ironically, at her employee orientation, the sexual harassment training materials provided by Tesla featured instructional videos that depicted women as the harassers of men.  Her initial experience at the factory proved to be the norm throughout her time at Tesla.  According to Blickman's complaint, she "did not work a single day at Tesla without hearing such comments" from male employees, including sexually explicit phrases such as, "I'd like to bend her over and spread her cheeks," and "I would fuck her from the back."

121.     In addition to loudly commenting about women's bodies to one another, male employees routinely made comments directly to female employees themselves, commenting on their looks, whistling, and making unwanted advances as the women walked past them.  A Tesla lead approached Blickman to inquire if she was single.  Another Tesla lead-in-training informed her that he liked to "spit on a girl's face when [he's] fucking her," and indicated to her that he had a preference for "rough" sex.

122.     The conduct from male employees, including leads and supervisors, also included unwanted physical touching.  For example, Tesla employees, including a Tesla lead, would routinely bump into Blickman on purpose in a clear attempt to initiate sexual contact.

123.     Blickman's first Supervisor, a man named Alex Nguyen ("Nguyen"), would place his hand on her lower back virtually every day at the start of each shift and rub her lower back.  Nguyen engaged in this behavior without warning by approaching Blickman from behind and remaining silent.  Nguyen would also place his face extremely close to Blickman's when

instructing her.  Blickman saw that Nguyen did not treat male employees in a similar manner. Blickman learned from others at the factory that Nguyen had a history of sexually harassing women, who were apparently transferred if they complained about his behavior.

124.    One morning during a team building exercise, Nguyen placed his mouth close to Blickman's ear without warning and whispered in a sexual tone, "I hear you don't like to scream loud enough."  Blickman was startled, and simply exclaimed, "What?" to him with an appalled expression on her face.

125.    A few days after this incident, Nguyen introduced her to a new Supervisor, George Knott ("Knott"), who would be replacing him as Blickman's supervisor.  Nguyen disparaged Blickman to her future supervisor, claiming that she was "not a valuable team member," and should be transferred to the least desirable section of the factory in extreme summer heat.  When Blickman asked him if the transfer was mandatory, Nguyen shouted at her, "We can *make* it mandatory!" Afterward, Knott acknowledged that the reason Nguyen was acting hostile toward Blickman was because she rebuffed his inappropriate advances.  However, Knott failed to take any action beyond assuring Blickman that any transfer would be voluntary.

126.    When Blickman reported to Knott that a male employee named Dennis was repeatedly brushing against her and making lewd comments about her appearance, Knott agreed to transfer the offending employee, but failed to ensure that the transfer kept the man away from Blickman entirely.

127.    In October of 2021, Blickman went on COVID-19 leave.  However, due to the constant sexual harassment she faced at work from Tesla employees, she could not stand the thought of returning.  Blickman filed a request with HR representative Ellen Welty ("Welty") to go on stress leave, which included a description of the sexual harassment she witnessed and

experienced at the Fremont factory as the cause of her anxiety.  She sent Welty additional requests to be transferred away from her harassers.  To Blickman's knowledge, Welty never responded to these requests.

128.    The next month, Blickman received a letter from Tesla, dated November 9, 2021, informing her that she may be terminated for job abandonment if she did not contact HR or her manager by the end of the day on November 11, 2021.  Because she was understandably unwilling to return to an environment in which she was subject to constant sexual harassment, Blickman was subsequently terminated for job abandonment.

129.    On December 14, 2021, Blickman filed a complaint against Tesla for damages and attorneys' fees, stating claims for sexual harassment, failure to prevent sexual harassment, retaliation, discrimination, and wrongful termination in violation of FEHA and California public policy based on the conduct described herein.

**Alize Brown**

130.    Tesla hired twenty-one year old Alize Brown ("Brown") through a third-party staffing agency in November of 2020 to work in the Fremont factory castings department.  Brown worked a twelve-hour night shift alongside Carl, a male employee.  At the time, Brown was a new mother to a three-month-old child.

131.    Shortly after she started work, Carl began following Brown on her trips to the bathroom.  Later, he began to make comments about her breast-feeding by calling her a "cow" and saying that she was "milking."  When her breast milk leaked through her shirt, he would make comments like, "I see you're milking today."  He would move his eyes up and down her body and make inappropriate comments about her body throughout their shift together.  He would further make sure to reach for a particular component at the same time that she reached for it.  In response,

Brown simply ignored him and tried to remain professional. She even went so far as to purchase an oversized jumpsuit to obscure her figure in an attempt to stop Carl's incessant commentary. However, the remarks and ogling continued unabated.

132.     Having reached her limit with Carl's behavior, Brown reported Carl's inappropriate comments to her Supervisor, Daniel Grey ("Grey"), asking him to speak to Carl in an effort to get him to stop. However, Grey, who himself had a habit of ogling Brown's body, simply told her to get back to work. Grey made no inquiry into the nature of the inappropriate comments Brown had mentioned. Discouraged, but determined to make the best of the job for the sake of her child, Brown returned to work under these conditions. Even after Brown managed to obtain a transfer to a different section of the factory, Carl managed to obtain a transfer to that same section, where he continued to harass her. With no one at Tesla willing to keep Carl away from her, Brown resorted to asking her supervisor for permission to work intermittently in other parts of the factory whenever the castings machine at her station was inoperable. Brown did this in an effort to reduce the amount of time she would have to endure unmitigated harassment from Carl during her shift.

133.     Other male employees at the factory would also make unwanted advances and comments toward Brown. Approximately every other shift, Brown heard such comments as, "Oh, wow, you're beautiful," and, "Are you single?" Brown made it clear to these men that their advances were unwanted, yet they still persisted. These advances escalated in severity over time. At one point, a male employee who smelled like alcohol began following her out to her car after her shift concluded in the early morning hours, asking for a ride.

134.     After only several months at the Fremont factory, Grey told Brown that her contract was up, and that she would be terminated. However, Brown was not on a short-term contract, and her recruiter at her staffing company had not told her that her contract would be expiring. When

she asked a different Tesla supervisor if he knew why she was being let go, he told her that Tesla records indicated that she was being terminated for leaving her workstation too often.

135.     Brown was distraught and confused.  In spite of the difficulties she experienced as a new mother and the constant harassment she faced at work, her performance at Tesla was exemplary in comparison to her peers.  The only major difference Brown noted between herself and other female employees who had retained their jobs at the factory was that they had responded favorably to sexual harassment from Tesla employees, leads, and supervisors, whereas she had not.

136.     On December 14, 2021, Brown filed a complaint against Tesla for damages and attorneys' fees, stating claims for sexual harassment, failure to prevent sexual harassment, discrimination, retaliation, and wrongful termination in violation of FEHA and California public policy based on the conduct described herein.

