# UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| IN RE TESLA INC. STOCKHOLDER DERIVATIVE LITIGATION | Lead Case No.: 1:22-cv-00592-LY<br><br>(Consolidated with Case No. 1:22-cv-00611-LY) |
| This Document Relates To:<br><br>All Cases | |

## DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' VERIFIED CONSOLIDATED DERIVATIVE COMPLAINT

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................ 1

FACTUAL BACKGROUND ....................................................................... 2

    A.    Tesla Has Grown to Be America's Largest Electric Cars Manufacturer ........... 2

    B.    Tesla Is Led by an Experienced Board and Management Team ................... 3

    C.    Tesla's Board and Management Diligently Created and Monitored Internal Controls, Contrary to Plaintiffs' Selective Characterizations ................... 4

ARGUMENT ............................................................................................ 8

I.    PLAINTIFFS DO NOT MEET FEDERAL AND DELAWARE STRINGENT STANDING REQUIREMENTS FOR DERIVATIVE LAWSUITS ................... 8

II.    A MAJORITY OF THE BOARD IS DISINTERESTED ....................... 8

    A.    No Substantial Likelihood of Board Liability for Employee Misconduct ......... 9

        1.    Plaintiffs Concede that Tesla Had Internal Controls ...................... 9

        2.    The Board Did Not Willfully Ignore Red Flags or Fail to Act ........... 11

    B.    No Substantial Likelihood of Liability for Purported Section 14(a) Claim ....... 15

        1.    Plaintiffs Do Not Identify Any False Statements in the 2021 Proxy ...... 16

        2.    Plaintiffs Fail to Establish Bad Faith ..................................... 18

        3.    There Is No "Essential Link" Between the Proxy and Any Alleged Injury ................................................................... 18

III.    A MAJORITY OF THE BOARD IS INDEPENDENT ....................... 19

    A.    Mr. Musk Does Not Control Tesla (Nor Is That Relevant) ................... 20

    B.    All Outside Directors Are Independent of Mr. Musk ......................... 21

CONCLUSION ......................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*Allied Capital Corp. v. GC-Sun Holdings, L.P.*,
910 A.2d 1020 (Del. Ch. 2006) ……………………………………………….. 22

*In re Am. Apparel, Inc.*,
2015 U.S. Dist. LEXIS 191466 (C.D. Cal. Apr. 28, 2015) ………………………………… 26

*Beam v. Stewart*,
845 A.2d 1040 (Del. 2004) …………………………………………………. 11, 21

*Behrmann v. Brandt*,
2020 U.S. Dist. LEXIS 136543 (D. Del. July 31, 2020) ……………………………... 19

*In re Browning-Ferris Indus., Inc. S'holder Deriv. Litig.*,
830 F. Supp. 361 (S.D. Tex. 1993) ……………………………………………… 16

*In re Cabot Oil & Gas Corp. Deriv. Litig.*,
2022 U.S. Dist. LEXIS 61353 (S.D. Tex. Mar. 31, 2022) …………………………... 9, 14, 16

*In re Citigroup Inc. S'holder Deriv. Litig.*,
964 A.2d 106 (Del. Ch. 2009) …………………………………………...…… 9, 11, 13

*City of Birmingham Relief & Ret. Sys. v. Hastings*,
2019 WL 3815722 (N.D. Cal. Feb. 13, 2019) ……………………………………...…… 20

*City of Detroit Policy & Fire Ret. Sys. v. Hamrock*,
2022 Del. Ch. LEXIS 159 (June 30, 2022) …………………………………………...…… 12

*Coates v. Heartland Wireless Communs., Inc.*,
26 F. Supp. 2d 910 (N.D. Tex. 1998) ……………………………………………… 18

*Cohen v. Ruckelshaus*,
20 F.3d 465 (5th Cir. 1994) ……………………………………………………… 16

*Constr. Indus. Laborers Pension Fund v. Bingle*,
2022 Del. Ch. LEXIS 223 (Sept. 6, 2022) …………………………………………… 13

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) …………………………………………………… 14

Page(s)

*In re DELL Deriv. Litig.*,
  2007 WL 9710279 (W.D. Tex. Oct. 9, 2007) ……………………………………… 8, 11

*In re Ezcorp Inc. Consulting Agreement Deriv. Litig.*,
  2016 Del. Ch. LEXIS 14 (Jan. 25, 2016) …………………………………………... 16

*In re Facebook, Inc.*,
  922 F. Supp. 2d 445 (S.D.N.Y. 2013) ……………………………….………. 22, 23

*Fisher v. Sanborn*,
  2021 Del. Ch. LEXIS 61 (Mar. 30, 2021) ……………………………………… 11, 12

*Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*,
  565 F.3d 200 (5th Cir. 2009) …………………………………………………….. 18

*Freuler v. Parker*,
  803 F. Supp. 2d 630 (S.D. Tex. 2011) ……………………………………… *passim*

*Freuler v. Parker*,
  517 Fed. App'x 227 (5th Cir. 2013) …………………………………………… 8

*Friedman v. Khosrowshahi*,
  2014 Del. Ch. LEXIS 121 (July 16, 2014) ……………………………………… 16

*Friedman v. Khosrowshahi*,
  2015 Del. LEXIS 112 (Mar. 4, 2015) …………………………………………… 16

*In re GM Co. Deriv. Litig.*,
  2015 Del. Ch. LEXIS 179 (June 26, 2015) ……………………………………... 11, 18

*In re GM Co. Deriv. Litig.*,
  133 A.3d 971 (Del. 2016) ………………………………………………………... 11

*Goldfarb v. Barbier*,
  2012 U.S. Dist. LEXIS 200820 (W.D. Tex. Apr. 26, 2012) ……………………… 8, 10

*In re Goldman Sachs Group, Inc. S'holder Litig.*,
  2011 Del. Ch. LEXIS 151 (Oct. 12, 2011) ……………………………………… 25

*In re GoPro, Inc. S'holder Deriv. Litig.*,
  2020 Del. Ch. LEXIS 165 (Apr. 28, 2020) ……………………………………… 14

Page(s)

*Heinze v. Tesco Corp.*,
    971 F.3d 475 (5th Cir. 2020) ……………………………………………………….. 17

*Hohenstein v. Behringer Harvard Reit I, Inc*.,
    2014 U.S. Dist. LEXIS 40759 (N.D. Tex. Mar. 27, 2014) ………………………………… 17

*Hulliung v. Bolen*,
    548 F. Supp. 2d 336 (N.D. Tex. 2008) ………………………………………………... 19

*Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
    537 F.3d 527 (5th Cir. 2008) …………………………………………………………….. 14

*Kandell v. Niv*,
    2017 Del. Ch. LEXIS 640 (Sept. 29, 2017) …………………………………………… 21, 24

*In re KBR, Inc. Sec. Litig.*,
    2018 U.S. Dist. LEXIS 221137 (S.D. Tex. Aug. 31, 2018) …………………………… 17, 18

*Kiger v. Mollenkopf*,
    2021 U.S. Dist. LEXIS 220509 (D. Del. Nov. 15, 2021) ……………………………….. 8, 17

*Kooker v. Baker*,
    497 F. Supp. 3d 1 (D. Del. 2020) ………………………………………………………... 18

*In re Kraft Heinz Co. Deriv. Litig.*,
    2021 Del. Ch. LEXIS 295 (Dec. 15, 2021) …………………………………………… 23, 24, 25

*In re Lendingclub Corp. Deriv. Litig.*,
    2019 Del. Ch. LEXIS 1347 (Oct. 31, 2019) …………………………………………….. 25

*Loudon v. Archer-Daniels-Midland Co.*,
    700 A.2d 135 (Del. 1997) ………………………………………………………….….. 18

*Martin v. CB Restaurants, Inc.*,
    2021 U.S. Dist. LEXIS 126851 (W.D. Tex. Mar. 12, 2021) ………………………………… 15

*In re Match Grp., Inc. Derivative Litig.*,
    2022 Del. Ch. LEXIS 212 (Sept. 1, 2022) …………………………………………… 23

*McElrath v. Kalanick*,
    2019 Del. Ch. LEXIS 107 (Apr. 1, 2019) ……………………………………… 22, 23, 24, 26

Page(s)

*MCG Capital Corp. v. Maginn*,
2010 Del. Ch. LEXIS 87 (May 5, 2010) ……………………………………… 24, 26