**Jessica Brooks**

137.     Jessica Brooks ("Brooks") started working at Tesla in June of 2021 as a Production Associate at the Company's seat-making facility in the Fremont factory.

138.     Brooks experienced harassment at Tesla almost immediately as a new-hire.  During her employee orientation, she and other employees participated in warm-up exercises that included performing squats.  When she performed this exercise, a man in the back of the room grunted at her and exclaimed, "woohoo – yeah!" in a sexually suggestive manner.  When asked to give feedback to the Company on her orientation experience, Brooks told Tesla that she felt uncomfortable due to this incident, and that Tesla should stress the importance of sexual harassment training.

139.    When Brooks began working on the production line, her male coworkers would whistle at her, ogle her, and make comments about her body as they walked past her workstation. She also learned from a colleague at the factory that her own Manager, Knott, was making sexually suggestive comments to other men at the factory about her body, imploring them to "[c]heck out the new girl" and describing her body to them.  As a result of the manager's suggestion, male coworkers would loiter around her workstation in order to ogle her from behind.  Later, this conduct escalated to physical touching, as male coworkers would purposefully brush up against her body in order to initiate sexual contact with Brooks.

140.    After only a couple of months on the job, Brooks resorted to tying flannel shirts around her waist and stacking boxes behind her workstation in an effort to obscure her backside from the view of her coworkers.  One male employee, noticing that Brooks had taken to wearing flannel shirts around her waist, informed her that she had to remove them because they presented a safety hazard.  However, Brooks saw numerous other women at the factory tying sweaters or other articles of clothing around their waists with no issues.  When Brooks refused, the male employee simply dropped the issue, indicating that his safety concerns were simply a pretext for the employee to get Brooks to uncover herself.  Feeling humiliated by this encounter, Brooks went to the restroom to cry, causing a manager to reprimand her for spending too much time in the restroom.  When she disclosed the harassment to him as the cause of her distress, the manager simply left her alone.

141.    Another Tesla lead noticed Brooks' behavior and told her that he was aware that she was feeling uncomfortable.  This lead also informed her that other female employees experienced unwanted attention from their male coworkers, explaining that "all the guys are like that as soon as they see 'fresh meat.'"  Another Tesla lead insinuated to one of Brooks' male

coworkers that Brooks "belonged" to him, reducing Brooks to an object of conquest for the men at the factory.

142.    One coworker, a man named Roberto, was particularly aggressive in his advances toward Brooks.  At various points, Roberto would make sexual jokes and whistle at Brooks, even going so far as to lean uncomfortably close to her in an effort to smell her perfume.  When she recoiled from this last transgression, he simply explained, "I'm a man, and, you know…."  Later that day, Roberto again attempted to initiate contact with Brooks by purposefully running his cart into her.  When she again rejected his flirtatious advances and rebuked him for his unprofessional behavior, he responded with a thinly veiled threat.  Tesla leads and managers witnessed this exchange.  Other coworkers, whom Brooks new to be friends of Roberto, collectively ogled her while one member made an obscene hand gesture.  Another member of this group told Brooks in the middle of a training session that he found her tattoos to be "really sexy."

143.    Brooks reported Roberto's behavior to her supervisor, who instructed her to report the misconduct to Tesla HR, which she did.  However, Brooks discovered that the HR representative, Ellen, was already aware of the harassment and Brooks' attempts stop it, including the fact that Brooks had placed boxes around her workstation.  HR informed Brooks that an investigation was underway.

144.    The same day Brooks made her complaint to HR, her Manager, Louis, informed her that she would be transferred to a new work area, where she would have to learn to perform a new role at the factory, essentially requiring her to start over from scratch.  When she asked why she was essentially being punished for being a victim of harassment, Louis gave her no response.  Later, she learned that Louis had written her up for an "occurrence."  After making her complaint,

Brooks further noticed that Roberto and his group of friends treated her more negatively than before, with one admonishing her for complaining by shaking his head in disbelief at her actions.

145.    Brooks was subsequently transferred to the Manual line.  After her transfer, male employees no longer loitered at her old workstation.  Instead, they gravitated toward her new station, sometimes traveling from all the way across the factory to stare at her body or to make unwanted advances.  One production lead stared at Brooks so constantly that she felt as though she were being stalked.  Another employee covertly snapped photos of her with his phone.

146.    Weeks after her complaint, HR informed Brooks that its purported investigation was complete, but that they could not disclose any details about it to her.  However, Tesla HR failed to take any steps to protect her from the ongoing harassment at the hands of Tesla employees and managers.

147.    On December 14, 2021, Brooks filed a complaint against Tesla for damages, including attorneys' fees, and injunctive relief, stating claims for sexual harassment, failure to prevent sexual harassment, retaliation, and discrimination in violation of FEHA based on the conduct described herein.

**Michala Curran**

148.    Tesla hired eighteen year old Michala Curran ("Curran") through a third-party staffing agency in December of 2019 as a Production Associate applying paint to car bodies at the Fremont factory.  At the beginning and end of each shift, she and other employees working at the paint station would change into and out of bodysuits in a nearby booth.

149.    Curran's Supervisor, Ron, frequently positioned himself behind her and stared at her as she changed out of her bodysuit at the end of her shift.  Ron further made comments about her body, informing her that she had a "big butt," that she should "shake [her] ass," and suggesting

that she become a stripper.  On approximately two occasions, Ron attempted to slap Curran on her backside, usually while she undressed after a shift.  Curran would dodge his hand and move away from him in response.  This behavior made Curran extremely uncomfortable, but because of Ron's status as a supervisor and the fact that she was young and new at the factory, she was afraid to complain.

150.    Curran's male coworkers also made comments about her appearance and body, and many would stare at her suggestively or yell for her to come over to them.  Specific comments made to Curran by her male coworkers included phrases, such as: "Oh, this white bitch has ass," "She's hella thick," and "Your tits are small, but you have a big ass."  Curran noted that this behavior appeared to be typical for male employees who saw any female employee passing by them.  In one particularly egregious instance, a male coworker stationed in her area propositioned Curran by inviting her to engage in sexual activity with him in the Fremont factory parking lot. Curran felt extremely uncomfortable and rejected his proposal.

151.    After two months at work, Curran became ill and took time off to recover.  Faced with a choice between going back to the constant harassment at work and quitting, she determined that no job was worth being sexualized and insulted for.  Curran therefore quit her job at Tesla.

152.    On December 14, 2021, Curran filed a lawsuit against Tesla for damages and attorneys' fees, stating claims for sexual harassment, failure to prevent sexual harassment, discrimination, and wrongful termination in violation of FEHA and California public policy based on the conduct described herein.