*In re MetLife Inc.*,
2020 Del. Ch. LEXIS 265 (Aug. 17, 2020) ……………………………………... 11

*Midwestern Teamsters Pension Trust Fund v. Deaton*,
2009 U.S. Dist. LEXIS 50521 (S.D. Tex. May 7, 2009) …………………………... 22

*Okla. Firefighters Pension & Ret. Sys. v. Corbat*,
2017 Del. Ch. LEXIS 848 (Dec. 18, 2017) ……………………………………… 9, 13

*In re Oracle Corp. Deriv. Litig.*,
2011 U.S. Dist. LEXIS 129765 (N.D. Cal. Nov. 9, 2011) …………………………… 20

*Owens v. Mayleben*,
2020 Del. Ch. LEXIS 59 (Feb. 13, 2020) ……………………………………… 20, 22

*Pedroli v. Bartek*,
564 F. Supp. 2d 683 (E.D. Tex. 2008) …………………………………………...… 19

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
307 F. Supp. 3d 583 (S.D. Tex. 2018) …………………………………………… 17

*In re Qualcomm Inc.*,
2017 Del. Ch. LEXIS 106 (June 16, 2017) …………………………………… 14

*Reiter v. Fairbank*,
2016 Del. Ch. LEXIS 158 (Oct. 18, 2016) ……………………………………….. 12, 13

*Rojas v. Ellison*,
2019 Del. Ch. LEXIS 281 (July 29, 2019) …………………………………… 14

*Simons v. Brookfield Asset Mgmt.*,
2022 Del. Ch. LEXIS 15 (Jan. 21, 2022) ……………………………………… 18, 21

*Smith v. Carrillo*,
2019 U.S. Dist. LEXIS 205836 (D. Del. Nov. 26, 2019) …………………………….. 16

*Steinberg v. Bearden*,
2018 Del. Ch. LEXIS 169 (May 30, 2018) …………………………………… 19

Page(s)

*Stone v. Ritter*,
   911 A.2d 362 (Del. 2006) …………………………………………………….. 9, 15

*Talley v. Mann*,
   2012 U.S. Dist. LEXIS 50523 (C.D. Cal. Feb. 14, 2012) ………………………………… 26

*In re Tesla Motors, Inc. Stockholder Litig.*,
   2022 Del. Ch. LEXIS 94 (Apr. 27, 2022) ……………………………………………… 3, 21, 24

*Tilden v. Cunningham*,
   2018 Del. Ch. LEXIS 510 (Oct. 26, 2018) …………………………………………… 21

*UFCW & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*,
   250 A.3d 862 (Del. Ch. 2020) ………………………………………………………… 23, 26

*United Food & Commer. Workers Union v. Zuckerberg*,
   262 A.3d 1034 (Del. 2021) …………………………………………………… *passim*

*Vitellone v. Evans*,
   2013 U.S. Dist LEXIS 179016 (S.D. Tex. Dec. 20, 2013) ………………………………… 16

*White v. Panic*,
   793 A.2d 356 (Del. Ch. 2000) ……………………………………………………… 15

*White v. Panic*,
   783 A.2d 543 (Del. 2001) …………………………………………………………… 15

Statutes

8 Del. C. § 141(e) …………………………………………………………………… 13

Fed. R. Civ. P. 23.1 …………………………………………………………………… 8

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| ¶ __ or Complaint | Verified Consolidated Stockholder Derivative Complaint for Breach of Fiduciary Duty, Unjust Enrichment, and Violation of Securities Law, *In re Tesla Inc. S'holder Deriv. Litig.*, No. 1:22-cv-00592-LY (W.D. Tex. Sept. 6, 2022), ECF No. 33. |
| DFEH | Department of Fair Employment and Housing[1] |
| Ewell Decl. ¶ __ | Declaration of Gary Ewell in Support of Defendants' Motion to Dismiss Plaintiffs' Verified Consolidated Derivative Complaint |
| Ex. __ | Exhibits to the Declaration of Gary Ewell in Support of Defendants' Motion to Dismiss Plaintiffs' Verified Consolidated Derivative Complaint |
| Individual Defendants | Defendants Elon Musk, Robyn Denholm, Kimbal Musk, Ira Ehrenpreis, James Murdoch, Lawrence J. Ellison, Kathleen Wilson-Thompson, Hiromichi Mizuno, Antonio J. Gracias, Stephen T. Jurvetson, Brad W. Buss, and Linda Johnson Rice |
| Tesla or the Company | Tesla, Inc. |
| TSLA-Janklow __ | Bates-stamped documents in Tesla's books and records production to Plaintiffs pursuant to Section 220 of the Delaware General Corporation Law |

---

[1] DFEH has been renamed the "Civil Rights Department" as of July 1, 2022.

Nominal Defendant Tesla hereby moves to dismiss Plaintiffs' Verified Consolidated Stockholder Derivative Complaint pursuant to Federal Rule of Civil Procedure 23.1 for failure to make pre-litigation demand, and therefore lack of standing.  The remaining Individual Defendants move to dismiss the Complaint under Federal Rules of Civil Procedure 12(b)(6) and 9(b) for failure to state a claim, for the same reasons articulated by Tesla.

## INTRODUCTION

Prejudice and discrimination have no place at Tesla.  100,000 Tesla employees across three continents, from Austin to Beijing, work to create millions of electric cars for a cleaner planet.  Tesla has adopted and implemented stringent policies against every form of misconduct in the workplace. Its legal and human relations departments investigate harassment and discrimination complaints received, and, if validated, take action against any wrongdoers, including termination.  Management and the Board, including its compensation and audit committees, receive quarterly updates on these processes and, where needed, allocate additional resources.

Tesla has been unable, however, to eliminate racial and misogynistic conduct altogether. Plaintiffs now sue the Board, purportedly on Tesla's own behalf, alleging nothing less than breach of fiduciary duty for the directors' purported failure to root out prejudice.  Plaintiffs did so despite having received over a hundred Board and management-level document packages showing Tesla's dedication to equality and fairness in the workplace.

Delaware corporate law requires Plaintiffs to make demand on the Board before filing a derivative lawsuit in Tesla's name.  Instead of following the prescribed procedure and engaging with the Board, Plaintiffs rushed to court alleging that demand would have been "futile."  The Board's attention and dedication to these issues, as evidenced in the records Plaintiffs received, shows the very opposite.  As importantly, Delaware law does not require corporate boards to resolve enduring

societal problems that have eluded governments for decades.  That is not because corporate leaders do not wish to solve these problems—they do, dearly—but because no single company, no matter how large or successful, can do so.  What it can do—and what Tesla has done—is to establish values, communicate clearly, investigate violations, and take decisive action when warranted.

Plaintiffs' disagreement with the outcome of the Board's action is not a basis for a lawsuit under Delaware law.  Delaware law entrusts decisions to the business judgment of Tesla's elected Board.  Plaintiffs cannot usurp that authority simply because *they* would have acted differently.  Notably, Plaintiffs own just 375 shares of Tesla stock, out of 1.036 billion shares outstanding, compared, for example, to 284 million owned by Board members (as of March 2022).  Ex. 1 at 7.

Plaintiffs also cannot shoehorn their second-guessing of the Board into a claim alleging a failure to exercise oversight.  *Infra* Section II.A.  Delaware law requires boards to (1) establish internal controls and (2) monitor and react to them.  *Id.*  Tesla's Board has done both.  Equally unavailing is Plaintiffs' attempt to fabricate federal jurisdiction by pleading a cursory claim under the federal securities laws.  *Infra* Section II.B.  District courts routinely reject attempts to use Section 14 of the Securities Exchange Act of 1934, which governs proxy statements, as a vehicle for dragging corporate state law claims into federal courts.  *Id.*

Because they failed to make demand on Tesla's Board, Plaintiffs lack standing to bring this derivative lawsuit in Tesla's name.  Instead of circumventing the requirements of Delaware law, Plaintiffs should engage with the Board and use the prescribed channels of resolving corporate disagreements.  They would find the Board thoughtful and receptive to their concerns.