**Eden Mederos**

153.    Tesla initially hired Eden Mederos ("Mederos") as a Concierge in its Centinela Service Center in Los Angeles, California.  She was promoted to Lead Service Advisor prior to

the end of her employment.  Mederos was tasked with the responsibility of training new hires and employees at Tesla's Los Angeles service centers, including service assistants, service advisors, concierges, managers, and parts.  Each Tesla service center Mederos encountered had a male-dominated atmosphere in which lewd jokes and comments about women's bodies were the norm. Virtually all service managers were male.

154.    Mederos experienced frequent sexual harassment at Tesla service centers.  As Mederos walked through these shops, male employees would whistle and shout "Damn" while she passed by them.  Mederos' coworkers told her that if she "showed [her] ass" or "showed a bit of skin" to male customers, she "would have a rich husband" and "customers would be nicer" to her. Technicians would belittle her capabilities, telling her that "[g]irls don't know cars," and "[a] pretty girl shouldn't be working in a service center."  Further, because Mederos has difficulty hearing certain frequencies and often asked people to repeat themselves, her coworkers assumed that she was unable to hear them and felt comfortable saying offensive and sexist remarks about her well within her earshot.

155.    The harassment Mederos experienced further involved unwanted touching of both her person and property.  For example, Mederos had to remove the dinosaur miniatures she decorated her desk with after technicians continued to rearrange them in sexually suggestive positions.  Technicians also attempted to throw coins down Mederos' shirt, an activity that they also subjected other women in the office to.  To discourage this behavior, Mederos took to wearing sweaters to work.  Technicians would also approach Mederos and begin rubbing her shoulders, telling her that she looked stressed.  Mederos began sitting on the floor with her back to the wall in an effort to deter this unwanted touching.

156.    One technician, a man named Jonathan, frequently made comments about Mederos to the other technicians because he believed that she couldn't hear what he was saying.  His remarks included the phrase, "I've never seen a white girl with an ass like her," and, upon learning that she had Cuban ancestry, "That explains why you have an ass."  He made these comments repeatedly. Two other technicians, Chris Carpenter and a man named Aaron, would sit together and wait for Mederos to pass by.  When she did, they directed comments about Mederos' body to her using a slew of sexually explicit words and phrases.  When Mederos was promoted, these two technicians would speak about other female employees using the similarly explicit language, well within earshot of Mederos.  Occasionally, Mederos would have to ask technicians questions in order to do her job.  One technician, Eric, would wink and bite his lip while she spoke to him, attempting to flirt with her instead of providing her with the information she requested.

157.    Mederos could not even enjoy her lunch break without coworkers harassing her. After she brought a banana into work one day for lunch, coworkers began joking that the banana was a penis.  Soon, it became impossible for Mederos to eat anything at work without hearing comments such as, "How much can you fit in your mouth?" and "I know that you can take a bigger bite than that."  Mederos subsequently stopped bringing food into work, and often skipped lunch altogether due to the lack of restaurants in the area.

158.    Mederos further noted that the sexually charged atmosphere she experienced while working for Tesla was exacerbated by public communications from defendant E. Musk.  Defendant E. Musk would frequently tweet out sexually suggestive jokes and comments, which employees at the service center would read and share amongst themselves.  These tweets included frequent references to the number "69," as well as pointing out that Tesla's line of cars, the Models S, 3, X, and Y, spell out the word "SEXY."  Mederos reported that her coworkers seized onto this last

communication in particular, referring to everything as "sexy," including random objects around the service center.

159.    Tesla HR reportedly took a hands-off approach to Tesla service centers, and had a reputation for being unresponsive.  On a number of occasions, Mederos asked her managers for HR's phone number.  Her managers responded by either claiming they did not know the number or by promising to get back to her with the information, but neglecting to follow up with her.  The lack of HR presence at Tesla service centers manifested as a marked disrespect for company policy on the part of employees.  Mederos reported that her coworkers would joke about the mandatory sexual harassment courses, and that they thought it was funny to deliberately break the rules.  For example, technicians would touch Mederos' arm or leg and remark facetiously, "Oh no, I'm sexually harassing you," or "I better not get too close.  I don't want to sexually harass you."

160.    Mederos was also harassed by her Manager, Edan Kurzweil ("Kurzweil"). Kurzweil initially showered her with general compliments about her looks.  Over time, his comments became more explicit, including remarking to others about Mederos' backside when she was within earshot.  Kurzweil also deliberately blocked doorways with his body when Mederos and other women were attempting to pass through so that the women would be forced to interact with him.  When Mederos accompanied Kurzweil on a test drive, he placed his hand on her shoulder and instructed her to "be calmer because that is what is expected of a woman."  Kurzweil further belittled and yelled at Mederos regularly because he harbored a dislike for outspoken women.

161.    Mederos reported Kurzweil's behavior to Tesla HR.  Tesla HR representative, Alfonso Ribiero ("Ribiero"), responded to her e-mail by telling her that he wanted to meet with her first to discuss her issues, at which point they could also meet with Kurzweil.  However, when

Ribiero arrived at the Centinela Service Center, he called Mederos **and** Kurzweil into the same room together.   At the meeting, Ribiero characterized Mederos' reasonable complaints as "aggressive accusations."   Moreover, due to Ribiero's insistence that Kurzweil be present at the meeting, Mederos found herself unable to get a word in without being interrupted by Kurzweil calling her a liar or mistaken.   Overwhelmed by this confrontation, Mederos began to cry, and Kurzweil left.   Ribiero instructed Mederos to go home for the day, and that her concerns would be addressed at a later time.

162.   However, Mederos received no further communication from Ribiero, and her complaints were never addressed despite her attempts to reach him.   Mederos was never provided another HR contact, and no one from Tesla HR ever affirmatively reached out to Mederos.

163.   After their meeting, Kurzweil retaliated against Mederos by refusing to officially approve vacation time that she had previously received verbal approval for.   He became increasingly cold and condescending toward her and deliberately made it more difficult to perform her duties by refusing to answer her questions, even though doing so was a requirement of his job. As a result, Mederos was forced to make decisions, including decisions with monetary implications for the service center, that were not her responsibility to make.   In meetings, Kurzweil berated and interrupted her.   When a customer became upset with Kurzweil due to another employee's mistake, Kurzweil wrongly targeted Mederos and screamed at her so aggressively that a technician intervened in an effort to calm him down and protect Mederos.   Kurzweil further denied her leadership opportunities, including the opportunity to train other employees, that she had previously been granted under other managers.

164.   Mederos eventually requested a transfer to a different service center to escape this retaliation, but the ultimate power to approve the request rested with Kurzweil, who denied her

requests repeatedly.  Mederos eventually bypassed Kurzweil by appealing to upper management, which approved her transfer to Tesla's Torrance Service Center.  Prior to her departure, Kurzweil gave her a poor performance review despite her objectively excellent results.  Kurzweil continued to visit her at the Torrance Service Center even after her transfer, where he would sit on her desk and belittle her performance.  He further criticized her during management meetings, undermining her achievements in front of other members of management, including her new managers at the Torrance Service Center, in order to sabotage her career.