## FACTUAL BACKGROUND

### A.     Tesla Has Grown to Be America's Largest Electric Cars Manufacturer

Founded in 2003, Tesla is America's largest manufacturer of electric cars, and is on track to

deliver more than 1 million cars this year.  Ex. 2 at 13.  In 2008, Elon Musk (Tesla's Chairman of the

Board and largest investor at the time) was appointed CEO.  ¶ 12.  The Company had produced no

cars prior to that year.  Since then, it has launched five consumer models.  Ex. 3 at 16.  As of

September 2022, Tesla had produced more than 3 million cars.  Ex. 4 at 20.

Since its founding, Tesla's manufacturing capacity grew from a single initial facility in

Fremont, California to six factories in California, Nevada, New York, Texas, Germany, and China.

Ex. 3 at 17.  At the end of 2021, Tesla moved its headquarters to Austin, where its Gigafactory will

employ thousands of workers.  The Company's employee count also grew during this period, from

899 in 2010, Ex. 5 at 23, when Tesla became publicly traded, to 37,543 in 2017, Ex. 6 at 28, and to

more than 100,000 as of March 2022.  Ex. 7 at 32.  Revenue rose from $116.7 million in 2010, Ex. 5

at 24, to $53.8 billion for the full year 2021.  Ex. 8 at 35.

**B.      Tesla Is Led by an Experienced Board and Management Team**

Tesla's Board is currently chaired by Robyn Denholm, its lead independent director.  Ms.

Denholm served as an executive at Sun Microsystems, Toyota, and Australia's largest telecom

company.  Hailed as a "disinterested decisionmaker" and "indisputably independent director," in the

words of the Delaware Court of Chancery, Ms. Denholm is "an independent, powerful and positive

force" who has ensured "Tesla fiduciaries placed the interests of Tesla stockholders ahead of their

own."  *In re Tesla Motors, Inc. S'holder Litig.*, 2022 Del. Ch. LEXIS 94, at *61 (Apr. 27, 2022).

The Board also includes Ira Ehrenpreis, recognized by the National Association of Corporate

Directors as "one of the most influential leaders in the boardroom and corporate governance

community."  He has served on the U.S. Department of Energy's Energy Efficiency and Renewable

Energy Advisory Committee and the National Renewable Energy Laboratory Advisory Council.

Hiro Mizuno is the United Nations Special Envoy on Innovative Finance and Sustainable

Investments, and has served as an executive on the world's largest pension fund.  James Murdoch previously served in leadership roles at Twenty-First Century Fox, Inc. and the boards of News Corporation, GlaxoSmithKline, and Sotheby's, among others.  Kathleen Wilson-Thompson previously held different leadership roles at Walgreens, Kellogg, and Wolverine.  Larry Ellison, the founder of Oracle, was on the Board when Plaintiffs filed their lawsuit, but was no longer on the Board at the time of the Amended Complaint.  Kimbal Musk, Elon Musk's brother, serves on the boards of Chipotle, The Kitchen, and SpaceX.

Elon Musk also serves on the Board, in addition to serving as Tesla's CEO.  Mr. Musk's holdings in Tesla have declined from 28.5% in 2010, Ex. 9 at 39, to 17% in 2022, as Plaintiffs admit. ¶ 321.  In addition to Tesla, Mr. Musk's remarkable achievements at his other companies make him one of most successful entrepreneurs of modern times: SpaceX is a space rocket company that delivers astronauts and satellites to orbit (and whose satellite network has been pivotal to the defense of Ukraine); The Boring Company focuses on infrastructure and tunnel construction; Neuralink develops technology aimed at helping people with paralysis regain independence through a brain-computer interface; and Twitter is a well-known communications platform.

### C.     Tesla's Board and Management Diligently Created and Monitored Internal Controls, Contrary to Plaintiffs' Selective Characterizations

This lawsuit concerns allegations of racial and sexual discrimination and harassment at Tesla's factory in Fremont, California, between 2015 and 2022.  ¶¶ 36, 71.  Some of these incidents gained prominence through investigations by California's DFEH and civil lawsuits.  ¶¶ 48, 49, 86, 104.  These lawsuits are ongoing.  ¶¶ 69, 103.  Contrary to Plaintiffs' characterizations, in the only lawsuit to have reached trial, the judge reduced the jury's damages award by nearly 90%, and later ordered a new trial on damages.  Ex. 10.  Tesla is seeking a new trial on liability.  *Id.*

***Critically, none of Plaintiffs' allegations concerns any misconduct by members of***

***management or the Board.***   Rather, Plaintiffs claim that the Board should have stopped racist or

misogynist conduct from occurring at the Company.   ¶ 308.   Plaintiffs are not able to show, however,

that the Board has a duty to prevent all wrongdoing or that it could even do so.   *Infra* Section II.A.

Plaintiffs concede that, as required by Delaware law, Tesla had ample internal controls aimed

at discrimination and harassment.   Prior to the filing of this lawsuit, Tesla provided Plaintiffs with

Board and management documents under Delaware law, which allows shareholders confidential

access to Company books and records.   *See* Ewell Decl. ¶ 3.   Tesla produced to Plaintiffs over 90

sets of internal documents, and even 18 professionally produced training videos on discrimination

and harassment.   *Id.*   These materials included Board and committee minutes for the period from

January 1, 2019 to January 31, 2022, records of investigations and their outcomes, and policies and

manuals.   Pursuant to Delaware law and the parties' written agreement, these materials were all

incorporated by reference into the pleadings.   *Id.*

In light of these books and records, Plaintiffs concede that, as required by Delaware law,

Tesla had ample internal controls aimed at discrimination and harassment.   For example:

- Tesla's audit committee, chaired by Ms. Denholm, met at least 15 times from 2019 to January
  2022, TSLA-Janklow 220_000734, -742, -774, -765, -757, -762, -753, -781, -785, -790, -792,
  -796, -803, -1015, -1037; and received numerous updates on complaints of workplace
  discrimination and harassment, *see, e.g.*, TSLA-Janklow 220_000739, -751, -765, -768, -778,
  -801, -879, -1001, -1006, -1011;

- Tesla's compensation committee, chaired by Mr. Ehrenpreis, met and received presentations
  regarding employee relations issues and workplace diversity on at least four occasions from
  2019 to January 2022, TSLA-Janklow 220_000598, -705, -858, -898;

- Tesla's full Board met and received presentations regarding workplace complaints at least 8

times during the period from 2019 to January 2022, TSLA-Janklow 220_000295, -397, -501, -506, -521, -553, -807, -1026;

- Tesla's Legal and Employee Relations Departments actively investigated employee complaints of discrimination and harassment over this period, *see, e.g.*, TSLA-Janklow 220_000295, -739, -751, -765, -768, -778, -858, -990, -999, -1004, -1006, -1009;

- Tesla adopted and later enhanced its policies specifically prohibiting discrimination and harassment, which included ███████████████████████████████████ ████████████████████████████████████████████ ██████████████, *see, e.g.*, TSLA-Janklow 220_000001, -05, -260 at 23:00; and

- Tesla also adopted a plain-English employee Handbook.  ¶¶ 41-45.  Plaintiffs fault the Handbook for various purported deficiencies, ¶ 41, but seem to ignore that the very information they claim is missing from it is extensively discussed in the same training module in which the Handbook appears.  Topics include: ██████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ █████████████████████████  TSLA-Janklow 220_000260 at 23:00.

Plaintiffs further claim that the Board ignored the data it obtained from these sources and took no action in the face of employee complaints.  ¶¶ 273-85.  Again, the reality is vastly different:

- At committee meetings on March 19, 2019, February 26, 2020, August 26, 2021, and December 20, 2021, directors were informed of proactive measures management had taken in response to employee complaints, including that it had: ███████████████████ ███████████████████████████████████ ████████████████████████████████████ █████████████████████ TSLA-Janklow 220_000629;

- Since 2015, Tesla has added an Employee Relations team, a Diversity, Equity & Inclusion team, and promulgated a comprehensive Employee Handbook, ¶¶ 5, 87;

- Management launched campaigns to increase awareness of ████████████████ ████████████ ¶ 279; TSLA-Janklow 220_000353, -1004;

- Tesla created trainings regarding the Company's Code of Business Ethics, ¶¶ 279, 294;

- Tesla investigated ████████████████████████████████ ████████████████████████████████████ ████████████████████ TSLA-Janklow 220_000351, -1006;

- The Audit Committee requested the preparation and presentation of data better to understand Employee Relations trends, TSLA-Janklow 220_000757; and

- Tesla expanded its Employee Relations team in order to █████████████████ ███████████ TSLA-Janklow 220_000397.