165.    Mederos' new Manager at the Torrance Service Center, Mark Miyamota ("Miyamota"), was friends with Kurzweil.  Miyamota routinely made sexual comments about women in the Torrance Service Center and openly attempted to hit on female customers. Miyamota adopted Kurzweil's cold and condescending attitude toward Mederos and gave her negative performance reviews despite the consistently high ratings she received from her peers.  He further denied her leadership opportunities and never promoted her even while he promoted individuals that she herself had trained.  When she asked for a well-deserved raise after being recognized for improving operations at the Torrance Service Center, he refused, telling her that if she was "only in it for the money," she should "quit right now."

166.    Eventually, the pressure and stress that Mederos experienced from the hostile and sexist work environment at Tesla caused her to reach a breaking point.  She began to experience panic attacks at work due to the constant harassment.  Unable to continue subjecting herself to this abuse, Mederos left Tesla in November of 2019.

167.    On October 14, Mederos filed a lawsuit against Tesla for damages and attorneys' fees, stating claims for sexual harassment, failure to prevent sexual harassment, discrimination,

retaliation, and wrongful termination in violation of FEHA and California public policy based on the conduct described herein.

**Samira Sheppard**

168.   Tesla hired Samira Sheppard ("Sheppard") in October of 2020 as a Production Associate at the Fremont factory.  Sheppard was nineteen years old when she began working for Tesla, and was one of only a few women in her work area.

169.   Sheppard experienced daily harassment from her male coworkers at Tesla. Sheppard also experienced harassment at various times from Tesla leads and one supervisor.  Each day, coworkers made comments to Sheppard about her body, including the phrases, "You have such big tits," "Damn, you look good," "Nice body," and "You're gonna be my baby mama," among others.  Several times a week, male coworkers would ask Sheppard out on dates and flirt with her daily despite the fact that she repeatedly rebuked their advances.  This behavior was so objectionable to Sheppard that she became mentally "blank" during work as a way to cope with the constant harassment.

170.   During her first week at work, a male coworker named Anthony began stalking Sheppard at work.  Anthony had noticed that Sheppard and a coworker would often meet up at a particular spot at the end of their shifts, and would wait at the same spot for Sheppard to appear. Anthony would follow Sheppard around the factory; when he could not find her he would bother her coworkers incessantly about her whereabouts.  When Anthony discovered her social media profiles, he told her that he had seen her pictures and complimented her appearance.  Sheppard began arriving and leaving work at odd times to avoid encounter him.  When a friend of Sheppard's reported Anthony's behavior to HR, the friend, not Anthony, was moved to a new location in the factory.

171.    Two male coworkers, CJ and Lerone, would also harass Sheppard on a daily basis. When the two men approached Sheppard and her female friend and asked them on a double date, both women refused.  After this rejection, Lerone commented to Sheppard, "we don't need a serious relationship, but I still want to mess around with you."  The two men continued to make sexual comments and ogle both Sheppard and her friend.

172.    One day, a colleague approached Sheppard and informed her that a male Supervisor named Atuba was telling male employees that Sheppard's nipples were visible through her shirt. Atuba was reportedly encouraging the employees to seek out Sheppard and ogle her.  Sheppard was hesitant to complain because the allegations involved a supervisor and she was new at the factory.

173.    After two months at work, Sheppard went on bereavement leave and subsequently became ill.  While hospitalized, a supervisor or manager contacted her regarding her return to work.  She explained that she was uncomfortable with returning to work in the same area of the factory and asked if she could be moved to another area.  She never received a response.  As a result, Sheppard decided that she was unwilling to return to the constant harassment she faced at the Tesla factory.  Tesla then sent her a letter warning her that she would be terminated if she did not return to work by March 3, 2021.  Sheppard received this letter after the deadline had already passed, and she was ultimately terminated.

174.    On December 14, 2021, Sheppard filed a lawsuit against Tesla for damages and attorneys' fees, stating claims for sexual harassment, failure to prevent sexual harassment, and wrongful termination in violation of FEHA and California public policy based on the conduct described herein.

**Defendant E. Musk Permitted and Encouraged the Culture of Racial and Sexual Harassment, Discrimination, and Retaliation at Tesla**

175.     Through communications directed to members of the public and Tesla employees, defendant E. Musk has encouraged and permitted the pervasive culture of discrimination, harassment, and retaliation that exists at Tesla.

176.     By at least March of 2017, defendant E. Musk was personally aware of the culture of racial harassment and discrimination that existed at Tesla's Fremont factory.  When a former Tesla employee, DeWitt Lambert ("Lambert"), brought an action against the Company stating that he experienced racial and sexual harassment, discrimination, and retaliation at the Fremont factory in violation of FEHA, defendant E. Musk reviewed Lambert's case personally.  Lambert's claims were disturbing, and involved multiple coworkers threatening his life while repeatedly referring to him by the N-word.  When Lambert reported this conduct to HR, no action was taken.  Lambert's complaint further noted that Tesla "failed to enact an anti-discrimination policy and/or failed to distribute it appropriately and failed to effectively train its employees on racial and/or sex harassment or discrimination."

177.     After Lambert filed suit, General Counsel for Tesla, Todd Maron, wrote to Lambert's attorney in March of 2017 with an offer to settle, stating:  "We are willing to pay Mr. Lambert $100,000, but only if we are able to resolve this matter before there is media attention."  The e-mail further noted that "[Tesla] C.E.O., Elon Musk, has reviewed this case personally and ... he is sorry that this case did not get escalated much sooner and he agrees that change is needed."  However, Tesla later fell back on its usual tactic of sweeping complaints under the rug by forcing Lambert into mandatory arbitration and subsequently terminating him from his employment.

178.     Despite defendant E. Musk's reported acknowledgement that "change [was] needed" at Tesla to address the systemic misconduct of its employees and management, his own

internal communications to Tesla employees on the subject of workplace harassment only revealed his intent to reinforce the status quo at the Company. In a May 31, 2017 e-mail directive to employees, titled "Doing the Right Thing," defendant E. Musk reportedly told employees:

> Part of not being a huge jerk is considering how someone might feel who is part of [a] historically less represented group.  ... Sometimes these things happen unintentionally, in which case you should apologize.
>
> In fairness, if someone is a jerk to you, but sincerely apologizes, it is important to be thick-skinned and accept that apology.

Defendant E. Musk also criticized Tesla employees who had previously sued Tesla for discrimination, calling their decision to take legal action, "obviously not cool."  Thus, the message to employees from the very top of Tesla's corporate hierarchy was clear: "doing the right thing" at Tesla meant treating instances of discrimination and harassment as the unintentional result of a misunderstanding between two people, or, at worst, just a case of someone "being a huge jerk," for which the only remedy required is a simple apology.  Meanwhile, those who spoke up about harassment were decidedly "not cool" in the eyes of defendant E. Musk.