Plaintiffs were aware of these efforts when they filed their lawsuit.  Instead of presenting this information fairly and in full, so that the Court may make its own assessment, Plaintiffs cherry picked information.  A full examination of these materials shows that the very actions Plaintiffs claim were lacking were memorialized in contemporaneous Board and management materials.  As discussed below, this lawsuit should be dismissed.

## ARGUMENT

### I.      PLAINTIFFS DO NOT MEET FEDERAL AND DELAWARE STRINGENT STANDING REQUIREMENTS FOR DERIVATIVE LAWSUITS

"'A cardinal precept' of Delaware law is 'that directors, rather than shareholders, manage the business and affairs of the corporation.'" *United Food & Commer. Workers Union v. Zuckerberg*, 262 A.3d 1034, 1047 (Del. 2021).[2]  Derivative plaintiffs must show that "demand [on the Board] is excused because the directors are incapable of making an impartial decision regarding such litigation." *Freuler*, 803 F. Supp. 2d at 636.  Under both Federal Rule of Civil Procedure 23.1 and Delaware law, Plaintiffs "must meet stringent requirements of factual particularity." *Id.* at 638; "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *In re DELL Deriv. Litig.*, 2007 WL 9710279, at *2 (W.D. Tex. Oct. 9, 2007).  Plaintiffs "must plead futility of a demand for a majority of the director defendants, with individual allegations for each director." *Freuler*, 803 F. Supp. 2d at 638.

Plaintiffs lack standing for this lawsuit because they fail to plead demand futility.  Demand would be futile only if a majority of directors either (1) are self-interested because they "face[] a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand" or (2) "lack[] independence from" an interested party.  *Kiger v. Mollenkopf*, 2021 U.S. Dist. LEXIS 220509, at *14-15 (D. Del. Nov. 15, 2021).  Plaintiffs' allegations fail on both grounds.

### II.      A MAJORITY OF THE BOARD IS DISINTERESTED

Directors face a substantial likelihood of liability "only in the rare case when a plaintiff is able to show director conduct that is 'so egregious on its face that board approval cannot meet the

---

[2] Tesla is a Delaware corporation.  As a result, "the particularity of a plaintiff's pleadings is governed by the standards of the state of incorporation, here, Delaware." *Freuler v. Parker*, 803 F. Supp. 2d 630, 636 (S.D. Tex. 2011), *aff'd*, 517 Fed. App'x 227 (5th Cir. 2013); *see also Goldfarb v. Barbier*, 2012 U.S. Dist. LEXIS 200820, at *4 n.2 (W.D. Tex. Apr. 26, 2012) (same).

test of business judgment[.]'" *Freuler*, 803 F. Supp. 2d at 638.  Tesla's Certificate of Incorporation exculpates its directors from liability for all but breaches of the duty of loyalty.  Ex. 1 at 10. Negligence alone cannot be the basis for "breaches of the duty of loyalty [which are] preconditioned on a finding of bad faith."  *Okla. Firefighters Pension & Ret. Sys. v. Corbat*, 2017 Del. Ch. LEXIS 848, at *45 (Dec. 18, 2017).  Plaintiffs must plead the Board's bad faith "by alleging with particularity that a director *knowingly* violated a fiduciary duty or failed to act in violation of a *known* duty to act, demonstrating a *conscious* disregard for her duties."  *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 125 (Del. Ch. 2009).  Plaintiffs advance two theories, both of which fail.

### A.   No Substantial Likelihood of Board Liability for Employee Misconduct

Plaintiffs assert that "the Director Defendants abdicated their responsibility to exercise proper oversight of Tesla."  ¶ 273.  Known as a *Caremark* claim, it "is possibly the most difficult [claim] . . . in corporation law upon which a plaintiff might hope to win a judgment."  *Freuler*, 803 F. Supp. 2d at 639; *accord Stone v. Ritter*, 911 A.2d 362, 372-73 (Del. 2006).  *Caremark* has two prongs: (1) Plaintiffs must allege "that the directors utterly failed to provide a corporate reporting system to permit board-level review of compliance with law," *or* (2) "that the directors were provided sufficient notice of corporate non-compliance with law such that their failure to remediate amounts to bad faith."  *In re Cabot Oil & Gas Corp. Deriv. Litig.*, 2022 U.S. Dist. LEXIS 61353, at *39-40 (S.D. Tex. Mar. 31, 2022).  Plaintiffs' allegations fail both prongs.

### 1.   Plaintiffs Concede that Tesla Had Internal Controls

Far from pleading that Tesla has "utter[ly] fail[ed] to attempt to assure a reasonable information and reporting system exists[,]" Plaintiffs concede that Tesla established internal controls, *supra* at 5-7.  *Goldfarb v. Barbier*, 2012 U.S. Dist. LEXIS 200820, at *17 (W.D. Tex. Apr. 26, 2012).

***Management Controls.***  The Board learned that Tesla ██████████████████████



████████████████████████ to cement Tesla's culture of anti-discrimination.  TSLA-Janklow 220_000353.

**Policies and Procedures Prohibiting Discrimination.**  Unmentioned in the Complaint, Tesla maintains a Code of Business Ethics, Ex. 11, and an anti-harassment and discrimination policy. TSLA-Janklow 220_000001.  The latter policy outlines Tesla's ████████████████ ████████████████████████████████████████████████and warns that █████████ ████████████████████████████████ *Id.* at -01, -05.

**Audit Committee and Compensation Committee Reporting.**  Plaintiffs' own Complaint is replete with examples of the Employee Relations and Legal departments reporting to the Audit and Compensation Committees.  *See* ¶¶ 280-81, 294-95, 318.  The Audit Committee receives quarterly updates on █████████████████████████████████████ as well as regular updates from Tesla's legal and compliance teams.  *See, e.g.*, TSLA-Janklow 220_000759, -1006.

**Full Board Reporting.**  The full Board has also received Employee Relations and People updates detailing █████████████████████████ and highlighting ██████████████████ █████████████████████████████████ TSLA-Janklow 220_000350, -485.

Plaintiffs' sniping at these systems is insufficient to state a claim: courts dismiss *Caremark* claims where plaintiffs "complain that [a company] could have, should have, had a *better* reporting system, but not that it had *no* such system."  *In re GM Co. Deriv. Litig.*, 2015 Del. Ch. LEXIS 179, at *49 (June 26, 2015), *aff'd* 133 A.3d 971 (Del. 2016); *Fisher v. Sanborn*, 2021 Del. Ch. LEXIS 61, at *22 (Mar. 30, 2021) ("[P]laintiffs usually lose [*Caremark* cases] because they must concede the

existence of board-level systems of monitoring and oversight").

### 2.      The Board Did Not Willfully Ignore Red Flags or Fail to Act

Plaintiffs also fail to make "particularized factual allegations" showing the Board *knowingly* failed to monitor Tesla's controls or ignored "red flags" of misconduct.  *Citigroup*, 964 A.2d at 126-28.  "Under Delaware law, directors are entitled to the presumption that they were faithful to their fiduciary duties."  *Freuler*, 803 F. Supp. 2d at 637 (citing *Beam v. Stewart*, 845 A.2d 1040, 1048 (Del. 2004)).  Plaintiffs "bear[ ] the burden of rebutting" this presumption.  *Id.*

*No Red Flags.*  "[R]ed flags are only useful when they are either waived in one's face or displayed so that they are visible to the careful observer."  *In re MetLife Inc.*, 2020 Del. Ch. LEXIS 265, at *35 (Aug. 17, 2020).  To plead *Caremark* liability, "Plaintiffs must identify what, if anything, in the course of [their] reviews or discussions should have been a 'red flag' to the [Board] triggering a duty to further investigate."  *DELL*, 2007 WL 9710279, at *6; *see Citigroup*, 964 A.2d at 128.