179.     Defendant E. Musk also made multiple public statements that female complainants cited as direct influences on the culture of sexual harassment that persisted at Tesla. Specifically, defendant E. Musk made frequent references to sexual acts and sexual objectification in his Twitter posts, many of which were also related to Tesla's products or the Company's financial performance.  In its press releases and public disclosures with the SEC, Tesla has previously directed investors and others seeking official sources of information about the Company to "follow Elon Musk's and Tesla's Twitter accounts."  Using the same platform that he used to announce new Tesla products and to deliver news about the Company's performance, defendant E. Musk broadcast lewd and sexually objectifying remarks to the world.

180.    For example, defendant E. Musk proposed starting a "Texas Institute of Technology and Science," and noted that the proposed institute would be "[u]niversally admired."  Defendant E. Musk has further suggested that "Jack in the Box should do double duty as a sperm donor clinic[,]" and announced that "Model S price changes to $69,420 tonight[,]" among many other repeated references to the number "69."  As previously discussed, defendant E. Musk also tweeted that Tesla's line of vehicles, the models S, 3, X, and Y, together spell out the word "SEXY."

181.    Mederos' lawsuit against Tesla, discussed *supra*, cites defendant E. Musk's lewd tweets as a contributing factor to the environment of sexual harassment Mederos experienced as an employee at Tesla's service centers.  In particular, Mederos reported that the coworkers who harassed her read and shared defendant E. Musk's communications amongst themselves.  Mederos further reported that these coworkers seized onto defendant E. Musk's "SEXY" tweet in particular, referring to everything they saw at the office as "sexy."

182.    Barraza, whose lawsuit detailing the near-daily occurrences of sexual harassment she endured at Tesla's Fremont factory is discussed *supra*, said of defendant E. Musk's tweets: "That doesn't set a good example for the factory—it almost gives it like an ... 'he's tweeting about it, it has to be okay.' … It's not fair to myself, to my family, to other women who are working there."

**The Board Ignored Repeated Warnings of the Culture of Discrimination and Harassment at Tesla**

183.    Not only did the Board fail to maintain proper internal controls to ensure the Company's compliance with the law, the Board reviewed and permitted the unlawful practices to continue.  The Section 220 Documents, along with publicly available information, show that while the Company was engaging in systemic, discriminatory policies, the Director Defendants abdicated their responsibility to exercise proper oversight of Tesla. ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

184.   ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████   ████████████████████   ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

185.   ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████   ████████████████   ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████

186.   ████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████

187.   ██████████████████████████████████████

████████████████████████████████████████████   ██████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████   ██████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████

188.   ██████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████

189.

190. ███████████████████████████████████████

████████████████████████████████████████ ████ ████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████ ██████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████ ████████████████████

████████████████████████████████████████████████

██████████████████

191. ███████████████████████████████████████

████████████████████████████████ ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████ ████████████████████████████ ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

192. ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ ████████████████ ██████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

193.    ████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████

194.    Later that year, at Tesla's Annual Shareholders Meeting on October 7, 2021, multiple stockholder representatives formally implored the Company's stockholders to pass these proposals, warning that the clear lack of Board oversight in Tesla's human capital management practices "pose[s] material risks to the company's exponential growth," citing the then recently announced multimillion-dollar Diaz verdict, discussed herein.  The supporting statement for the proposal further noted that, "[t]o date, Tesla has not established clear oversight responsibilities for its workforce at the board level or provided sufficient information for investors to understand its human capital management approach."   However, in its opposing statements, the Board recommended that Tesla stockholders vote against these proposals.  Therein, the Board reduced the foregoing concerns to "media headlines," "one-sided allegations," and "incendiary storylines." The Board further concluded that it was "already well-equipped to address human capital

management issues."   At the Board's recommendation, a majority of stockholders declined to approve either proposal.

## DEFENDANTS' MISLEADING 2021 PROXY

**Defendants Issue a Misleading 2021 Proxy Containing False Statements Regarding the Culture of Discrimination and Harassment at Tesla**

195.   On August 26, 2021, the Board, including defendants Denholm, Ehrenpreis, Ellison, Gracias, Mizuno, Murdoch, E. Musk, K. Musk, and Wilson-Thompson, had Tesla file with the SEC its Proxy Statement on Form DEF 14A in connection with the Company's upcoming 2021 Annual Meeting of Stockholders (the "2021 Proxy").   In the 2021 Proxy, the Board recommended voting against the two stockholder proposals meant to protect against and address workplace misconduct at Tesla.   In particular, the Board recommended voting against the proposals regarding: (i) reporting on employee arbitration; and (ii) assigning responsibility for strategic oversight of human capital management to an independent Board-level committee.   In opposing these proposals, the Board put forth false and misleading statements in the 2021 Proxy and omitted material information necessary to make certain statements not misleading.   The misleading 2021 Proxy ultimately led to the denial of both proposals.

196.   In a proposal requesting the Board to oversee the preparation of a public report on the impact of the use of mandatory arbitration on Tesla's employees and workplace culture, proponents of the proposal warned the Board that "[a] workplace that tolerates harassment and discrimination invites legal, brand, financial, and human capital risk."   The proposal noted that "[t]hese concerns are particularly relevant" to the Company because "[e]mployees who sought court trials but whose cases were held in arbitration have alleged experiencing sexual harassment, discrimination, racism and violent threats."

197.    However, rather than disclose material information related to the DFEH and EEOC investigations and the myriad employee relations issues brewing at Tesla, the Board touted the Company's purported compliance with the law and ability to foster a workplace free of discrimination and harassment as a reason to vote against this proposal.  In particular, the 2021 Proxy stated:

> In the case of Tesla, our mission is to accelerate the world's transition to sustainable energy.  ***Implicit in our mission is a mandate to not only follow the law, but to do the right thing.  As we have pledged in our annual Impact Report, Tesla has designed our workplace and policies to provide all employees with a respectful and safe working environment by not tolerating any discrimination, harassment, retaliation, or any other mistreatment at work, whether based on a legally protected status or otherwise***.  ***Therefore, we reiterate that Tesla, its employees and its stockholders would be better served by continuing to execute on our mission and tangible workplace goals*** rather than devote attention and resources to reporting on an issue as to which the proponent has inaccurately characterized the fundamental premise and which is a pretext for its narrowly-focused goal.