Plaintiffs' assertion that the Board ignored red flags of "endemic" discrimination fall flat.  ¶ 273.  The fact the Board received reports about ███████████████████████████ is not a red flag. *City of Detroit Policy & Fire Ret. Sys. v. Hamrock*, 2022 Del. Ch. LEXIS 159, at *62 (June 30, 2022) (board knowledge of pipeline safety violations and a prior gas explosion not red flags of risk of another explosion); *Fisher*, 2021 Del. Ch. LEXIS 61, at *34-35 (board's receipt of thousands of complaints regarding technical bug was not a "red flag" of consumer protection violations).  In *Reiter v. Fairbank*, 2016 Del. Ch. LEXIS 158 (Oct. 18, 2016), the Chancellor held that reports over the course of several years informing directors that Capital One's compliance risk had risen from "low" to "high" were not "red flags" because "[n]one of these reports" stated "that the Company's [compliance] controls and procedures actually had been found to violate statutory requirements at any time or that anyone within Capital One had engaged in fraudulent or criminal

conduct." *Fairbank*, 2016 Del. Ch. LEXIS 158, at *36.  Those reports were, at most, "yellow flags

of caution," which "explained to the directors in considerable detail on a regular basis the initiatives

management was taking to address those problems." *Id*. at *39.  Besides, as courts have held, ██

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ *Hamrock,* 2022 Del. Ch.

LEXIS 159, at *62 ("General risks are not 'red flags' of a specific corporate trauma.  To the contrary,

such knowledge may be evidence that the reporting system in place is working as it should.").

The same is true here.  None of the reports to directors demonstrates that management

"refused to act or displayed an indifference to complying with" anti-discrimination requirements.

*Reiter*, 2016 Del. Ch. LEXIS 158, at *39.  On the contrary, those reports show preventative

measures, TSLA-Janklow 220_000351-53, -487, and directors requesting further data in light of

employee complaints.  TSLA-Janklow 220_000759.  "Thus the factual context [is] fundamentally

inconsistent with the inference [P]laintiff[s] ask[ ] the Court to draw—that the directors must have

known they were breaching their fiduciary duties by tolerating a climate in which the Company was

operating part of its business in defiance of the law." *Reiter*, 2016 Del. Ch. LEXIS 158, at *39-40.

Nor does the allegation that the Board relied on analyses by Tesla's Employee Relations and

Investigations teams demonstrate a breach of fiduciary duty.  Delaware law provides that directors

are "fully protected in relying in good faith" on "information, opinions, reports or statements

presented to the corporation by any of the corporation's officers or employees."  8 Del. C. § 141(e);

*see also Citigroup*, 964 A.2d at 135 (directors may "rely[ ] in good faith on the opinions and

statements of the corporation's officers and employees").  In *Corbat*, Vice Chancellor Glasscock

dismissed a claim alleging that the Citigroup board had failed to address gaps in its anti-money

laundering systems, because the board had been told that "management was preparing an action

plan" and "had achieved progress." 2017 Del. Ch. LEXIS 848, at *54. Tesla's Board received

similar reports from management, including that ████████████████████████████

████████████████████████████████████████████████████

████████████████████ TSLA-Janklow 220_000999. As in *Corbat*, the Board's good faith

reliance on these progress reports in no way suggests bad faith. *See Corbat*, 2017 Del. Ch. LEXIS

848, at *56; *Constr. Indus. Laborers Pension Fund v. Bingle*, 2022 Del. Ch. LEXIS 223, at *33

(Sept. 6, 2022) (dismissing *Caremark* claim because "[t]he Complaint is silent as to what

management told [the Board] that is sufficient to imply bad faith"). "[I]nferences cannot take the

Plaintiffs from inattention to intentional dereliction." *Bingle*, 2022 Del. Ch. LEXIS 223, at *36.

Plaintiffs also allege that Mr. Musk must have known of Tesla's allegedly discriminatory

culture because of his "micromanaging leadership style."[3] Courts repeatedly hold that a "hands-on

management style" does not make an executive omniscient. *See Ind. Elec. Workers' Pension Tr.*

*Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 535 (5th Cir. 2008); *see also In re Daou Sys., Inc.*, 411

F.3d 1006, 1022 (9th Cir. 2005) ("General allegations of defendants' 'hands-on' management style . .

. are insufficient."). Nor does Plaintiffs' allegation that Mr. Musk acknowledged a former

employee's lawsuit establish that Mr. Musk willfully ignored a *systemic* culture of discrimination. ¶

310. One lawsuit, or even several, do not mean that a director or CEO is supposed to "extrapolate on

[his] own" and infer an *unaddressed* systemic problem. *In re GoPro, Inc. S'holder Deriv. Litig.*,

2020 Del. Ch. LEXIS 165, at *28 (Apr. 28, 2020) (no red flag where plaintiffs alleged directors had

---

[3] Similarly, Plaintiffs' criticism of Mr. Musk's email to employees admonishing discriminatory behavior gets it exactly backwards. ¶ 267. Mr. Musk's email addressed discrimination at Tesla head-on, telling employees that they must not "ever intentionally allow someone to feel excluded, uncomfortable or unfairly treated" and must "consider[ ] how someone might feel who is part of a historically less represented group." Ex. 12 at 64. *See Rojas v. Ellison*, 2019 Del. Ch. LEXIS 281, at *22 (July 29, 2019) ("Directors have great discretion to design context- and industry-specific approaches tailored to their companies' business and resources.").

-13-

access to company inventory systems but did not discover a product shortage).

***The Board Took Responsive Action.***  Contrary to Plaintiffs' allegations of inaction, Tesla's Board began implementing an array of remedial measures as early as January 2018.  TSLA-Janklow 220_00352.  This included reviewing ███████████ implementing new ████ expanding the ████████████████████████ updating ███ creating █████████ and increasing ████████████  *See id.*; TSLA-Janklow 220_000487.  Plaintiffs' own Complaint shows "planned remedial actions[,]" so "[t]here is no indication that the board believed" Tesla could act "without consequences."  *In re Qualcomm Inc.,* 2017 Del. Ch. LEXIS 106, at *8-10 (June 16, 2017); *Cabot Oil*, 2022 U.S. Dist. LEXIS 61353, at *57 ("documents on which the shareholders rely do not support a reasonable inference . . . that Cabot was not taking active steps to address, monitor, or engage in discussions . . . about those violations. The updates showed the opposite.").[4]

Plaintiffs' misleading citations to Tesla's books and records tries to hide these measures.



Plaintiffs' claim that ███████████████████████████████████ TSLA-Janklow 220_000759.  Plaintiffs' selective reading infects the entire Complaint.  Plaintiffs cite the left side of a slide presented to the Board stating that ███████████ Yet they omit

_____
[4] Plaintiffs claim that Tesla's use of arbitration clauses contributed to discrimination, ¶ 46, but arbitration clauses are lawful and courts "must give due regard to the federal policy favoring arbitration[.]"  *Martin v. CB Restaurants, Inc.*, 2021 U.S. Dist. LEXIS 126851, at *4 (W.D. Tex. Mar. 12, 2021) (enforcing workplace arbitration).  Whether to maintain such a policy is within the Board's business judgment.  *White v. Panic*, 793 A.2d 356, 370 (Del. Ch. 2000), *aff'd*, 783 A.2d 543 (Del. 2001) (demand not excused where board required arbitration of sexual harassment claims).

the right side of that slide, which states that ███████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████              TSLA-Janklow 220_000351.

Ultimately, "[t]he lacuna in the [P]laintiffs' argument is a failure to recognize that the directors' good faith exercise of oversight responsibility may not invariably prevent employees from violating . . . the law[]." *Ritter*, 911 A.2d at 373 (dismissing complaint).  It would be absurd to expect—nor does Delaware law require—Tesla's Board to eradicate racism and sexual harassment from its ranks of 100,000 employees.  *Id.* ("There is no basis for an oversight claim seeking to hold the directors personally liable for . . . failures by the employees").  "[G]ood faith attempts to address compliance issues, even if unsuccessful, cannot serve as the basis for *Caremark* claims."  *Cabot Oil*, 2022 U.S. Dist. LEXIS 61353, at *58.[5]

### B.    No Substantial Likelihood of Liability for Purported Section 14(a) Claim

Plaintiffs devote six pages of their 112-page Complaint to federal claims, ¶¶ 286-300, "mak[ing] it pretty clear that the Section 14(a) claims are asserted merely as a thinly-pled basis for bringing the case in federal court."  *Smith v. Carrillo*, 2019 U.S. Dist. LEXIS 205836, at *2 n.1 (D. Del. Nov. 26, 2019) (dismissing claim).  Plaintiffs' 14(a) claims fail as a matter of law.  A Section 14(a) claim requires Plaintiffs to show that: "(1) defendants misrepresented or omitted a material fact

---

[5] Because Plaintiffs' unjust enrichment claim "is derivative of [their] fiduciary duty claim[,]" it too fails.  *Friedman v. Khosrowshahi*, 2014 Del. Ch. LEXIS 121, at *38 (July 16, 2014), *aff'd*, 2015 Del. LEXIS 112 (Mar. 4, 2015) (dismissing unjust enrichment claim because "[a]pplying the same logic" as their fiduciary duty claim, plaintiffs "failed to allege particularized facts creating a reasonable doubt concerning the capacity of the Expedia board to consider impartially a demand to pursue the unjust enrichment claim"); *see also In re Ezcorp Inc. Consulting Agreement Deriv. Litig.*, 2016 Del. Ch. LEXIS 14, at *102-103 (Jan. 25, 2016) (an "unjust enrichment count adds nothing" where it "presumes the existence of a breach of fiduciary duty").

in a proxy statement; (2) defendants acted at least negligently in distributing the proxy statement;

and (3) the false or misleading proxy statement was an essential link in causing the corporate

actions." *In re Browning-Ferris Indus., Inc. S'holder Deriv. Litig.*, 830 F. Supp. 361, 365 (S.D. Tex.