198.    This statement was false and misleading because, as the Section 220 Documents discussed herein reveal, Tesla was not only tolerant of workplace harassment and discrimination, ████████████████████████████████████████████████ Further, despite its purported mandate to "follow the law" and "do the right thing," ██████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████

199.    Moreover, as the DFEH investigation revealed, Tesla contracted with fourteen staffing agencies in 2021 and "mandated the staffing agencies ... to require all workers to sign arbitration agreements before being assigned to Tesla" in an effort to "avoid responsibility over its workers."  The DFEH complaint also notes that this practice, among others, "allowed and continue[s] to allow race harassment, discrimination, and retaliation to occur at Tesla." However, because of the Board's false and misleading opposing statement causing stockholders to vote against the proposal, the Board wrongfully denied Tesla stockholders the ability to be

apprised of and address the impact of mandatory arbitration on Tesla's workforce until it was too late.

200.    Next, in seeking stockholder approval for the establishment of an independent Board-level committee to exercise increased oversight over the Company's human capital issues, the stockholder proponents explained that analyst reports had warned that "'Tesla's weak labor management practices may pose risks to the company's growth strategy.'"  The proponents further noted that, "[t]o date, Tesla has not established clear oversight responsibilities for its workforce at the board level or provided sufficient information for investors to understand its human capital management approach."

201.    The Board responded flippantly in its opposing statement by dismissing these concerns and touted its human capital management capabilities, and the purported strength of its Board oversight over human capital issues.  In particular, the 2021 Proxy stated:

> The Board already has independent committees in place with oversight over the issues identified by the proponent.  For example, ***the Compensation Committee of the Board plays a key role in overseeing human capital management at Tesla.  ... [T]he Compensation Committee reviews, considers and provides to management guidance related to workforce management, equity and inclusion, and compensation, recruiting and retention efforts for employees other than executive officers.***  As part of its broad oversight of Tesla's material risks and compliance burdens, ***the Audit Committee of the Board also regularly receives updates from and provides feedback to management relating to various workforce issues including environmental, health and safety incident metrics and enterprise risk assessments pertaining to human resources.***  As such, the responsibilities requested by the proponent for an independent board-level committee are already generally being performed by independent committees of the Board.
>
> *      *      *
>
> More broadly, ***Tesla's DEI efforts, including those described in our annual Impact Report, illustrate our focus on attracting, developing and retaining top talent while integrating DEI principles and practices into our core values***.  Independent members of our Board regularly engage with our human resources leadership to review and align with Tesla's DEI progress and provide feedback as to the effectiveness of its program.

***Therefore, we believe we are already well-equipped to address human capital management issues***, including with the support of an independent committee of the Board.

202.    This statement was false and misleading because, as the Section 220 Documents show, the Board's oversight over its human capital issues was inadequate, resulting in ███████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████

203.    Further, the Audit Committee and Compensation Committee were, despite the Board's assurances, failing to meaningfully address these issues despite being repeatedly made aware of their scope and severity, as the Section 220 Documents discussed herein show.  Indeed, beyond patting themselves on the back for implementing low-cost, low-effort solutions like online business ethics courses or HR hotline awareness, the Audit and Compensation Committees of the Board seemed either unable or unwilling to do anything at all.  Regardless, the Board misleadingly recommended that stockholders vote against the proposal to institute a sorely-needed independent Board-level committee that could focus solely on Tesla's rapidly growing human capital issues.  As a result, the Board caused stockholders to reject the proposal, preventing the installation of appropriate and dedicated Board-level reporting structures for employee relations issues, and allowing the harassment and discrimination to continue unabated.

204.    By the time they filed the 2021 Proxy, members of the Board were privy to information that contradicted the above statements.  For example, ███████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████    ████████

████████████████████████

205.   ███████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████

206.   ███████   ██████   ██████   ██  ██████   █████   ██████████   ███

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████   ██████████████████   ██████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████

207. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
█████████████████████████████████

208. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████  ███████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████

209.    In sum, defendants Denholm, Ehrenpreis, Ellison, Gracias, Mizuno, Murdoch, E. Musk, K. Musk, and Wilson-Thompson knowingly or recklessly issued the Company's 2021 Proxy with the above false and misleading statements.  In particular, the Board caused the Company to issue the false and misleading 2021 Proxy despite having knowledge that: (i) the DFEH and EEOC had been investigating the Company for systemic and unlawful racial discrimination since 2019; (ii) racial discrimination and sexual harassment were rampant at Tesla, particularly in its manufacturing sectors; and (iii) that Tesla's human capital management practices and its Board-

level oversight of the same were ineffective, and had been for years. The Board issued the 2021 Proxy with the above false statements, misleadingly urging stockholders to vote against these proposals. As a result, stockholders voted to reject both proposals, ensuring that Tesla's human capital issues remained undisclosed and unaddressed, further harming the Company.

## DAMAGES TO TESLA

210. As a result of the Individual Defendants' misconduct and breaches of fiduciary duty, Tesla has violated federal and state laws and regulations to the detriment of the Company's stockholders. Federal and state regulatory and government agencies have the authority to impose significant monetary fines and sanctions if they find that Tesla's conduct violated these laws and regulations.

211. The Company's unlawful discriminatory practices have caused it to lose high quality employees. As Tesla acknowledges in its 2021 Form 10-K, "[O]ur ability to retain our workforce is dependent on our ability to foster an environment that is sustainably safe, respectful, fair and inclusive of everyone and promotes diversity, equity and inclusion inside and outside of our business." Further, potential high quality employees are less likely to join a company that engages in or permits the harassment and discrimination of its employees.

212. Further, as a direct and proximate result of the Individual Defendants' actions, Tesla has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a)     costs incurred from defending and paying any settlement, fines, or damages in the actions for violations of employment laws;

(b)     costs incurred to investigate wrongdoing;

(c)     costs incurred to implement corrective or remedial measures by virtue of a settlement or compromise; and

(d)     costs incurred from compensation and benefits paid to defendants who have breached their duties to Tesla.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

213.    Plaintiff brings this action derivatively in the right and for the benefit of Tesla to redress injuries suffered, and to be suffered, by the Company as a direct result of breaches of fiduciary duty, unjust enrichment, and violation of securities law, as well as the aiding and abetting thereof, by the Individual Defendants.  Tesla is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

214.    Plaintiff will adequately and fairly represent the interests of Tesla in enforcing and prosecuting its rights.

215.    Plaintiff was a stockholder of Tesla at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Tesla stockholder.

216.    The current Board of Tesla consists of the following eight individuals: defendants E. Musk, K. Musk, Mizuno, Denholm, Ehrenpreis, Ellison, Murdoch, and Wilson-Thompson. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because a Majority of the Board Faces a Substantial Likelihood of Liability for Their Misconduct**

217.    As alleged above, defendants E. Musk, K. Musk, Mizuno, Denholm, Ehrenpreis, Ellison, Murdoch, and Wilson-Thompson breached their fiduciary duties of loyalty by consciously

permitting or otherwise failing to act, stop, and remedy the systemic discrimination, harassment, and retaliation at Tesla, despite numerous warnings and indicators.

218. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████  ████████████  ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

219. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████ .