1993), *aff'd, Cohen v. Ruckelshaus*, 20 F.3d 465 (5th Cir. 1994).  Because Tesla's Certificate of

Incorporation exculpates directors for all but bad faith breaches of fiduciary duty, however, pleading

negligence is insufficient.  *Vitellone v. Evans*, 2013 U.S. Dist. LEXIS 179016, at *28-29 (S.D. Tex.

Dec. 20, 2013) (Plaintiffs must plead "particularized factual allegations that 'support the inference

that the [alleged] disclosure violation was made in bad faith, ***knowingly or intentionally***'"); *see*

*Carrillo*, 2019 U.S. Dist. LEXIS 205836, at *21-23 (requiring scienter for Section 14(a) claim).

### 1.   Plaintiffs Do Not Identify Any False Statements in the 2021 Proxy

Plaintiffs fail in the threshold task of identifying any misleading or false statements in the

2021 Proxy.  Plaintiffs must "specify each statement alleged to have been misleading" and "the

reason or reasons why the statement is misleading."  *Heinze v. Tesco Corp.*, 971 F.3d 475, 480 (5th

Cir. 2020).  "[V]ague allegations about the gestalt of a proxy statement will not suffice."  *Id.*

***Statement of Values.***  Plaintiffs challenge the Proxy's descriptions of Tesla's commitment to

"do[ing] the right thing" and upholding principles of diversity, equity, and inclusion.  ¶¶ 288, 292.

But these statements are "not actionable under the federal securities laws," because they "are

aspirational [and] incapable of objective verification."  *In re KBR, Inc. Sec. Litig.*, 2018 U.S. Dist.

LEXIS 221137, at *16 (S.D. Tex. Aug. 31, 2018); *Mollenkopf*, 2021 U.S. Dist. LEXIS 220509, at

*5-6 (statements about diversity goals are inactionable; collecting cases); *In re Plains All Am.*

*Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 626 (S.D. Tex. 2018) (same).  Moreover, these

statements were true: Tesla designed its workplace and policies with the goal of combating

discrimination.  *E.g.,* TSLA-Janklow 220_000001 (anti-discrimination policy), -271 (Code of

Ethics).  Plaintiffs did not plead that the Board "did not actually believe" in Tesla's mission, nor did the Proxy "express[ ] something false about its subject."  *Hohenstein v. Behringer Harvard Reit I, Inc.*, 2014 U.S. Dist. LEXIS 40759, at *30 (N.D. Tex. Mar. 27, 2014).

**Board Oversight.**  Plaintiffs' claims regarding statements in the Proxy about "Board oversight over human capital issues" are also unavailing.  ¶ 292.  That is a quintessential *Caremark* claim, as discussed above.  *Supra* Section II.A.  "The law is well-established" that "bootstrapping a federal securities claim to a cause of action for breach of fiduciary duty is not permissible." *Mollenkopf*, 2021 U.S. Dist. LEXIS 220509, at *13 (dismissing § 14(a) claim that "rehashes the same allegations" as "fiduciary duty claims").  Besides, the Proxy merely "recite[s] the directors' responsibilities[,]" which Plaintiffs do not allege are "inaccurately described[.]"  *Kooker v. Baker*, 497 F. Supp. 3d 1, 7 (D. Del. 2020) (dismissing § 14(a) claims).

Tesla is not required to add a new committee simply because a shareholder requests it.  *See GM*, 2015 Del. Ch. LEXIS 179, at *38 ("Decisions . . . regarding the duties of officers and board committees, are a quintessential matter of business judgment that are soundly within a board's discretion.").  Plaintiffs' characterization of Tesla's controls as "low-cost, low-effort solutions" is just a disagreement with the Board's business judgment.  *Coates v. Heartland Wireless Communs., Inc.*, 26 F. Supp. 2d 910, 922 (N.D. Tex. 1998) ("disagreement with a company's business judgment does not state a claim under federal securities laws"); *see also Simons v. Brookfield Asset Mgmt.*, 2022 Del. Ch. LEXIS 15, at *30 (Jan. 21, 2022) ("mere disagreement" with a stock repurchase "does not give rise to a substantial likelihood of liability for disloyalty or bad faith").

**Regulatory Investigations.**  Finally, nondisclosure of a single ongoing regulatory investigation did not render false or misleading any statements about corporate values, oversight, or the Board's belief in Tesla's diversity and inclusion efforts.  There is no "duty to disclose uncharged,

unadjudicated wrongdoing."  *KBR*, 2018 U.S. Dist. LEXIS 221137, at *20; *Loudon v.*

*Archer-Daniels-Midland Co.*, 700 A.2d 135, 143 (Del. 1997) (companies are "not required to engage

in 'self-flagellation' . . . prior to a formal adjudication of the matter.").

### 2.    Plaintiffs Fail to Establish Bad Faith

Even if Plaintiffs had identified any false statements, they would still fall short of pleading

that in publishing the Proxy the directors acted with "an intent to deceive, manipulate, or defraud" or

with "severe recklessness."  *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565

F.3d 200, 207 (5th Cir. 2009).  Citing directors' attendance at board and committee meetings does

not "specify the role of each defendant [and] demonstrat[e] each defendant's involvement in [the

alleged] misstatements and omissions."  *Behrmann v. Brandt*, 2020 U.S. Dist. LEXIS 136543, at *53

(D. Del. July 31, 2020) (dismissing § 14(a) claim); *Pedroli v. Bartek*, 564 F. Supp. 2d 683, 687 (E.D.

Tex. 2008) (no § 14(a) liability "because of [directors'] positions and access to meetings and

documents").  Nothing discussed in those meetings would have alerted the directors that any of the

challenged statements were false.  *Supra* at 11-13; *Steinberg v. Bearden*, 2018 Del. Ch. LEXIS 169,

at *26 (May 30, 2018) (no scienter where presentations did not contradict statements).

### 3.    There Is No "Essential Link" Between the Proxy and Any Alleged Injury

Plaintiffs' Section 14 claim also fails because they cannot "establish that their 'alleged injury

resulted from a transaction *directly authorized* by the [P]roxy solicitation.'"  *Hulliung v. Bolen*, 548

F. Supp. 2d 336, 340 (N.D. Tex. 2008).  Mere speculation that an additional report and a new

committee would have revealed the alleged wrongdoing by Tesla employees to the world is not the

"particularized allegation[ ]" of a direct link required by federal law.  *See Hulliung*, 548 F. Supp. 2d

at 341 & n.4 (no "essential link" where "the Proxies did not in any way concern—let alone

authorize—the implementation of [the company's] internal controls").

"As a matter of common sense, the Prox[y] cannot be an essential link to harm caused by" the loss of employees and investigations "that occurred years prior to the Prox[y's] issuance." *Hulliung*, 548 F. Supp. 2d at 340; *see* ¶¶ 49, 281, 302-03.  Though Plaintiffs claim that "high quality employees" will be deterred from joining Tesla, ¶ 302, the Complaint is "utterly devoid of any particularized allegations to that effect."  *Hulliung*, 548 F. Supp. 2d at 341 n.4 (no essential link where plaintiffs "vaguely hint" about future harm).  Plaintiffs' claim that Tesla will be injured from investigations or lawsuits is rank speculation—the Proxy cannot have directly caused something that has yet to occur.  *City of Birmingham Relief & Ret. Sys. v. Hastings*, 2019 WL 3815722, at *15 (N.D. Cal. Feb. 13, 2019) (no essential link for "potential liability for a tax investigation").