220. ████████████████████████████████████

████████████████████████████████████████

██████████████████████  ████████████████████████

████████████████████████████████████████

██████████████    ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

221.    In spite of this knowledge, defendants E. Musk, K. Musk, Mizuno, Denholm, Ehrenpreis, Ellison, Murdoch, and Wilson-Thompson allowed the culture of racial and sexual harassment to persist at the Company.  As a result, defendants E. Musk, K. Musk, Mizuno, Denholm, Ehrenpreis, Ellison, Murdoch, and Wilson-Thompson face a substantial likelihood of liability for their failure to act appropriately in spite of numerous warnings, and thus demand upon them is futile.

222.    Defendants E. Musk, K. Musk, Mizuno, Denholm, Ehrenpreis, Ellison, Murdoch, and Wilson-Thompson also face a substantial likelihood of liability for issuing the false and misleading 2021 Proxy, in which the Board misleadingly urged stockholders to vote against various proposals that could have helped address the Company's employee relations and human capital management issues, while making false statements regarding those very same issues. Defendants E. Musk and Denholm further signed the misleading 2021 Proxy, while defendants Denholm, Mizuno, and Murdoch, as members of the Audit Committee, further reviewed and knowingly or recklessly allowed the Company to issue the 2021 Proxy with the false and misleading statements contained therein.  Thus, demand upon them is futile.

223.    In addition to abdicating his responsibilities as a director to take reasonable steps to prevent the rampant discrimination occurring at Tesla, defendant E. Musk further faces a substantial likelihood of liability for breaching his duties of care and loyalty to the Company as an officer of Tesla.  As discussed in the foregoing sections, defendant E. Musk personally made statements directed at Tesla employees and the public at large that permitted or encouraged the

culture of discrimination, harassment, and retaliation at the Company.  The remaining members of the Board lack independence from defendant E. Musk, as discussed below.

**Demand Is Further Excused Because a Majority of the Board Lacks Independence from Defendant E. Musk**

224.    **Defendant E. Musk** is considered the face of Tesla.  He has been the CEO of the Company since October 2008.  He currently owns approximately 17% of the Company's stock, which makes him Tesla's single largest individual stockholder and gives him an effective blocking position given Tesla's supermajority voting requirements.   He has consolidated power at the Company in himself.  The Company openly acknowledges the king-like power held by defendant E. Musk in its 2021 Form 10-K, stating: "We are highly dependent on the services of Elon Musk, *Technoking of Tesla* and our Chief Executive Officer."   A *Business Insider* article quoted an individual that witnessed defendant E. Musk having a romantic dinner with a woman at Tesla's Fremont factory as saying that "Elon basically does what he wants whenever he wants."  The article explained that "for Musk, Tesla is a personal kingdom where the boundaries of home and work are blurred and the method in the madness is never entirely clear."

225.    Defendant E. Musk has never been shy to use the Company's dependence on him to exert his singular influence over the Board.  In November 2016, Tesla acquired SolarCity, Inc. ("SolarCity"), a company previously founded by defendant E. Musk, for $2.6 billion.  At the time, SolarCity was in financial distress due to its overwhelming debt load and was quickly burning through cash.  Indeed, the company was embroiled in a liquidity crisis at the time of the purchase. Yet defendant E. Musk "[p]ersistently [p]resent[ed] the SolarCity [t]ransaction to the Board." Moreover, although the Board conditioned the acquisition on approval by a majority of disinterested stockholders, the Delaware Chancery Court found that the Board inexplicably allowed defendant E. Musk to participate in the deal process "to a degree greater than he should

have been."  Indeed, the court described how "Elon's recusal from deliberations was fluid," and "when he was present, he simply could not help but to 'voice [his] opinion, obviously.'"  Just a few months later, Tesla was shrinking SolarCity and outsourcing its solar manufacturing.  It is widely agreed that Tesla's acquisition of SolarCity was a bailout for defendant E. Musk, along with his co-investor cousins.  In addition to the 22.2 million SolarCity shares defendant E. Musk held, he and his cousins had $100 million worth of bonds issued by SolarCity.  By bailing out SolarCity, defendant E. Musk made over $440 million from the sale of his SolarCity stock, which would otherwise have been worthless had SolarCity been forced to declare bankruptcy absent Tesla's acquisition.

226.    The Board has also previously acted at defendant E. Musk's behest when he had Tesla's founder fired at an improper Board meeting, without notice, and eventually substituted himself as CEO of the Company.

227.    **Defendant K. Musk** cannot independently consider a demand to sue defendant E. Musk because defendant E. Musk is his brother.  In addition, defendant K. Musk has received significant compensation and prestigious positions as a result of staying in defendant E. Musk's good graces.   In addition to sitting on the Board of Tesla, defendant K. Musk also serves as a director of Space Exploration Technologies Corp. ("SpaceX").  Defendant E. Musk invested in a software company that provided remote serving and management of computer systems called Everdream Corporation ("Everdream").  Defendant K. Musk provided advisory services to Everdream.  Defendant K. Musk also provided advisory services to PayPal Holdings, Inc., one of defendant E. Musk's earliest companies, and SolarCity.  Tesla's 2021 Proxy Statement admits that defendant K. Musk is not independent.

228.    **Defendant Ehrenpreis** also cannot independently consider a demand to sue defendant E. Musk.  Defendant Ehrenpreis is a Manager of DBL Partners ("DBL"), another venture capital fund.  Either personally or through DBL, defendant Ehrenpreis has made substantial investments in defendant E. Musk's companies while they were still private, including Tesla, SpaceX, and SolarCity.

229.    Concerning SolarCity, defendant Ehrenpreis' venture capital partner, Nancy Pfund ("Pfund") was a SolarCity investor and served on SolarCity's board of directors.  Pfund was an observer on the Tesla Board from 2006 to 2010.

230.    Defendant Ehrenpreis has long expressed his admiration for defendant E. Musk. For example, according to a May 2010 article published in the *Mercury News*, defendant Ehrenpreis stated the following about defendant E. Musk in an e-mail to a *Mercury News* correspondent: "Elon is able to attract some of the best and brightest to work with him…. His powerful vision and operational intensity and dedication combine to create game-changing companies." Defendant Ehrenpreis has further stated that E. Musk has had a "significant influence on [his] professional career" and that defendant Ehrenpreis' status as a Tesla director has been "a real benefit in fund-raising." In July of 2017, defendant E. Musk tweeted that defendant Ehrenpreis had gifted him the rights to the first Tesla Model 3 as a forty-sixth birthday present.

231.    Defendant Ehrenpreis is a member of the Board of Directors of Mapbox, Inc. ("Mapbox"), a provider of custom maps, and DBL is an investor in Mapbox.  Tesla paid Mapbox at least $3 million for its services.  As CEO of Tesla, defendant E. Musk controlled whether Tesla entered into this arrangement with Mapbox and whether it enters into any future arrangements with Mapbox.