## III.      A MAJORITY OF THE BOARD IS INDEPENDENT

Because Plaintiffs fail to show that a *single* Board member—much less a *majority*—is interested, the Court need not address their independence.  "In the absence of a showing that one or more board members is disqualified as interested, there is no reason to evaluate whether any remaining board member would be so beholden to that person or persons as to be unable to exercise independent judgment."  *In re Oracle Corp. Deriv. Litig.*, 2011 U.S. Dist. LEXIS 129765, at *19 (N.D. Cal. Nov. 9, 2011) (dismissing complaint).  Plaintiffs' allegations that Mr. Musk controls the Board are simply irrelevant: he is not self-interested in the outcome of their claims, because he does not face a substantial likelihood of liability himself.  *See supra* Section II.

But even if the Court were to examine Plaintiffs' independence allegations, it would find them hopelessly deficient.  Plaintiffs' allegations fall into two categories.  First, they claim that Mr. Musk somehow controls Tesla.  As discussed below, that is both untrue and insufficient.  Second, Plaintiffs claim that a majority of the Board is beholden to Mr. Musk.  But Plaintiffs fail to allege any particularized facts showing that a majority of directors are "so 'beholden' to an interested

director . . . that [their] discretion would be sterilized." *Zuckerberg*, 262 A.3d at 1060.  "[I]n the

demand futility context, directors are presumed to be independent."  *Owens v. Mayleben*, 2020 Del.

Ch. LEXIS 59, at *23 (Feb. 13, 2020).  Plaintiffs do not rebut this presumption.

### A.       Mr. Musk Does Not Control Tesla (Nor Is That Relevant)

Plaintiffs concede that Mr. Musk owns only 17% of Tesla's stock and thus does not have

voting control over Tesla.  ¶ 321.  Instead, through a series of embellished anecdotes, Plaintiffs

attempt to portray Mr. Musk as somehow controlling the Company despite his lack of dispositive

voting power.  Delaware courts have long held that "[a] stockholder's control of a corporation does

not excuse presuit demand on the board without particularized allegations of relationships between

the directors and the controlling stockholder demonstrating that the directors are beholden to the

stockholder."  *Beam v. Stewart*, 845 A.2d 1040, 1054 (Del. 2004) (demand not excused even if

company controlled by stockholder with 94% voting power).  Plaintiffs rely on "conclusory

allegations of domination and control that are insufficient to excuse pre-suit demand."  *Kandell v.

Niv*, 2017 Del. Ch. LEXIS 640, at *44 (Sept. 29, 2017) (dismissing complaint).

***Involvement in 2016 Transaction***.  Plaintiffs argue that the Delaware Court of Chancery held

in an unrelated lawsuit that Mr. Musk was involved in Tesla's 2016 acquisition of SolarCity "to a

degree greater than he should have been[.]"  ¶ 322.  Plaintiffs fail to explain how a *six year old*

transaction informs the current Board's ability to consider an unrelated demand.  *See Tilden v.

Cunningham*, 2018 Del. Ch. LEXIS 510, at *28 (Oct. 26, 2018) ("speculative allegations of a

situational conflict" involving litigation "not … even related to this derivative litigation" were

"inadequate to disqualify [director] from considering a demand"); *Brookfield Asset Mgmt.*, 2022 Del.

Ch. LEXIS 15, at *28 n.80 ("it is not reasonable to conclude that a series of unrelated market

transactions call [independence] into question").  Plaintiffs omit that *at trial* the Court of Chancery

found *in favor of Tesla*, holding that the "Tesla fiduciaries placed the interests of Tesla stockholders ahead of their own." *Tesla*, 2022 Del. Ch. LEXIS 94, at *61. The Court expressly found that "[w]hile *involved*, [Mr. Musk] did not *impede* the Tesla Board's pursuit of a fair price." *Id.* at *68. The Court's verdict suggests the opposite of a Board with "sterilized" judgment.

 ***Replacing Tesla's CEO in 2007.*** Plaintiffs next invoke Mr. Musk's replacement of Tesla's then-CEO in 2007. ¶ 323. Mr. Musk was Chairman of the Board at the time and Tesla's principal investor. There is no dispute that in the intervening *fifteen* years, Tesla thrived under Mr. Musk's leadership. Courts have refused to infer dominance from executive replacements—much less from stale ones a decade-and-a-half before. *McElrath v. Kalanick*, 2019 Del. Ch. LEXIS 107, at *51 (Apr. 1, 2019) (independence claim "based solely on the fact that Kalanick appointed him during a power struggle" insufficient to plead demand futility). Plaintiffs' conclusory allegations leave the Court "to guess about the exact discretion and authority [Mr. Musk] exercise[d]" over the decision and "how much influence" he had over the directors. *See Midwestern Teamsters Pension Trust Fund v. Deaton*, 2009 U.S. Dist. LEXIS 50521, at *39 (S.D. Tex. May 7, 2009) (dismissing claim that CEO was beholden to committee).[6] Rather than show that Mr. Musk controls the Board today, these allegations show that fifteen years ago Tesla's then-Board thought Mr. Musk was the best person to lead Tesla. They were right: Tesla's shareholders have reelected Mr. Musk to the Board ever since.

 **B. All Outside Directors Are Independent of Mr. Musk**

 Even if Mr. Musk controlled Tesla (which he does not), Plaintiffs' remaining allegations about the outside directors are without merit.

---

[6] Plaintiffs also urge the Court to somehow infer that Mr. Musk controls Tesla's Board by drawing attention to SpaceX, an ***entirely separate company***. ¶ 324. This flouts Delaware law, which "is largely built on the idea that the separate legal existence of corporate entities should be respected—even when those separate corporate entities are under common ownership and control." *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1038 (Del. Ch. 2006).

*Mr. Ehrenpreis.*  Plaintiffs first assert that Mr. Ehrenpreis is not independent because he manages a venture fund that has invested in Tesla, SpaceX, and SolarCity.  ¶ 326.  But Delaware law does not "infer a lack of director independence simply because that director owns stock in the company on whose board he sits."  *Mayleben*, 2020 Del. Ch. LEXIS 59, at *24-25.  On the contrary, "that dynamic is common and is generally regarded as a desirable alignment of incentives between fiduciaries and beneficiaries."  *Id.*  Plaintiffs' claim that Mr. Musk's position as a board member and investor at Mapbox renders Mr. Ehrenpreis beholden to him is also deficient.  ¶ 329.  "[T]he [C]omplaint does not make any particularized allegations" as to how Mapbox's contract with Tesla "was material to [Mapbox's] business interests," let alone to Mr. Ehrenpreis's.  *Zuckerberg*, 262 A.3d at 1062.  Absent allegations that "[Mr. Ehrenpreis] would risk [his] reputation[ ] and career[ ] to protect [Mapbox's] relationship with [Tesla]," it is irrelevant that Mr. Musk controlled whether Tesla hired Mapbox.  *See also In re Facebook, Inc.*, 922 F.Supp. at 472 (dismissing complaint).[7]

Mr. Ehrenpreis's "admiration" for Mr. Musk, ¶ 328, is "not sufficient to compromise [Mr. Ehrenpreis's] independence."  *See UFCW & Part. Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 250 A.3d 862, 899 (Del. Ch. 2020).  Vice Chancellor Laster declined to find a Facebook director beholden to CEO Zuckerberg despite having stated that he was "proud to be a small part of [Zuckerberg's] life."  *Id.* (finding it suggested nothing more than a "collegial relationship"); *Kalanick*, 2019 Del. Ch. LEXIS 107, at *53 (allegations that Uber director "defended [CEO] . . . when his leadership of Uber was embroiled in controversy" were "not noteworthy").

---

[7] That one of Mr. Ehrenpreis's many business partners previously served on the board of SolarCity—a company irrelevant to this lawsuit—is "a *more* attenuated business relationship" also insufficient to establish demand futility.  *See In re Match Grp., Inc. Deriv. Litig.*, 2022 Del. Ch. LEXIS 212, at *41-42 (Sept. 1, 2022) (emphasis added) (dismissing with prejudice argument that "[director] cannot be independent because of her husband's employment at [law firm] who served as outside counsel for [the company]"); *In re Kraft Heinz Co. Deriv. Litig.*, 2021 Del. Ch. LEXIS 295, at *19 (Dec. 15, 2021) (rejecting a similar "transitive theory of independence").