232.    **Defendant Ellison** also cannot independently assess a litigation demand against defendant E. Musk.  Defendant Ellison has publicly praised and defended defendant E. Musk from criticism and further derided his critics.  Responding to critics who took issue with defendant E. Musk's controversial statements on Twitter, defendant Ellison stated: "This guy is landing rockets. You know, he's landing rockets on robot drone rafts in the ocean.  And you're saying he doesn't know what he's doing.  Well, who else is landing rockets?  You ever land a rocket on a robot drone?  Who are you?"  A *Business Insider* article published on December 29, 2021, highlighted the close friendship between the two.  Therein, defendant Ellison was quoted as saying: "I think Tesla has a lot of upside.  I am not sure how many people know, but I'm very close friends with Elon Musk, and I'm a big investor in Tesla."  Defendant E. Musk has also reportedly flown his private plane directly to defendant Ellison's private island in order to seek his advice.

233.    **Defendant Murdoch** also cannot independently consider a demand to initiate litigation against defendant E. Musk.  Defendant Murdoch has publicly praised defendant E. Musk, stating: "What's exciting about the company and about Elon is the goals are so audacious.  He's an entrepreneur who has some really audacious goals about what can be created and what can be settled for."

234.    **Defendant Mizuno** has responded to a number of defendant E. Musk's lewd tweets in a joking manner.  Defendant Mizuno has also publicly praised defendant E. Musk and identified him as a friend.  For example, in March of 2022, defendant Mizuno thanked defendant E. Musk for a 2011 donation he made to the city of Soma, Japan, and an accompanying visit, stating: "Thanks for your gift and, more importantly, showing your support for friends in trouble."

235.   **Defendant Denholm** also cannot independently consider a demand to initiate litigation against defendant E. Musk.  In an article published in March 2016 in the *Australian*, defendant Denholm was quoted as stating the following about Tesla and defendant E. Musk:

> It's great, and [defendant E. Musk] is great, he's just phenomenal…. To see what he's created there, it's a company that has a hugely innovative culture, really wanting to change the world. And that to me is a great tenant for a technology company. What I get to see with Tesla is what they're doing from an artificial intelligence perspective, but also the impact they're having on the world environmentally and geopolitically. I love these companies that transform industries.

Defendant Denholm has also expressed her approval of defendant E. Musk's statements on Twitter. In a March 2019 article from *Business Insider*, defendant Denholm stated: "Twitter is part of everyday business for many executives today ...  From my perspective, he uses it wisely ...  I don't think he poses any challenges ... the company is running very well and the board itself is very engaged."

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

236.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

237.   The Individual Defendants owed and owe Tesla fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Tesla the highest obligation of loyalty and care.

238.   The Individual Defendants and each of them, violated and breached their fiduciary duties.

239.   The Officer Defendant either knew, was reckless, or was grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendant either knew, was reckless, or was grossly negligent in not knowing about the pervasive culture of

racial and sexual harassment and discrimination at Tesla.  Accordingly, the Officer Defendant breached his duty of care and loyalty to the Company.

240.    The Director Defendants, as directors of the Company, owed Tesla the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly permitting the pervasive culture of racial and sexual harassment and discrimination at Tesla.  The Director Defendants knew or were reckless in not knowing that the Company's systemic culture of discrimination, harassment, and retaliation would damage the Company.  Accordingly, these defendants breached their duty of loyalty to the Company.

241.    The Audit Committee Defendants breached their fiduciary duty of loyalty by failing to address and remedy the red flags concerning internal reports of discrimination, harassment, and retaliation.  The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately address the Company's failure to comply with the law, as required by the Audit Committee Charter in effect at the time.

242.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Tesla has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

243.    Plaintiff, on behalf of Tesla, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Unjust Enrichment

244.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

245.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Tesla.  The Individual Defendants were unjustly

enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Tesla.

246.     Plaintiff, as a stockholder and representative of Tesla, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

247.     Plaintiff, on behalf of Tesla, has no adequate remedy at law.

## COUNT III

**Against Defendants Denholm, Ehrenpreis, Ellison, Gracias, Mizuno, Murdoch, E. Musk, K. Musk, and Wilson-Thompson for Violation of Section 14(a) of the Exchange Act**

248.     SEC Rule 14a-9 promulgated pursuant to section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]"  17 C.F.R. §240.14a-9.

249.     Defendants Denholm, Ehrenpreis, Ellison, Gracias, Mizuno, Murdoch, E. Musk, K. Musk, and Wilson-Thompson knowingly or recklessly issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to stockholders that were contained in the 2021 Proxy.  The 2021 Proxy contained a stockholder proposal that would require the Company to issue a report on the impact of the Company's mandatory arbitration policies on its workforce.  The 2021 Proxy also contained a stockholder proposal urging the Company assign strategic oversight over human capital issues to an independent Board-level committee.  In the 2021 Proxy, the Board included statements recommending that stockholders vote against these proposals.  The 2021 Proxy, however, misrepresented and failed to disclose and explain that: (i)

the DFEH and EEOC had been investigating the Company for systemic and unlawful racial discrimination since 2019; (ii) racial discrimination and sexual harassment were rampant at Tesla, particularly in its manufacturing sectors; and (iii) Tesla's Board-level oversight over its human capital management practices was inadequate.

250.    By reasons of the conduct alleged herein, defendants Denholm, Ehrenpreis, Ellison, Gracias, Mizuno, Murdoch, E. Musk, K. Musk, and Wilson-Thompson violated section 14(a) of the Exchange Act.  As a direct and proximate result of these violations, stockholders voted against adopting the above proposals, which led to the continuation of the wrongful actions described herein.

251.    Plaintiff, on behalf of Tesla, thereby seeks relief for damages inflicted upon the Company in connection with the improper denial of these stockholder proposals.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Tesla, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breach of fiduciary duty, unjust enrichment, and violation of securities law;

B.    Directing Tesla to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Tesla and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a proposal to strengthen the Company's controls over its employment policies concerning discrimination, harassment, and retaliation;

2.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.      a provision to permit the stockholders of Tesla to nominate at least three candidates for election to the Board;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Tesla has an effective remedy;

D.      Awarding to Tesla restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: June 16, 2022                KENDALL LAW GROUP, PLLC

*/s/ Joe Kendall*
_____
JOE KENDALL
State Bar No. 11260700
3811 Turtle Creek Blvd., Suite 1450
Dallas, TX 75219
Telephone: (214) 744-3000
Facsimile: (214) 744-3015
E-mail: jkendall@kendalllawgroup.com

ROBBINS LLP
BRIAN J. ROBBINS
CRAIG W. SMITH
SHANE P. SANDERS
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsllp.com
        csmith@robbinsllp.com
        ssanders@robbinsllp.com

Attorneys for Plaintiff

1565931