Equally benign is Mr. Ehrenpreis's statement that his Tesla directorship has been a "real benefit in fund-raising," ¶ 328, and that he had rights to buy the first Tesla Model 3.  ¶ 328. Plaintiffs allege no particularized facts that either benefit was "material to [Mr. Ehrenpreis's] interests," financial or otherwise.  *See Zuckerberg*, 262 A.3d at 1063 (rejecting allegation that director was beholden to CEO Zuckerberg because his venture capital fund "'[got] good deal flow from its high profile association' with Facebook"); *MCG Capital Corp. v. Maginn*, 2010 Del. Ch. LEXIS 87, at *76 (May 5, 2010) (plaintiff failed to plead "particulars . . . that [directors'] objective judgment would be impaired by the threat of losing their . . . compensation").

**Ms. Denholm.**  Plaintiffs attempt to twist Ms. Denholm's 2019 statement about Mr. Musk's Twitter activity into evidence of subservience.  ¶ 332.  But her statement had nothing to do with the present case, so the Court "need not reach the question of [her] independence" at all.  *See Kalanick*, 2019 Del. Ch. LEXIS 107, at *47.  Ms. Denholm's other statements praising Mr. Musk also say nothing of her independent judgment.  *See supra* at 22.  No wonder that, after a trial on the merits, Vice Chancellor Slights heralded Ms. Denholm as a "director who was not, and would not be, unduly influenced by [Mr. Musk]."  *See Tesla Motors*, 2022 Del. Ch. LEXIS 94, at *68.

**Mr. Mizuno.**  Plaintiffs' barebones allegation that Mr. Mizuno described Mr. Musk as his "friend," ¶ 333, is "insufficient, without more, to rebut the presumption of independence." *Kraft Heinz*, 2021 Del. Ch. LEXIS 295, at *21; *see also Parker*, 803 F. Supp. at 646 n.24.  Similarly, Plaintiffs fail to identify the content of the alleged "lewd tweets" Mr. Mizuno responded to, ¶ 333, or how they render him unable to consider their demand.  *See Niv*, 2017 Del. Ch. LEXIS 640, at *46 (demand futility not excused where "particularized facts alleging that directors . . . were dominated or controlled by an [interested] party" are "wholly absent from the Complaint").  Nor do Plaintiffs explain how Mr. Mizuno's gratitude to Mr. Musk for his charitable donations to a Japanese city, ¶

333, makes him subservient to Mr. Musk. Plaintiffs do "not allege that . . . donations made by [Mr. Musk] were the result of active solicitation by [Mr. Mizuno]" or "how the amounts given influenced [Mr. Mizuno's] decision-making process." *In re Goldman Sachs Group, Inc. S'holder Litig.*, 2011 Del. Ch. LEXIS 151, at *29 (Oct. 12, 2011) (dismissing with prejudice).

    ***Mr. Murdoch.*** Mr. Murdoch's public praise of Mr. Musk's "audacious goals," ¶ 334, does not suggest that he is so "under his influence" so as to raise "doubt that [he] could bring [his] impartial business judgment to bear on a litigation demand." *Zuckerberg*, 262 A.2d at 1049.

    ***Mr. Ellison.*** Plaintiffs include demand futility allegations against Mr. Ellison, even though he stepped down from Tesla's Board on August 4, 2022, before the filing of their amended Complaint. As a result, demand futility allegations against him are irrelevant, since he could not have considered a demand a month later. In any event, the allegations directed at Mr. Ellison's independence, a celebrated American CEO well before he met Mr. Musk, are even flimsier.

    Plaintiffs characterize Mr. Ellison's *factual* praise of Mr. Musk's space rocket landings, ¶ 330, as evidence of control. Crediting Mr. Musk for genuine accomplishments does not mean that Mr. Ellison could not discharge his fiduciary duties. Nor does an allegation that the two are "very close friends," having reportedly dined for four hours together in August 2022. ¶ 330. "Not all friendships, or even most of them, rise to [the] level" of undercutting director independence. *In re Lendingclub Corp. Deriv. Litig.*, 2019 Del. Ch. LEXIS 1347, at *39 (Oct. 31, 2019) (13-year working relationship and "significant business and social ties" did not excuse demand); *Kraft Heinz*, 2021 Del. LEXIS 295, at *17-18 (allegation that Buffett "walked [director] down the aisle at her wedding . . . provide[d] no reason to doubt that [she] could not exercise . . . independent judgment").

    Plaintiffs' reliance on tabloid gossip about Mr. Musk's travels, ¶ 330, reveals nothing about Mr. Ellison's ability to consider demand. *Talley v. Mann*, 2012 U.S. Dist. LEXIS 50523, at *25-26

(C.D. Cal. Feb. 14, 2012) (allegation that control person "regularly allow[ed] the other directors to use his personal aircraft to attend MannKind Board meetings" insufficient to plead demand futility). Nor do "conclusory assertion[s]" implying that Mr. Ellison is Mr. Musk's confidant and advisor have "sufficient specificity to support a claim that the two have such a close personal relationship that [Mr. Ellison] lacks independence." *Kalanick*, 2019 Del. Ch. LEXIS 107, at *48-49; *In re Am. Apparel, Inc.* 2015 U.S. Dist. LEXIS 191466, at *68 (C.D. Cal. Apr. 28, 2015) (director independent despite being "personal consultant, and . . . 'one of [CEO's] confidants on the board'").

Mr. Ellison's investment in Tesla (allegedly worth $12 billion) makes him *more* aligned with stockholders, not less. The "[C]omplaint alleges nothing about [Mr. Ellison] to suggest that [$12 billion] is, in fact, personally material to [him]." *Maginn*, 2010 Del. Ch. LEXIS 87, at *76. This assertion is all the more dubious given Mr. Ellison's vast personal wealth.[8] Finally, allegations "entang[ed] financial alliances" do not establish demand futility. *See* ¶ 331; *Parker*, 803 F. Supp. 2d at 646 n.24 (S.D. Tex. 2011) (dismissing complaint).

Finally, Plaintiffs make no allegations about Ms. Wilson-Thompson, another outside director. In short, Plaintiffs cannot impugn the independence of a majority of the Board.[9]

## CONCLUSION

The Court should dismiss Plaintiffs' lawsuit for failure to make demand.

Dated: November 7, 2022                          Respectfully submitted,

                                                 /s/Boris Feldman
                                                 Boris Feldman *(pro hac vice)*
                                                 Doru Gavril (*pro hac vice*)

---

[8] Courts have highlighted the independence of the "*uber*-rich," like Mr. Ellison. *Zuckerberg*, 250 A. 3d. at 898-99; *see* ¶¶ 330-31 (Mr. Ellison has "made billions of dollars" and has a "private island").
[9] The only thing that Plaintiffs get right about Mr. Kimbal Musk is that he is Elon Musk's brother. Plaintiffs do not plead facts showing that Mr. Kimbal Musk's judgment would be sterilized because of this familial relationship.

Jennifer Loeb (*pro hac vice*)
Rebecca Lockert (*pro hac vice*)
Olivia Rosen (*pro hac vice*)

FRESHFIELDS BRUCKHAUS
DERINGER US LLP
855 Main Street
Redwood City, California 94063
Telephone: (650) 421-8200
Facsimile: (212) 277-4001
E-mail: boris.feldman@freshfields.com
      doru.gavril@freshfields.com
      jennifer.loeb@freshfields.com
      rebecca.lockert@freshfields.com
      olivia.rosen@freshfields.com

Gary Ewell (SBN: 06752800)
Alithea Z. Sullivan (SBN: 24072376)
EWELL, BROWN, BLANKE & KNIGHT LLP
111 Congress Avenue, Suite 2800
Austin, Texas 78701
Telephone: (512) 770-4000
Facsimile: (877) 851-6384
E-mail:  gewell@ebbklaw.com
      asullivan@ebbklaw.com

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that I have served a true and correct copy of this motion upon each attorney of record and the original upon the Clerk of Court on this the 7th day of November, 2022.

s/Boris Feldman_____
Boris Feldman (*pro hac vice*)