UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE TESLA INC. STOCKHOLDER DERIVATIVE LITIGATION | § § § § § § § | Lead Case No. 1:22-cv-00592-LY |
| | | (Consolidated with Case No. 1:22-cv-00611-LY) |
| This Document Relates To:<br><br>All Cases | § § § § § § § | DEMAND FOR JURY TRIAL |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS VERIFIED CONSOLIDATED DERIVATIVE COMPLAINT**

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................1

II.   STATEMENT OF FACTS ......................................................................................3

      A.    Tesla's Discriminatory Workplace Policies and Practices Violate the Law ...........3

      B.    E. Musk Knew About, Encouraged, and Failed to Rectify the Widespread
            and Unlawful Culture of Harassment and Discrimination at Tesla ........................5

      C.    The Individual Defendants Knowingly Failed to Rectify the Widespread
            and Unlawful Culture of Discrimination and Harassment at Tesla ........................7

      D.    The Board Knowingly Issued the False and Misleading 2021 Proxy
            Statement...............................................................................................................8

III.  ARGUMENT .........................................................................................................8

      A.    Legal Standards Applicable to this Motion to Dismiss ..........................................8

      B.    Plaintiff Has Adequately Alleged Demand Futility...............................................10

            1.    Demand is Futile Because at Least Half the Members of the
                  Demand Board Face a Substantial Likelihood of Liability ......................10

            2.    There Is Reason to Doubt the Independence of at Least Three
                  Directors from E. Musk, Providing an Additional Basis for
                  Demand Futility .....................................................................................20

            3.    Demand Is Also Futile as to Plaintiff's 14(a) Claim ...............................26

IV.   CONCLUSION....................................................................................................30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Abbott Lab'ys. Derivative S'holders Litig.*,
  325 F.3d 795 (7th Cir. 2003) ...................................................................18

*In re Am. Int'l Grp., Inc.*,
  965 A.2d 763 (Del. Ch. 2009)..................................................................13

*Amalgamated Bank v. Yahoo! Inc.*,
  132 A.3d 752 (Del. Ch. 2016)....................................................................9

*Stone ex rel. AmSouth Bancorporation v. Ritter*,
  911 A.2d 362 (Del. 2006) .........................................................................10

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)....................................................................................8

*In re Baker Hughes Inc. Merger Litig.*,
  2020 WL 6281427 (Del. Ch. Oct. 27, 2020) ......................................10, 14, 28, 29

*Baker, Watts & Co. v. Miles & Stockbridge*,
  876 F.2d 1101 (4th Cir. 1989) .................................................................28

*Beck v. Dobrowski*,
  559 F.3d 680 (7th Cir. 2009) ...................................................................27

*Brehm v. Eisner*,
  746 A.2d 244 (Del. 2000) ...........................................................................9

*United States v. Causey*,
  2005 WL 2647976 (S.D. Tex. Oct. 17, 2005)...................................26, 27

*City of Detroit Policy & Fire Ret. Sys. v. Hamrock*,
  2022 WL 2387653 (Del. Ch. June 30, 2022).........................................19

*City of Warren Gen. Empls.' Ret. Sys. v. Roche*,
  2020 WL 7023896 (Del. Ch. Nov. 30, 2020) ...................................28, 29

*Cohen v. Viray*,
  622 F.3d 188 (2d Cir. 2010).....................................................................28

*In re Columbia Pipeline Grp., Inc. Merger Litig.*,
  2021 WL 772562 (Del. Ch. Mar. 1, 2021).............................................29

*In re Crimson Exploration Inc. S'holder Litig.*,
  2014 WL 5449419 (Del. Ch. Oct. 24, 2014) .........................................21

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) ........................................................................13

*Del. Cnty. Emps. Ret. Fund v. Sanchez*,
124 A.3d 1017 (Del. 2015) ....................................................................9, 13, 25

*Edwards v. McDermott Int'l, Inc.*,
2021 WL 1421603 (S.D. Tex. Apr. 13, 2021) ..................................................26

*In re Facebook, Inc. Section 220 Litig*,
2019 WL 2320842 (Del. Ch. May 30, 2019) ....................................................19

*In re Fitbit, Inc. S'holder Derivative Litig.*,
2018 WL 6587159 (Del. Ch. Dec. 14, 2018) ....................................................23

*Rich ex rel. Fuqi Int'l, Inc. v. Chong*
(Del. Ch. 2013) 66 A.3d 963 ............................................................................11

*Gantler v. Stephens*,
965 A.2d 695 (Del. 2009) ....................................................................10, 11, 12

*H&N Mgmt. Grp. v. Couch*,
2017 WL 3500245 (Del. Ch. Aug. 1, 2017) ....................................................30

*In re Hansen Med., Inc. S'holders Litig.*,
2018 WL 3025525 (Del. Ch. June 18, 2018) ....................................................29

*In re Hansen Med., Inc. S'holders Litig.*,
2018 WL 3030808 (Del. Ch. June 18, 2018) ....................................................29

*Harbor Fin. Partners v. Huizenga*,
751 A.2d 879 (Del. Ch. 1999) ..........................................................................22

*In re Heckmann Corp. Sec. Litig.*,
869 F. Supp. 2d 519 (D. Del. 2012) ..................................................................28

*Himstreet v. Scharf*,
No. CGC-22-599223, slip op. (Cal. Super. Ct.-S.F. Cnty. Oct. 5, 2022) ........18, 23

*Hughes v. Hu*,
2020 WL 1987029 (Del. Ch. Apr. 27, 2020) ....................................................20

*Hulliung v. Bolen*,
548 F. Supp. 2d 336 (N.D. Tex. 2008) ..............................................................30

*Int'l Equity Cap. Growth Fund, L.P. v. Clegg*,
1997 WL 208955 (Del. Ch. Apr. 22, 1997) ......................................................24

*Kahn v. Lynch Comm'ns Sys., Inc.*,
638 A.2d 1110 (Del. 1994) ................................................................................20

*Knollenberg v. Harmonic, Inc.*,
    152 F. App'x 674 (9th Cir. 2005) ........................................................27

*Kurr v. Orbital ATK, Inc.*,
    276 F. Supp. 3d 527 (E.D. Va. 2017) ................................................27

*Lebanon Cnty. Employees' Ret. Fund v. Collis*,
    __ A.3d __, 2022 WL 17687848 (Del. Ch. Dec. 15, 2022)..................9, 11, 19

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*,
    594 F.3d 383 (5th Cir. 2010) ............................................................9

*La. Mun. Police Emps.' Ret. Sys. v. Pyott*,
    46 A.3d 313 (Del. Ch. 2012)..................................................9, 10, 11

*Marchand v. Barnhill*,
    212 A.3d 805 (Del. 2019) ................................................................25

*Marcus Vaughn et al. v. Tesla, Inc.*,
    __ Cal. Rptr. 3d __, 2023 WL 29132 (Cal. Ct. App. Jan. 4, 2023) ..............4

*In re Massey Energy Co.*,
    2011 WL 2176479 (Del. Ch. May 31, 2011)..........................1, 11, 17, 18

*In re Maxim Integrated Prods., Inc. Derivative Litig.*,
    574 F. Supp. 2d 1046 (N.D. Cal. 2008) ..............................................27

*McCall v. Scott*,
    239 F.3d 808 (6th Cir. 2001) ............................................................17

*In re McKesson HBOC, Inc. Sec. Litig.*,
    126 F. Supp. 2d 1248 (N.D. Cal. 2000) ..............................................27

*In re MetLife Inc. Derivative Litig.*,
    No. CV 2019-0452-SG, 2020 WL 4746635 (Del. Ch. Aug. 17, 2020) ..................15

*In re Mindbody, Inc.*,
    2020 WL 5870084 (Del. Ch. Oct. 2, 2020) ..........................................15

*Morrison v. Berry*,
    191 A.3d 268 (Del. 2018), *as revised* (July 27, 2018)..............................28

*In re New Valley Corp. Derivative Litig.*,
    2001 WL 50212 (Del. Ch. Jan. 11, 2001)........................................23, 25

*In re Oracle Corp. Derivative Litig.*,
    2018 WL 1381331 (Del. Ch. Mar. 19, 2018)......................................20, 22

*In re Oxford Health Plans, Inc.*,
    192 F.R.D. 111 (S.D.N.Y. 2000) ......................................................17

*Parsons v. Jefferson-Pilot Corp.*,
    789 F. Supp. 697 (M.D.N.C. 1992) ...................................................................27

*Pfeiffer v. Toll*,
    989 A.2d 683 (Del. Ch. 2010)...........................................................................20

*Plotkin v. IP Axess Inc.*,
    407 F.3d 690 (5th Cir. 2005) .............................................................................8

*In re Primedia Inc. Derivative Litig.*,
    910 A.2d 248 ....................................................................................................23

*Rales v. Blasband*,
    634 A.2d 927 (Del. 1993) ...................................................................................9

*Reiter v. Fairbank*,
    2016 WL 6081823 (Oct. 18, 2016) ..............................................................17, 18

*Rosenblatt v. Getty Oil Co.*,
    493 A.2d 929 (Del. 1985) .................................................................................27

*Rosenbloom v. Pyott*,
    765 F.3d 1137 (9th Cir. 2014) ..........................................................................17

*Rosky ex rel. Wellcare Health Plans, Inc. v. Farha*,
    2009 WL 3853592 (M.D. Fla. Mar. 30, 2009) .................................................16

*Ryan v. Gifford*,
    918 A.2d 341 (Del. Ch. 2007).......................................................................10, 30

*Ryan v. Gifford*,
    935 A.2d 258 (Del. Ch. 2007).......................................................................13, 14

*Sandys v. Pincus*,
    152 A.3d 124 (Del. 2016) .............................................................................23, 24

*In re SCANA Corp. Derivative Litig.*,
    2018 WL 3141813 (D.S.C. June 27, 2018).......................................................16

*Shapiro v. UJB Fin. Corp.*,
    964 F.2d 272 (3d Cir. 1992).............................................................................27

*Shidler v. All Am. Life & Fin. Corp.*,
    775 F.2d 917 (8th Cir. 1985) .......................................................................16, 27

*Teamsters Loc. 443 Health Servs. & Ins. Plan v. Chou*,
    2020 WL 5028065 (Del. Ch. Aug. 24, 2020) ...................................................11

*In re Tesla Motors, Inc. S'holder Litig.*,
    2018 WL 1560293 (Del. Ch. Mar. 28, 2018)............................................21, 22, 25

*In re Tesla Motors, Inc. Stockholder Litigation*,
    2022 WL 1237185 (Del. Ch. April 27, 2022) ........................................................................21

*United Food & Com. Workers Union v. Zuckerberg*,
    250 A.3d. 862 (Del. Ch. 2020) ..............................................................................................24

*United Food & Com. Workers Union v. Zuckerberg*,
    262 A.3d 1034 (Del. 2021) ......................................................................................................10

*In re Veeco Instruments, Inc. Sec. Litig.*,
    434 F. Supp. 2d 267 (S.D.N.Y. 2008) ...................................................................................16

*Vitellone v. Evans*,
    2013 WL 6806179 (S.D. Tex. Dec. 20, 2013) .......................................................................28

*Voigt v. Metcalf*,
    2020 WL 614999 (Del. Ch. Feb. 10, 2020) .............................................................................9

*In re Walt Disney Co. Derivative Litig.*,
    825 A.2d 275 (Del. Ch. 2003) ................................................................................................30

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
    282 F. Supp. 3d 1074 (N.D. Cal. 2017) ...........................................................................28, 29

*Wilson v. Great Am. Indus., Inc.*,
    855 F.2d 987 (2d Cir. 1998) ...................................................................................................27

*In re Zhongpin Inc. S'holders Litig.*,
    2014 WL 6735457 (Del. Ch. Nov. 26, 2014) ........................................................................21

*In re Zoran Corp. Derivative Litig.*,
    511 F. Supp. 2d 986 (N.D. Cal. 2007) ...................................................................................27

## STATUTES, RULES & OTHER AUTHORITIES

Del. Ch. Ct. R. 23.1 ........................................................................................................................20, 30

Fed. R. Civ. P.
    15(a)(2) ....................................................................................................................................30
    12(b)(6) ..................................................................................................................................8, 30

California's FEHA and the Civil Rights Act of 1866 ...................................................... *passim*

Section 14(a) of the Securities Exchange Act of 1934 ..................................................... *passim*

## I.    INTRODUCTION

This shareholder derivative action seeks redress on behalf of Tesla, Inc. ("Tesla" or the "Company") for an array of systemic wrongs fostered and permitted by the Company's Board of Directors (the "Board"), including Chief Executive Officer ("CEO"), director, and self-appointed "Technoking" of Tesla, Elon Musk ("E. Musk").  Under the defendants' direction and supervision, Tesla has long maintained a pernicious culture of illegal harassment, discrimination, and retaliation against its Black and female employees.  Investigations and lawsuits from regulators and employees have exposed the severity and extent of the illegal workplace culture at Tesla.  A three-year investigation undertaken by California's Department of Fair Employment and Housing ("DFEH") found that Tesla maintains a racially segregated workplace where Black employees are discriminated against in every aspect of their employment.  A litany of female complainants have described a workplace where sexual harassment, discrimination, and retaliation are commonplace, routinely go unaddressed, and often are even perpetrated personally by Tesla supervisors and managers.  This unlawful course of conduct predictably resulted in investigations, lawsuits, and regulatory action and/or investigations by the DFEH and the United States Equal Employment Opportunity Commission ("EEOC"), as well as numerous current and former Tesla employees— one of which has already resulted in a multi-million dollar verdict against the Company.  Despite knowledge of the wrongdoing and bright red flags of unlawful conduct being waved in their faces, the defendants – including the Board – failed to take meaningful steps to prevent, halt, and/or remedy the misconduct, and Tesla and its stockholders have suffered significant harm as a result.

As fiduciaries of a Delaware corporation, Tesla's directors may not willfully blind themselves to illegal activity or fail to act in the face of a known duty.  *See In re Massey Energy Co.*, 2011 WL 2176479, at *19-20 (Del. Ch. May 31, 2011).  As an employer operating in California and nationwide, Tesla is required to comply with California's Fair Employment and

Housing Act ("FEHA") and federal laws and regulations designed to prevent workplace harassment and discrimination on the basis of race, sex, and gender. For years, however, with E. Musk and the Board's knowledge and approval, Tesla systematically discriminated against its Black and female employees in direct contravention of these laws and regulations. E. Musk, in particular, fostered a culture of non-compliance, punctuated by his response of encouraging employees to simply be more "thick-skinned" in the face of illegal discrimination and harassment, while his own communications—including using official Company channels to criticize victims and normalize discrimination and harassment in Tesla's workplace—set a toxic tone at the top.

Despite the fulsome factual record evidencing this misconduct, Defendants have moved to dismiss this Action on the ground that Plaintiff was required to first make a pre-suit demand on Tesla's Board. But the particularized facts alleged in the Complaint establish that a demand would have been futile, and therefore is legally excused, because at least half of the members of the Board at the time this litigation was commenced on June 22, 2022 (the "Demand Board")—including E. Musk in his capacity as CEO—face a substantial likelihood of liability for breaching their fiduciary duties of good faith and loyalty, including by causing and/or consciously permitting the Company (1) to violate state and federal employment laws by fostering and permitting a culture of racist and sexist harassment, discrimination, and retaliation; and (2) to issue a false and misleading Proxy Statement in violation of Section 14(a) of the Securities Exchange Act of 1934 ("Section 14(a)"). Demand on Tesla's Board also would have been futile, and therefore is legally excused, because Plaintiff has alleged particularized facts demonstrating reason to doubt that the members of the Demand Board are independent of E. Musk, who himself faces a substantial likelihood of liability for knowingly permitting and encouraging the unlawful conduct as a Tesla director and officer.

For the reasons discussed herein, Defendants' Motion should be denied in its entirety.

## II.    STATEMENT OF FACTS

### A.    Tesla's Discriminatory Workplace Policies and Practices Violate the Law

Tesla is one of the largest manufacturing employers in the state of California.  ¶31.[1]  The Company's factory in Fremont, CA (the "Fremont factory") alone employs more than 22,000 employees.  *Id*.  The Company employs thousands more employees at its additional three manufacturing facilities in the United States.  ¶30.  As an employer operating in the state of California and nationwide, Tesla is subject to state and federal laws concerning the treatment of its employees, including laws that prohibit the Company from engaging in and permitting employment discrimination, harassment, and retaliation against its employees on the basis of race, sex, and gender.  In direct contravention of these laws and the Company's own statements and purported objectives, the Individual Defendants have fostered and permitted a culture of rampant race- and sex-based discrimination, harassment, and retaliation at the Company.  ¶37.

The Company's practices violated California's FEHA and the Civil Rights Act of 1866, codified as 42 U.S.C. §1981 ("Section 1981").  ¶¶38-39.  After conducting a three-year investigation that began in 2019, the DFEH initiated suit against Tesla in February of 2022 based on extensive evidence demonstrating that (i) the Company systematically discriminated against Black employees in virtually every aspect of their employment; and (ii) management and the Board, in particular, failed to take steps to prevent unlawful discrimination, harassment, and retaliation against Black employees.[2]  ¶¶48-68.  The investigation revealed that Tesla's management knew about widespread racial harassment and discrimination since at least 2012 due

---

[1] Unless otherwise indicated, paragraph references ("¶___" or "¶¶___-___") are to Plaintiff's Verified Consolidated Derivative Complaint, filed September 6, 2022 ("the Complaint").

[2] On August 26, 2022, the Honorable Evelio M. Grillo of the Superior Court of California, County of Alameda overruled Tesla's demurrer and motion to strike portions of the DFEH's complaint, finding that the factual allegations were sufficiently specific to withstand Tesla's demurrer.  ¶69.

to the litany of complaints Black employees lodged against the Company. ¶59. Tesla leadership not only failed to address these complaints, but actually retaliated against the complainants by denying them bonuses and advancement opportunities, making false accusations against them, denying their transfer requests, and terminating their employment. ¶60. The EEOC has since issued a "cause finding" against the Company that "closely parallels" the DFEH's findings. ¶70.

Tesla also instituted a policy of forcing employees to sign mandatory arbitration agreements as a condition of their employment, which leadership maintained to shield the Company from employees seeking to hold it accountable for its rampant racist and sexist conduct. ¶¶46, 65-66. This policy had the intended effect of discouraging and suppressing reporting of discrimination and harassment at the Company. *Id*. Although Tesla has historically enjoyed some success hiding behind this policy, recent court rulings have allowed multiple employees who signed arbitration agreements to nonetheless proceed with their claims against the Company in open court. ¶46.[3]

In November 2021, a San Francisco jury awarded former Tesla employee Owen Diaz $137 million in total damages (subsequently modified to $15 million),[4] finding that Tesla had violated

---

[3] For example, on January 4, 2023, the California Court of Appeal for the First District rejected Tesla's attempt to use arbitration to forestall claims of racial discrimination in violation of FEHA, holding that Tesla could not compel public injunction claims, such as those brought under FEHA, to arbitration. See *Marcus Vaughn et al. v. Tesla, Inc.*, __ Cal. Rptr. 3d __, 2023 WL 29132, at *1 (Cal. Ct. App. Jan. 4, 2023).

[4] Defendants contend that the Complaint omits and/or mischaracterizes the Honorable William H. Orrick's reduction of the jury's damages award—but it does no such thing. *Compare* Motion at 4 *with* ¶¶4, 88-89. It is actually Defendants who have omitted material information here. Judge Orrick based the majority of his damages reductions on constitutional grounds, not on any factors mitigating the severity of the conduct by Tesla and its fiduciaries. ¶¶88-89. In fact, Judge Orrick cited the highly disturbing and reprehensible nature of Tesla's conduct toward its own employees as a basis for selecting the highest punitive damages ratio permitted by the Constitution. ¶¶89-90. Finally, while Defendants note that Judge Orrick ultimately ordered a new trial on damages, they fail to mention that he only did so because the plaintiff in that case rejected the reduced award as insufficient. *See* Motion, Ex. 10.

Section 1981 by subjecting Diaz to a racially hostile work environment. The jury further found that Tesla had failed to take reasonable steps that were necessary to prevent racial harassment. ¶86. In an order denying Tesla's motion for judgment as a matter of law, Judge Orrick found that, based on the evidence presented at trial, Tesla's Fremont factory was "saturated with racism," and "Tesla's broader management structure[] did little or nothing to respond." ¶90. Tesla's own public response acknowledged that Diaz's written complaints were "well-documented." ¶87. Numerous other current and former Tesla employees have since filed lawsuits against Tesla, alleging violations of FEHA and describing in detail their harrowing experiences with race, sex, and gender-based discrimination, harassment, and retaliation at the Company. ¶¶91-259.[5]

**B.    E. Musk Knew About, Encouraged, and Failed to Rectify the Widespread and Unlawful Culture of Harassment and Discrimination at Tesla**

By his own admission, E. Musk is a "nano-manager," whose deep personal involvement in even the most mundane tasks on the ground floor of Tesla's production lines is well known and well documented by him and others. ¶¶261-264, 309. For example, E. Musk has stated that he leads Tesla "from the front lines," where he works "personally on that line, in that machine." *Id*. In early 2016, E. Musk personally oversaw ground-level production line issues and managed production-level associates and their activities on the Fremont factory floor himself. ¶261. In April 2018, E. Musk described how he was sleeping on the Fremont factory floor because his extensive involvement on the production lines there left him with no time to "go home and shower." ¶262. At the very same time that E. Musk was essentially living at the Fremont factory and directly managing production-level associates, hundreds of Fremont factory workers experienced frequent—often daily—instances of intense, open, and racist harassment at the hands

---

[5] In the interest of brevity, Plaintiff does not repeat herein all of these employees' allegations and respectfully refers the Court to the above-cited paragraphs in the Complaint for further details concerning the specific allegations made by the numerous current and former Tesla employees.

of their coworkers and superiors, including exposure to racist graffiti prominently displayed in common areas throughout the building.[6]  E. Musk has further described how he maintained a similar level of personal involvement on the production line at Tesla's Gigafactory.  ¶¶263-64.

Between 2017 and 2021, E. Musk was repeatedly made aware of the extent and severity of the systemic and unlawful culture of racist and sexist abuse and harassment at Tesla:

• In March 2017, E. Musk acknowledged that "change [wa]s needed" at Tesla after personally reviewing a former employee's lawsuit against Tesla for violations of FEHA, which detailed the employee's experiences with unlawful racist discrimination, sexual harassment, and retaliation at Tesla, and which described the Company's utter failure to respond to complaints, enact an actionable anti-discrimination policy, or effectively train its employees.  ¶¶265-67, 310.



• By at least February 2022, E. Musk became aware of the DFEH investigation into systemic racial discrimination and the agency's impending lawsuit.  ¶272.

Despite these persistent warnings and his own acknowledgement that systemic change was

---

[6] *See* ¶4 (noting the hundreds of employee complaints describing systemic racial discrimination and harassment at the Fremont factory received by DFEH prior to its 2019 investigation); ¶¶54, 59, 78-80, 84, 87, 97, 122, 139 (describing numerous instances from 2018 and 2019 demonstrating open racial harassment and discrimination on the Fremont factory floor and sightings of racist effigies and graffiti displayed prominently in communal areas, including in bathrooms used by management).

needed to address the worsening employee relations issues caused by Tesla's unlawful conduct, E. Musk failed to institute or otherwise ensure any meaningful change at Tesla. To the contrary, E. Musk fanned the flames by issuing flippant and vulgar remarks through official Company channels. ¶¶268-269. These reckless statements minimized the seriousness of the discrimination and harassment, discouraged employees from speaking out, and normalized sexually explicit commentary and remarks in the workplace. *Id.* E. Musk even instructed employees to be more "thick-skinned" when confronted with discrimination and harassment, and criticized employees who had initiated lawsuits against the Company. ¶267. He also issued a series of sexually explicit tweets, which multiple female complainants cited as normalizing influences on the culture of sexual harassment they experienced at Tesla. ¶¶270-71.

    **C.**    **The Individual Defendants Knowingly Failed to Rectify the Widespread and Unlawful Culture of Discrimination and Harassment at Tesla**



████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████

Despite these red flags, the Individual Defendants utterly failed to take meaningful action to institute change, to hold management accountable, or to ensure proper oversight.  ¶¶282-84.

### D.    The Board Knowingly Issued the False and Misleading 2021 Proxy Statement

Despite knowing of Tesla's longstanding and unlawful discriminatory workplace practices and systemic human capital relations issues, defendants Denholm, Ehrenpreis, Ellison, Gracias, Mizuno, Murdoch, E. Musk, K. Musk, and Wilson-Thompson reviewed, approved, and caused Tesla to file the misleading 2021 Proxy,[7] in which they claimed that (1) Tesla's workplace policies provided employees with a respectful and safe working environment; (2) Tesla did not tolerate workplace discrimination or harassment of employees; and (3) the Board's oversight of its human capital issues was adequate.  ¶¶286-292.  These statements misrepresented and failed to disclose that: ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ and (iii) Tesla's Board-level oversight as to human capital management practices was inadequate.  ¶¶293-300.

## III.    ARGUMENT

### A.    Legal Standards Applicable to this Motion to Dismiss

Plaintiff is entitled to all favorable inferences, and all of Plaintiff's well-pled factual allegations must be taken as true.  *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005) (standard for motion brought under Rule 12(b)(6)); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

---

[7] The "2021 Proxy" refers to the Proxy Statement on Form DEF 14A issued in connection with the Company's 2021 Annual Meeting of Stockholders, filed with the U.S. Securities and Exchange Commission ("SEC") on August 26, 2021.

"The court's task is to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citing *Ashcroft*, 556 U.S. at 678).[8]

Plaintiff's "particularized factual allegations [must be] accepted as true" even in the context of Defendants' motion to dismiss on demand futility grounds, *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 798 (Del. Ch. 2016) ("*Yahoo!*"), *abrogated on other grounds by Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019), and the court is still "bound to draw all inferences from those particularized facts in favor of the plaintiff, not the defendant." *Del. Cnty. Emps. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1022 (Del. 2015) ("*Sanchez*"). This is true even if the Court believes an inference in favor of Defendants is more likely. *La. Mun. Police Emps.' Ret. Sys. v. Pyott*, 46 A.3d 313, 356 (Del. Ch. 2012) ("*LAMPERS*"), *rev'd on other grounds*, 74 A.3d 612 (Del. 2013).

The demand futility standard is not "unduly onerous." *Rales v. Blasband*, 634 A.2d 927, 935 (Del. 1993). Factual particularity does not mean that Plaintiff is required "to demonstrate a reasonable probability of success on the claim; rather, Plaintiff need only "make a threshold showing … that [his] claims ha[s] some merit," *LAMPERS*, 46 A.3d at 351, and Plaintiff is "not required to plead evidence." *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000).[9]

---

[8] Here, as throughout, all emphasis is deemed added and citations and footnotes are deemed omitted unless otherwise noted.

[9] While the Section 220 production referenced in the Complaint is subject to an "[i]ncorporation [c]ondition," such a condition "***does not change the pleading standard*** that governs a motion to dismiss," *Yahoo!*, 132 A. 3d at 798 (emphasis in original), nor does it "enable a court to weigh evidence on a motion to dismiss." *Voigt v. Metcalf*, 2020 WL 614999, at *9 (Del. Ch. Feb. 10, 2020). Defendants' self-serving interpretations of these documents carry no weight at the pleading stage. *See Yahoo!*, 132 A.3d at 798 (noting that "if a document or the circumstances support more than one possible inference, and if the inference that the plaintiff seeks is reasonable, then the plaintiff receives the inference."); *Lebanon Cnty. Employees' Ret. Fund v. Collis*, __ A.3d __, 2022 WL 17687848, at *7 (Del. Ch. Dec. 15, 2022) ("*Collis I*") ("To the extent that factual allegations or documents incorporated by reference support competing inferences, the plaintiffs are entitled at this stage to the inference that favors their claims.").

### B.    Plaintiff Has Adequately Alleged Demand Futility

Demand on a board of directors will be deemed futile if the facts pled, taken as true, show that at least half of the directors either: (i) face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand"; or (ii) "lack[] independence from someone who … would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand." *United Food & Com. Workers Union v. Zuckerberg*, 262 A.3d 1034, 1058 (Del. 2021) ("*Zuckerberg I*").  Here, the Demand Board consists of the following eight Directors: E. Musk, K. Musk, Denholm, Ehrenpreis, Ellison, Mizuno, Murdoch, and Wilson-Thompson. Demand is futile if "the answer to any of the [above] questions is 'yes' for at least" four members of the Demand Board.  *Id.*  Plaintiff has adequately alleged demand futility under this standard.

### 1.    Demand is Futile Because at Least Half the Members of the Demand Board Face a Substantial Likelihood of Liability

A substantial likelihood of liability can be demonstrated by pleading with particularity that a director or officer acted in bad faith or otherwise breached the fiduciary duty of loyalty.  *In re Baker Hughes Inc. Merger Litig.*, 2020 WL 6281427, at *15 (Del. Ch. Oct. 27, 2020); *Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009).  Directors serve as guardians who are accountable for subjecting the company to "corporate traumas," including "business losses[] and innumerable other potential calamities."  *LAMPERS*, 46 A.3d at 340 (noting "[t]he list of corporate traumas … is long and ever expanding….").  "Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith."  *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006); *see Ryan v. Gifford*, 918 A.2d 341, 357 (Del. Ch. 2007) ("*Ryan I*") (fiduciary acts in bad faith when he fails to take action to protect corporate interests).  Demand is, thus, futile where a "board consciously failed to act after learning

- 10 -

about evidence of illegality—the proverbial 'red flag.'" *LAMPERS*, 46 A.3d at 341; *see Teamsters Loc. 443 Health Servs. & Ins. Plan v. Chou*, 2020 WL 5028065, at *17 (Del. Ch. Aug. 24, 2020) (demand is futile where plaintiffs "plead particularized facts that [directors] knew of red flags, but acted in bad faith by consciously disregarding their duty to address the misconduct"); *In re Massey Energy Co.* (Del. Ch. May 31, 2011, No. 5430-VCS) 2011 WL 2176479, at *21 ("For fiduciaries of Delaware corporations, there is no room to flout the law governing the corporation's affairs.").[10]

### a.  Defendant E. Musk Faces a Substantial Likelihood of Liability

As a director and officer of Tesla, E. Musk was duty-bound to take corrective action when he became aware of the widespread illegal harassment, discrimination, and retaliation against Tesla's Black and female employees. As a self-admitted hands-on manager who was deeply involved with developing, managing, and implementing Tesla's business and internal workings from the ground level of its production facilities up to the highest echelons of the Company, E. Musk knowingly failed to undertake the necessary efforts to address the human relations issues at Tesla, in violation of his fiduciary duty of loyalty. *Gantler*, 965 A.2d at 708-09.

 As Tesla's CEO, E. Musk became aware of the

---

[10] *See also Rich ex rel. Fuqi Int'l, Inc. v. Chong* (Del. Ch. 2013) 66 A.3d 963, 984 (in the face of red flags, fiduciaries "must *act*, i.e., they must prevent further wrongdoing from occurring"); *Collis I*, 2022 WL 17687848, at *1-2 ("corporate fiduciaries cannot consciously ignore evidence [i.e., "red flags"] indicating that the corporation is suffering or will suffer harm").

Company's systemic human relations issues and acknowledged the need for internal change even earlier.  In 2017, E. Musk reviewed the details of a former employee's lawsuit against Tesla for sexual and racial harassment, discrimination, and retaliation, which put him on notice that Tesla had failed to implement an effective anti-discrimination policy and adequately train its employees on racial and sexual harassment, discrimination, and retaliation.    ¶¶265-66.    E. Musk acknowledged that Tesla had failed to escalate the matter appropriately and (at least facially) agreed that internal change at Tesla was necessary to address the systemic issues raised.  *Id*.

The Complaint is also replete with particularized facts showing that racist and sexist harassment, discrimination, and retaliation were so widespread, open, and apparent that it could not reasonably have escaped the attention of an officer as deeply involved in the Company's ground-level manufacturing and production operations as E. Musk.  *See, e.g.*, ¶¶50-55, 73-79, 82, 84, 97, 105, 123, 131, 159, 163, 167, 174 (detailing open displays of racist iconography and graffiti, daily use of racist slurs, and conspicuous racial segregation in Tesla manufacturing centers); ¶¶184-87, 193-202, 206, 211-15, 223, 242 (describing conspicuous sexual harassment, discrimination, and retaliation against female employees by employees and managers at manufacturing centers).  Given E. Musk's highly involved and hands-on leadership style at even the lowest levels of Tesla's manufacturing facilities, any suggestion that E. Musk was unaware of the systemic discrimination, harassment, and abuse of Tesla's Black and female employees would be absurd—and it certainly would not be a reasonable inference to make at the pleading stage.[11]

---

[11] Defendants try to downplay Plaintiff's well-pled allegations regarding E. Musk's highly involved managerial style (Motion at 13), but they cannot dispute that the particularized facts alleged in the Complaint include (among other things) admissions from E. Musk himself that he is a "nano-manager" who was personally involved in virtually all aspects of Tesla, personally managed production associates at the Fremont factory, and even slept on the factory floor.  ¶¶261-64.  While "[g]eneral allegations" of a hands-on management style—standing alone—may not be sufficient in to infer knowledge in every case, "specific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's [relevant

Finally, by at least February 2022, E. Musk was explicitly put on notice that the three-year long DFEH investigation into racial harassment, discrimination, and retaliation at Tesla had resulted in a cause finding from the agency.  ¶272.  Together, these facts support the reasonable inference that the true nature of Tesla's toxic workplace "was knowable," and that E. Musk "was in a position to know" the extent and severity of the illegal workplace harassment, discrimination, and retaliation occurring at the Company.  *In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 806 (Del. Ch. 2009), *aff'd sub nom. Teachers' Ret. Sys. of Louisiana v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011).[12]

Despite knowledge of these widespread systemic issues, E. Musk implemented did not implement any policy changes, and there is no indication that he even raised the self-admitted need for internal corrective action with the Board or anyone else at Tesla at any point.  *See Ryan v. Gifford*, 935 A.2d 258, 272 (Del. Ch. 2007) ("*Ryan II*") (holding that complaint stated claim for breach of the duty of loyalty against CFO and vice president who knew about illegal backdating but "kept silent").  E. Musk also received repeated indications that management was failing to take reasonable steps to address these issues, ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

Not only did E. Musk not take corrective remedial action, he actually made the known issues worse and actively endeavored to maintain the unlawful status quo at Tesla.  For example, in a directive to Tesla employees issued shortly after his acknowledgment that the Company's

business areas] are factors in favor of inferring scienter."  *In re Daou Sys., Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005).

[12] *See Sanchez*, 124 A.3d at 1019 (court must "consider all the particularized facts ... in their totality and not in isolation from each other, and draw all reasonable inferences from the totality of those facts in favor of the plaintiff[]").

- 13 -

policies and culture needed to change, E. Musk shifted the burden of responsibility onto the victims, instructing employees to just be more "thick-skinned" in the face of harassment and discrimination and criticizing employees who spoke up in protest of unlawful treatment at the Company.  ¶¶267-68.  Further, E. Musk's communications on Twitter, which were read and shared widely by employees (and certainly by E. Musk's fellow directors), exacerbated the harm suffered by victims of sexual harassment by normalizing sexually-charged "joking" in Tesla's workplace.  ¶¶231, 268-71.  E. Musk made many of these comments—which consisted of purported "jokes" and references to various sex acts, women's bodies, and sexual objectification generally—in conjunction with statements about Tesla's products and financial performance, essentially ensuring they would be viewed by Tesla employees and understood as the position of the Company on these issues.  *Id*.  These communications further demonstrate E. Musk's intentional disregard for the harassment and discrimination issues at Tesla, ███████████████████████████████

████████████████████████████████████████████████████

███████████████████████  Even after shareholders raised concerns that Tesla's mandatory arbitration policy, weak labor management practices, and poor Board-level oversight over human capital issues created legal risks for the Company, E. Musk declined to expand reporting on employee relations issues caused by its mandatory arbitration policy or to institute effective Board-level oversight over these long-suffering areas.  ¶¶282-84, 287-93.

Even if the Court were to find that E. Musk's actions and conscious inaction fell short of "bad faith" (they do not), his conduct—at a minimum—rises to the level of "reckless indifference" to the Company's legal obligations.  *See Baker Hughes*, 2020 WL 6281427, at *15 (noting that, for officers, a substantial likelihood of liability can also be demonstrated by pleading that the officer engaged in "conduct that constitutes reckless indifference" in breach of his fiduciary duty of care); *8 Del. Code* §102(b)(7) (only immunizing **non-executive directors** from liability for

violating their fiduciary duty of care).  "In view of these facts, it is reasonably conceivable that [E. Musk] was at least recklessly indifferent to" the culture of unlawful harassment, discrimination, and retaliation at Tesla.  *In re Mindbody, Inc.*, 2020 WL 5870084, at \*33 (Del. Ch. Oct. 2, 2020).

> **b.  At Least Three Other Members of the Board Face a Substantial Likelihood of Liability, Rendering Demand Futile**

In addition to E. Musk, at least three other members of the eight-member Demand Board face a substantial likelihood of liability for their utter failure to take any meaningful action to curb and/or remedy the Company's improper practices, rendering demand futile.

Defendants assert that Plaintiff must "identify what … in the course of [their] reviews or discussions should have been a 'red flag' to the [Board] triggering" a duty to act.  Motion at 11 (citing *In re DELL Derivative Litig.*, 2007 WL 9710279, at \*6 (W.D. Tex. Oct. 9, 2007)).  Plaintiff has done so here.  Defendants E. Musk, K. Musk, Ehrenpreis, and Denholm joined Tesla prior to 2015, ¶¶12-15, while defendants Murdoch, Wilson-Thompson, Ellison, and Mizuno joined the Board between 2017 and 2020.  ¶¶16-18, 23. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████ Conveyed to the Board in formal reports and presentations, these red flags were "displayed so that they [were] visible to the careful observer," warranting a reasonable inference of Board knowledge.  *In re MetLife Inc. Derivative Litig.*, No. CV 2019-0452-SG, 2020 WL 4746635, at \*14 (Del. Ch. Aug. 17, 2020).

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████    The Board nonetheless rejected stockholder proposals

designed to address these growing issues and risks.  ¶284.

Tesla's human capital relations issues predictably worsened as a result of the Board's refusal to take the necessary actions to improve Tesla's workplace. ████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

---

[13] *See In re SCANA Corp. Derivative Litig.*, 2018 WL 3141813, at *6 (D.S.C. June 27, 2018) (demand futile as to audit committee members who "failed to fulfill their risk management duties"); *Rosky ex rel. Wellcare Health Plans, Inc. v. Farha*, 2009 WL 3853592, at *3 (M.D. Fla. Mar. 30, 2009) (demand futile as to Audit Committee members "specifically charged with 'oversight of ... compliance ... with legal and regulatory requirements'"); *In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267, 278 (S.D.N.Y. 2008) (applying Delaware law and holding that audit committee members faced a substantial likelihood of liability for failing to fulfill responsibilities referenced in the committee charter, thereby "consciously permit[ing] a known violation of law by the corporation to occur").

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████  By the end of 2021, Tesla faced a multi-million dollar verdict in the Diaz case,

and the DFEH initiated its suit on behalf of hundreds of additional Tesla employees the following

year.  ¶¶86, 88.  In the face of these warnings of a systemic harassment and discrimination problem

and its impact on the Company's litigation risks and regulatory compliance, the members of the

Demand Board were duty-bound to take substantive and meaningful action to institute systemic

changes to Tesla's human capital management practices and oversight in order to mitigate risks

that had repeatedly been brought to their attention.  Yet, they did "nothing of actual substance to

change the direction of the company's real policy." *Massey*, 2011 WL 2176479, at *19.[14]

Defendants can only cite to factually inapposite cases and lobby for impermissible,

defense-friendly inferences, while ignoring Plaintiff's well-pled and particularized factual

allegations.  Motion at 11-14.  Defendants principally rely on *Reiter* to support their argument that

the Board received no red flags.  Motion at 11-12.  But the 220 documents in *Reiter* did not show

"that anyone within Capital One had engaged in … illegal conduct."  *Reiter v. Fairbank*, 2016 WL

6081823, at *1 (Oct. 18, 2016).  By contrast, the 220 Documents here show that ████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

---

[14] *See Rosenbloom v. Pyott*, 765 F.3d 1137, 1154 (9th Cir. 2014) (stating that "[t]he combination of **widespread** and **enduring** illegality ... strongly supports an inference of Board knowledge and intentional disregard" of their duties to stop it) (emphasis in original); *In re Oxford Health Plans, Inc.*, 192 F.R.D. 111, 117 (S.D.N.Y. 2000) ("In numerous cases where liability is based upon a failure to supervise and monitor, and to keep adequate supervisory controls in place, demand futility is ordinarily found, especially where the failure involves a scheme of significant magnitude and duration."); *McCall v. Scott*, 239 F.3d 808 (6th Cir. 2001) (finding problems occurring over a two-year time period supported a finding of demand futility).

███████████████████████████████████████████████████████████████

████████████     The board in *Reiter* also monitored "in meaningful detail on a regular basis the initiatives management was taking to ameliorate" non-compliance risks, which included instituting necessary systemic changes by exiting the affected business entirely.   *Reiter*, 2016 WL 6081823, at *1.   Here, Tesla management ██████████████████████████████████████████ ████████████████████████ and no systemic change like the type in *Reiter* occurred.  *Id.*

Even assuming Defendants had identified any tangible action undertaken to halt and remediate the Company's toxic workplace culture (they have not), this would not refute a pleading stage inference of bad faith.  *See In re Abbott Lab'ys. Derivative S'holders Litig.*, 325 F.3d 795, 800, 808-09 (7th Cir. 2003) (bad faith inferred from continual violations over a six-year period and directors' inferred awareness thereof, despite fact that company engaged in extensive remedial efforts); *Massey*, 2011 WL 2176479, at *19-20 (finding reasonable inference that board was simply "go[ing] through the motions … rather than mak[ing] good faith efforts to ensure that [the company] cleaned up its act"—notwithstanding evidence that the "[b]oard … had taken steps to improve the company's safety record"—because the violations continued unabated despite those efforts).  Similarly, any limited remediation efforts Tesla purportedly undertook here were plainly inadequate in light of the abuse that persisted unabated at the Company.  The Company and the Demand Board were, at best, just "going through the motions." *Id.*; *see also Himstreet v. Scharf*, No. CGC-22-599223, slip op. at 9 (Cal. Super. Ct.-S.F. Cnty. Oct. 5, 2022) (unpublished) (attached to Sanders Decl. as Ex. A) ("It is possible to infer from the totality of the allegations, including the duration of [the Company's] … repeated deficiencies in its performance, that the board's conduct more closely resembled sustained, knowing inaction as distinguished from good faith efforts ….").

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████ simply have been a product of improved reporting systems and employee willingness to use those systems.  Motion at 12.  But while Defendants may contend that "[o]ne reasonable inference is that the directors received reports" and "determined that … existing systems were adequate," the Complaint pleads a reasonable "inference … that the directors knew that the Company's existing systems were inadequate and consciously decided not to take any action in response to the red flags." *Lebanon Cnty. Emps.' Ret. Fund v. Collis*, 2022 WL 17841215, at *16 (Del. Ch. Dec. 22, 2022) ("*Collis II*").  "At this stage of the case, [] [P]laintiff[] get[s] the benefit of the inference [he] seek[s]." *Id.*

Defendants' reliance on *City of Detroit Policy & Fire Ret. Sys. v. Hamrock*, 2022 WL 2387653, at *25 (Del. Ch. June 30, 2022) ("*Hamrock*"), is misplaced because, there, the board was only warned of "[g]eneral risks" unrelated to "specific corporate trauma."  2022 WL 238765, at *25; Motion at 12.  Here, the specific corporate trauma consists of an avalanche of litigation from private parties and regulatory actions stemming from the unlawful culture of workplace discrimination the Board allowed to persist at the Company.  ████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████ "Delaware courts are more inclined to find Caremark oversight liability at the board level" where, as here, "the company operates in the midst of obligations imposed upon it by positive law yet fails … to monitor compliance systems such that a violation of law and resulting liability occurs."  *In re Facebook, Inc. Section 220 Litig*, 2019 WL 2320842, at *14 & n.150 (Del. Ch. May 30, 2019).

The Complaint is replete with particularized facts showing the Board's knowledge of

wrongdoing and its failure to implement meaningful remedial efforts.  The Court should reject Defendants' invitation to improperly evaluate Plaintiff's allegations in isolation and find that, taken together, Plaintiff's "constellation of facts … create[s] reasonable doubt about [the Demand Board's] ability to objectively consider a demand," satisfying Del. Ch. Ct. R. 23.1 ("Rule 23.1").  *In re Oracle Corp. Derivative Litig.*, 2018 WL 1381331, at *18 (Del. Ch. Mar. 19, 2018).[15]

### 2.    There Is Reason to Doubt the Independence of at Least Three Directors from E. Musk, Providing an Additional Basis for Demand Futility

Here, Plaintiff has established reason to doubt that K. Musk, Ellison, and Ehrenpreis are independent of E. Musk by "alleging with particularity that [each] director 'is sufficiently loyal to, beholden to, or otherwise influenced by [E. Musk] to undermine the director's ability to judge the matter on its merits.'"  *Oracle Corp.*, 2018 WL 1381331, at *15.  Accordingly, Plaintiff has also met his burden under Rule 23.1 to plead demand futility on independence grounds, irrespective of whether the other members of the Demand Board (aside from E. Musk) face a substantial likelihood of liability for the wrongdoing described above.

### a.    Defendant E. Musk Controls Tesla and Dominates the Board

The Complaint alleges particularized facts showing that E. Musk controls Tesla and dominates a majority of the Demand Board.  ¶¶321-24.  Delaware courts deem even a minority stockholder, such as E. Musk, to be "controlling" when the stockholder "***exercises control*** over the business affairs of the corporation."  *Kahn v. Lynch Comm'ns Sys., Inc.*, 638 A.2d 1110, 1113-14 (Del. 1994) (emphasis in original).  At the pleading stage, Plaintiff need only "show it is

---

[15] Demand is also futile with respect to Plaintiff's unjust enrichment claim (¶¶343-46) because the wrongdoing is sufficiently intertwined with Plaintiff's oversight claim.  *See Hughes v. Hu*, 2020 WL 1987029, at *18 (Del. Ch. Apr. 27, 2020) (board cannot impartially consider unjust enrichment claim brought just against officers because the "unjust enrichment claim … would implicate the same conduct" as the breach of fiduciary duty claim); *Pfeiffer v. Toll*, 989 A.2d 683, 690 (Del. Ch. 2010) (directors were unable to consider a demand impartially because pressing forward with that claim would compromise or undercut their defense of a different claim).

reasonably conceivable that [Musk] controlled [Tesla]." *In re Crimson Exploration Inc. S'holder Litig.*, 2014 WL 5449419, at \*17 (Del. Ch. Oct. 24, 2014).  Plaintiff has done so here.

The fact that E. Musk "is the 'face of Tesla' cannot meaningfully be disputed." *In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at \*15 (Del. Ch. Mar. 28, 2018) ("*Tesla Motors I*").  E. Musk is Tesla's single largest individual stockholder and treats Tesla as his "personal kingdom," directly involving himself in every aspect of the Company's day-to-day operations.  ¶¶261-64, 321.  Tesla has acknowledged E. Musk's king-like power and the Company's dependence on his services, while E. Musk himself has acknowledged his personal involvement in all aspects of the Company's business.  *Id.*  Further, by virtue of his 17% stake, E. Musk retains an effective blocking position in light of Tesla's supermajority voting requirements.  ¶321.[16]

Further, the Complaint alleges with particularity that E. Musk "has demonstrated a willingness to facilitate the ouster of senior management when displeased, as evidenced by the fact that he 'forced founder and then-CEO Eberhard out of the Company and thereafter appointed himself CEO.'"  *Tesla Motors I*, 2018 WL 1560293, at \*15; ¶323.  E. Musk has also retaliated against employees beneath him who criticized him for his conduct.  ¶324.  And he has demonstrated a willingness to leverage Tesla's dependence on him to exert his influence over the Board by participating in deliberations regarding the purchase of SolarCity, Inc. ("Solar City"), a transaction to which he was an interested party, "to a degree greater than he should have been." *In re Tesla Motors, Inc. Stockholder Litigation*, 2022 WL 1237185, at \*34 (Del. Ch. April 27, 2022)

---

[16] "[T]here is no absolute percentage of voting power that is required in order for there to be a finding that a controlling stockholder exists." *PNB Hldgs.*, 2006 WL 2403999, at \*9 (Del. Ch. Aug. 18, 2006).  Indeed, a stockholder's "[a]ctual control over business affairs may stem from sources extraneous to stock ownership." *In re Zhongpin Inc. S'holders Litig.*, 2014 WL 6735457, at \*8 (Del. Ch. Nov. 26, 2014), *rev'd on other grounds sub nom. In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A. 3d 1173 (Del. 2015); *see also Tesla Motors I*, 2018 WL 1560293, at \*14 (rejecting defendants' argument that E. Musk cannot be deemed a controlling stockholder because his "voting power is inadequate to dominate a contested election").

("*Tesla Motors II*"); *see* ¶322.  Taken together,

> the combination of well-pled facts relating to [E.] Musk's voting influence, his domination of the Board[,] … his extraordinary influence within the Company generally, the Board level conflicts that diminish[] the Board's resistance to [E.] Musk's influence, and the Company's and [E.] Musk's own acknowledgements of his outside influence … satisfy [Plaintiff's] burden to plead that [E.] Musk's status as a controlling stockholder is reasonably conceivable.

*Tesla Motors I*, 2018 WL 1560293, at *19.

Even if the Court were to determine that E. Musk does not qualify as a controlling stockholder, Plaintiff has still alleged facts sufficient to infer that a majority of the Demand Board lacks independence from E. Musk due to the foregoing facts evidencing his domination of the Board, in combination with the Board-level relationships discussed below.  *See Oracle Corp.*, 2018 WL 1381331, at *16 (finding that, even in the absence of control, plaintiff raised reasonable doubt that board members could independently consider a demand against minority stockholder where stockholder was both director and executive, had a "firm grip on [the company's] day-to-day operations," and showed "a willingness to remove directors and officers who cross him.").

### b.    There Is Reason to Doubt the Independence of K. Musk, Ellison, and Ehrenpreis from Interested Director E. Musk

**Defendant K. Musk.**  Defendants do not meaningfully dispute Plaintiff's allegations concerning K. Musk's lack of independence from his brother, E. Musk, because any such argument would be futile.  Plaintiff has alleged facts sufficient to infer that K. Musk lacks independence from E. Musk because of their close familial relationship as brothers, in addition to their numerous business and financial ties—including K. Musk's position on the board of E. Musk's Space Exploration Technologies Corp. (SpaceX).  ¶325; *see Harbor Fin. Partners v. Huizenga*, 751 A.2d 879, 886-889 (Del. Ch. 1999) (finding lack of independence based on familial relationship between CEO and brother-in-law, and because brother-in-law sat on boards of other companies controlled by CEO).  The Company's 2021 Proxy also admits that K. Musk is not independent (¶325), further

supporting a finding of demand futility as to him based on a lack of independence.  *See, e.g.,*

*Sandys v. Pincus*, 152 A.3d 124, 134 (Del. 2016) (where director is not independent under stock

exchange rules "and the [] board has determined that the director[] whose ability to consider a

demand impartially is in question cannot be considered independent, a reasonable doubt exists").

**Defendant Ellison.**[17]  Defendant Ellison identifies as a "very close friend[]" of E. Musk;

has defended E. Musk from criticism for his controversial Twitter statements; frequently meets

with E. Musk for lavish dinners; and hosts E. Musk at Ellison's private island. ¶330.  As a corollary

to their close personal friendship, the two also have a business relationship that has proven to be

extremely lucrative for Ellison in the form of investment opportunities, yielding Ellison $12 billion

from an initial $1 billion in investment in Tesla, as well as a $1 billion investment opportunity in

Musk-owned Twitter.  ¶331.  Delaware courts have found that similarly close personal and

business relationships warrant a pleading stage inference that a director lacks independence.  *See,*

*e.g.*, *In re Primedia Inc. Derivative Litig.*, 910 A.2d 248, 261 n.45 (finding in context of motion to

dismiss that directors who had "substantial past or current relationships, both of a business and of

a personal nature, with [a controller]" were not independent); *In re New Valley Corp. Derivative*

*Litig.*, 2001 WL 50212, at *8 (Del. Ch. Jan. 11, 2001) (considering allegations of interest and lack

---

[17] Defendants argue that Ellison's independence is irrelevant because he stepped down from the Board between the filing of the original complaint and the filing of the now-operative Complaint. Motion at 24.  Plaintiff properly references the Board at the time the original complaint was filed because "the original complaint was well pleaded as a derivative action[,] … satisfied the legal test for demand excusal[,] and … the act or transaction complained of in the amendment is essentially the same as the act or transaction challenged in the original complaint." *In re Fitbit, Inc. S'holder Derivative Litig.*, 2018 WL 6587159, at *11 (Del. Ch. Dec. 14, 2018) (citing *Braddock v. Zimmerman*, 906 A.2d 776 (Del. 2006) ("Plaintiffs maintain that demand futility must be assessed in reference to the [] Board as comprised at the time the first complaint in this consolidated action was filed…. I agree with Plaintiffs."); *Himstreet*, No. CGC-22-599223, slip op. at 9 n.6 (assessing demand futility as to board at time of original complaint despite change in board composition); *see* Dkt. 1.  In any event, for the reasons discussed herein, demand on the Board is futile regardless whether the Court looks at the Board at the time of the filing of the original complaint or the Board at the time of the filing of the operative Complaint.

of independence and finding that "[t]he facts alleged in the complaint show that all the members of the current Board have current or past business, personal, and employment relationships with each other and the entities involved").  Defendants suggest that Plaintiff must present evidentiary proof sufficient to sustain an ultimate judicial finding of a lack of independence at this early pleading stage.  Defendants are mistaken.  The demand futility standard "does not require a plaintiff to plead a detailed calendar of social interaction to prove that directors have a very substantial personal relationship rendering them unable to act independently of each other." *Sandys*, 152 A.3d at 130.  Plaintiff is only required to plead "facts supporting an inference … that a director cannot act impartially."[18]  *Id*.  Plaintiff has done so with respect to Ellison.

      **Defendant Ehrenpreis.**  There is also reason to doubt whether defendant Ehrenpreis could impartially consider a demand against E. Musk due to their longstanding personal and professional ties.  ¶¶326-29.  *See Int'l Equity Cap. Growth Fund, L.P. v. Clegg*, 1997 WL 208955, at *5-7 (Del. Ch. Apr. 22, 1997) (holding on a motion to dismiss that there was reason to doubt independence of directors based on history of dealing and overlapping governance relationships).  Ehrenpreis has made substantial investments in E. Musk's companies before they were public, and Tesla has contracted with Mapbox, Inc., where Ehrenpreis is both a director and investor, to provide millions of dollars in services to Tesla.  ¶¶326-27, 329.  Ehrenpreis also openly credits E. Musk as a

---

[18] Defendants ask this Court to infer that Ellison's *$12 billion* windfall enjoyed as result of his relationship with E. Musk is immaterial to Ellison because he is, as Defendants put it, a member of the "*uber*-rich."  Motion at 25, n.8 (citing *United Food & Com. Workers Union v. Zuckerberg*, 250 A.3d. 862, 898-99 (Del. Ch. 2020) ("*Zuckerberg II*"), *aff'd sub nom. United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 2021 WL 4344361 (Del. Sept. 23, 2021)).  Defendants are simply not entitled to an inference that a $12 billion financial benefit representing a 12x return on investment is not entitled to a pleading stage inference that supports—at a minimum—a reason to doubt the independence of the director receiving that benefit.  Defendants' reliance on *Zuckerberg II* is also misplaced, as the court there simply found that a wealthy director's "*service on the Board*" was not financially material to him. *Zuckerberg II*, 250 A.3d at 888-99.  That is a far cry from Plaintiff's allegations here.

"significant influence on [his] professional career," while Ehrenpreis's directorship has, by his own admission, significantly boosted his fundraising efforts. ¶328. Moreover, Ehrenpreis and E. Musk share a close friendship, underscored by the fact that Ehrenpreis gifted E. Musk the rights to the first Tesla Model 3 for his birthday in 2017. ¶329. The Court of Chancery found a similar gift warranted an inference that former Tesla director Jurvetson and E. Musk shared a close personal friendship. *See Tesla Motors I*, 2018 WL 1560293, at *17-18 (finding lack of independence in part because Jurvetson and E. Musk were "close friends," as evidenced by gift of first Tesla Model S and the second Tesla Model X ever made). Taken together, these facts create reason to doubt that Ehrenpreis could independently assess a demand against E. Musk. *See New Valley*, 2001 WL 50212, at *8 (the facts "show that all the members of the current Board have current or past business, personal, and employment relationships with each other and the entities involved").

Defendants improperly parse Plaintiff's individual allegations and attack each fact in isolation. Motion at 22-23. But Delaware law "requires that all the pled facts regarding a director's relationship to the interested party be considered in full context in making the … pleading stage determination of independence." *Sanchez*, 124 A.3d at 1022. Here, Plaintiff has pled "specific facts about the relationship" between E. Musk and Ehrenpreis (and other members of the Demand Board)—"such as the length of the relationship or details about the closeness of the relationship"— and "[the trial court] is charged with making all reasonable inferences from those facts in the plaintiff's favor." *Marchand v. Barnhill*, 212 A.3d 805, 818 (Del. 2019).

In sum, the particularized allegations in the Complaint, considered in their totality, create reason to doubt that defendants K. Musk, Ellison, and Ehrenpreis—representing, together with E. Musk, half of the Demand Board—could independently consider a demand to sue E. Musk.[19]

---

[19] Because Plaintiff has adequately pleaded that there is reason to doubt a majority of the Demand Board's ability to impartially consider a demand, the Court need not assess independence as to

### 3.    Demand Is Also Futile as to Plaintiff's 14(a) Claim

Demand is also futile based on a substantial likelihood of liability for violations of Section 14(a) because "(1) [the Demand Board] misrepresented or omitted a material fact in a proxy statement; (2) [the Demand Board] acted at least negligently in distributing the proxy statement; and (3) the false or misleading proxy statement was an essential link in causing the corporate actions." *Edwards v. McDermott Int'l, Inc.*, 2021 WL 1421603, at *5 (S.D. Tex. Apr. 13, 2021).

### a.    The 2021 Proxy Was False and Misleading

The 2021 Proxy stated that Tesla had a "mandate to not only follow the law, but to do the right thing" and had designed its "workplace and policies to provide all employees with a respectful and safe working environment by not tolerating any discrimination, harassment, retaliation … whether based on a legally protected status or otherwise." ¶288. These statements misrepresented the true state of affairs at the Company and omitted material facts concerning the rampant and ongoing discrimination and retaliation at Tesla. *See United States v. Causey*, 2005 WL 2647976, at *8 (S.D. Tex. Oct. 17, 2005) (statements about a company's corporate affairs are actionable misrepresentations if the statement is "inconsistent with the existence of the mismanagement"). Defendants mischaracterize the challenged statements in the 2021 Proxy as non-actionable aspirational statements, but they were, in fact, affirmative statements about the Company that contradicted facts known to the Demand Board. *See Causey*, 2005 WL 2647976, at *9 (complaint alleges "an actionable misrepresentation if it alleges that a defendant was aware that mismanagement had occurred and made a material public statement about the state of corporate affairs inconsistent with the existence of the mismanagement"). Similarly, the Board's statements

---

defendants Denholm, Mizuno, and Murdoch. However, the Complaint also contains well-pled allegations sufficient to create reason to doubt the independence of those defendants from E. Musk as well. *See* ¶¶332-34.

regarding its oversight of human capital issues were misleading given that they spoke to the adequacy of the Board's existing responsibilities. ¶¶284, 292.[20]  The 2021 Proxy recommended that shareholders vote against two proposals that would have direct consequences for Tesla's human capital management practices, but failed to disclose and misrepresented material information regarding those same practices.  ¶300; *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) ("An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.").

### b.    The Demand Board Is Neither Disinterested Nor Independent

For a Section 14(a) claim, Plaintiff need only show allege that the directors acted negligently.  *In re Maxim Integrated Prods., Inc. Derivative Litig.*, 574 F. Supp. 2d 1046, 1066 (N.D. Cal. 2008); *In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986, 1015 (N.D. Cal. 2007); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1265-66 (N.D. Cal. 2000).[21] Defendants, however, argue that Plaintiff must establish bad faith because Tesla's exculpation provision immunizes its directors against negligence-based Section 14(a) claims.  Motion at 16. As an initial matter, the Company's exculpatory clause only shields directors from liability for breaches of the fiduciary duty of care, not for violations of federal securities laws. *See* Ewell Decl.,

---

[20] *See Causey*, 2005 WL 2647976, at *9 ("[W]here a defendant affirmatively characterizes management practices as 'adequate,' […] and the like, the subject is 'in play' under the securities laws."); *see also Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992), *as amended* (May 27, 1992) ("By addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to a reasonable shareholder, and thus is bound to speak truthfully.").

[21] Courts across the country consistently apply a negligence standard in the context of determining Section 14(a) liability against corporate insiders.  *See, e.g., Kurr v. Orbital ATK, Inc.*, 276 F. Supp. 3d 527, 539-40 (E.D. Va. 2017) ("[T]he majority of circuits to address the question of whether §14(a) requires negligence or fraud have found that §14(a) requires only negligence as the requisite standard of culpability."); *see also Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009); *Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 682 (9th Cir. 2005); *Wilson v. Great Am. Indus., Inc.*, 855 F.2d 987, 995 (2d Cir. 1998); *Shidler v. All Am. Life & Fin. Corp.*, 775 F.2d 917, 926-27 (8th Cir. 1985); *Parsons v. Jefferson-Pilot Corp.*, 789 F. Supp. 697, 703 (M.D.N.C. 1992).

Ex. 1 at 10.  Moreover, exculpation for violations of the federal securities laws would contravene public policy by allowing directors to contract their way around the federal securities laws.[22] Defendants cite no authority to support the proposition that the Fifth Circuit applies anything but an ordinary negligence standard to Section 14(a) claims.  *See* Motion at 16 (citing *Vitellone v. Evans*, 2013 WL 6806179, at *10 (S.D. Tex. Dec. 20, 2013).[23]

In any event, Plaintiff has alleged facts demonstrating bad faith.  Directors have a fiduciary duty to disclose fully all material information within their control when it seeks shareholder action. *See, e.g.*, *City of Warren Gen. Empls.' Ret. Sys. v. Roche*, 2020 WL 7023896, at *19–23 (Del. Ch. Nov. 30, 2020) ("*Roche*"); *Baker Hughes*, 2020 WL 6281427, at *15-16.  A stockholder states a claim if it can allege facts to support "a rational inference that material facts were not disclosed or that the disclosed information was otherwise materially misleading." *Morrison v. Berry*, 191 A.3d 268, 282 (Del. 2018), *as revised* (July 27, 2018).  Here, each member of the Demand Board is liable for approving the false and misleading statements in the 2021 Proxy.  *In re Wells Fargo & Co. S'holder Derivative Litig.*, 282 F. Supp. 3d 1074, 1095 (N.D. Cal. 2017) (allegations that directors are liable for materially misleading statements because they are signatories to the SEC filing containing such statements are sufficient to maintain a claim); *see also In re Heckmann Corp. Sec. Litig.*, 869 F. Supp. 2d 519, 538 (D. Del. 2012) ("Unless a director formally dissents and disassociates himself from the proxy solicitation, that director is … soliciting proxies on behalf of management and thus, is liable for misstatements contained in the proxy materials.").  The

---

[22] *See Cohen v. Viray*, 622 F.3d 188, 195 (2d Cir. 2010) (holding that it would be against federal public policy to allow a company to exempt persons from liability under Sarbanes-Oxley); *Baker, Watts & Co. v. Miles & Stockbridge*, 876 F.2d 1101, 1108 (4th Cir. 1989) (Holding that "it would run counter to the basic policy of the federal securities laws to allow a securities wrongdoer … to shift its entire responsibility for federal violations on the basis … indemnification.").

[23] The court in *Vitellone* only addressed the issue of scienter for misleading statements contained in non-proxy SEC filings and press releases and, in fact, says nothing about the applicability of exculpatory provisions to Section 14(a) claims.  *Id*. at 9-10.

Demand Board knew about Tesla's failures to address systemic discrimination, harassment, and retaliation and, thus, acted in bad faith by knowingly or recklessly disseminating the false and misleading statements in the 2021 Proxy. ¶¶311-12, 316-18.[24]

Tesla's exculpatory provision cannot shield E. Musk from negligence claims. Officers "cannot be exculpated for breaches of duty of care with respect to challenged conduct taken in [their] role as an officer." *Roche*, 2020 WL 7023896, at *20. E. Musk signed the 2021 Proxy in his capacity as CEO and, thus, faces a substantial likelihood of liability for breaching his fiduciary duty of care. *In re Hansen Med., Inc. S'holders Litig.*, 2018 WL 3025525, at *11 (Del. Ch. June 18, 2018) (officer who signed proxy and presented the information to stockholders may be held liable for material misstatements); *see also Baker Hughes*, 2020 WL 6281427, *15-16 (CEO liable for breach of the duty of care for deficient proxy where CEO signed misleading proxy). At a minimum, E. Musk acted with gross negligence given his personal involvement, knowledge of these issues, and acknowledgement that change was necessary to correct them ¶¶309-13. Together with the (at least) three members of the Demand Board who lack independence from E. Musk, *see* section III.B.2., *supra*, there is reason to doubt the disinterestedness and/or independence of at least half of the members of the Demand Board, rendering demand futile as to the Section 14(a) claim.

---

[24] *See In re Columbia Pipeline Grp., Inc. Merger Litig.*, 2021 WL 772562, at *57 (Del. Ch. Mar. 1, 2021) (reasonably conceivable that fiduciaries breached the subsidiary element of the duty of loyalty to act in good faith by allowing proxy to go to stockholders where allegations supported reasonable inference that fiduciaries knew Proxy was materially misleading), *cert. denied sub nom. In re Columbia Pipeline Grp. Inc.* (Del. Ch. 2021), and *appeal refused sub nom. In re Columbia Pipeline Grp., Inc. Merger Litig.*, 249 A.3d 801 (Del. 2021); *In re Hansen Med., Inc. S'holders Litig.*, 2018 WL 3030808, at *11 (Del. Ch. June 18, 2018) (same); *Wells Fargo*, 282 F. Supp. 3d at 1095 (finding allegations that directors were part of a specific committee whose general responsibilities would have afforded them knowledge of wrongdoing and knowledge that the statements in the public filings were false or misleading were sufficient to show that the director defendants knowingly approved false and misleading statements in public SEC filings).

c.    **The Proxy Was an Essential Link in the Harm Suffered by Tesla**

Finally, Plaintiff sufficiently alleges Section 14(a) causation because the false proxy is linked to the harm Tesla sustained.[25]   Had the Director Defendants (*see* ¶24) disclosed the Company's true state of affairs regarding its employee relations issues, shareholders would not have rejected the stockholder proposals designed to improve oversight and reporting in those areas and stem the tide of litigation against the Company from regulators and employees.[26]

## IV.    CONCLUSION

The Motion should be denied.   In the event the Court grants the Motion, in whole or in part, Plaintiff requests leave to amend to address any perceived deficiencies and to account for developments in the related pending actions and potential additional confidential witness testimony.[27]

---

[25] Defendants rely on *Hulliung v. Bolen*, 548 F. Supp. 2d 336, 339 (N.D. Tex. 2008) (holding only that ut that case stands for the unremarkable proposition that directors who left the company nearly a decade before a proxy was issued could not have been personally involved in the dissemination of statements in that proxy.  Here, defendants Denholm, Ehrenpreis, Ellison, Gracias, Mizuno, Murdoch, E. Musk, K. Musk, and Wilson-Thompson were all directors of Tesla at the time the 2021 Proxy was issued, and they all signed, reviewed, and/or approved the proxy in their capacity as directors.  ¶300.  *Hulliung* is inapposite.

[26] Plaintiff has also adequately pleaded each of his three claims.  Defendants are entitled to dismissal under Rule 12(b)(6) only where it is clear from the allegations that the plaintiff would not be entitled to relief under any set of facts that could be proven to support the claim.  *In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 285 (Del. Ch. 2003).  "In the context of a motion to dismiss for failure to state a claim … the pleading standard does not reach so high a bar as Rule 23.1."  *Ryan I*, 918 A.2d at 357.  "If the complaint survives the 'more onerous' pleading standard required by Rule 23.1, 'assuming that it otherwise contains sufficient facts to state a cognizable claim,' it necessarily will survive the Rule 12(b)(6) notice pleading standard."  *H&N Mgmt. Grp. v. Couch*, 2017 WL 3500245, at *3 (Del. Ch. Aug. 1, 2017).  Plaintiff has established that the Individual Defendants face a substantial likelihood of liability for breaching their duty of loyalty by knowingly and in bad faith causing the Company to violate applicable laws and regulations and unnecessarily subjecting the Company to significant corporate trauma.  Plaintiff has easily satisfied the more lenient Rule 12(b)(6) standard.

[27] *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").

Dated: January 13, 2023                     ROBBINS LLP

                                            */s/ Shane P. Sanders*
                                            SHANE P. SANDERS

                                            BRIAN J. ROBBINS
                                            CRAIG W. SMITH (admitted *pro hac vice*)
                                            SHANE P. SANDERS (admitted *pro hac vice*)

                                            5060 Shoreham Place, Suite 300
                                            San Diego, CA 92122
                                            Telephone: (619) 525-3990
                                            Facsimile: (619) 525-3991
                                            E-mail: brobbins@robbinsllp.com
                                                    csmith@robbinsllp.com
                                                    ssanders@robbinsllp.com

                                            KENDALL LAW GROUP, PLLC
                                            JOE KENDALL
                                            State Bar No. 11260700
                                            3811 Turtle Creek, Blvd., Suite 1450
                                            Dallas, TX 75219
                                            Telephone: (214) 744-3000
                                            Facsimile: (214) 744-3015
                                            E-mail: jkendall@kendalllawgroup.com

                                            Co-Lead Counsel for Plaintiffs

1606099

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 13th day of January, I electronically filed the foregoing

document and all attachments thereto with the Clerk of Court using the CM/ECF system which

will send notification of such filing to the following:

- **Gregory E. Del Gaizo**
  notice@robbinsllp.com
- **Gary Ewell**
  gewell@ebbklaw.com,asullivan@ebbklaw.com,hfox@ebbklaw.com
- **Boris Feldman**
  boris.feldman@freshfields.com,caroline.bane@freshfields.com
- **Doru Gavril**
  doru.gavril@freshfields.com
- **Joe Kendall**
  jkendall@kendalllawgroup.com,administrator@kendalllawgroup.com
- **Drew Liming**
  drew.liming@freshfields.com
- **Rebecca Lockert**
  rebecca.lockert@freshfields.com
- **Jennifer Loeb**
  jennifer.loeb@freshfields.com
- **Brian J. Robbins**
  notice@robbinsllp.com
- **Olivia Rosen**
  olivia.rosen@freshfields.com,jonathan.sampson@freshfields.com,anthony.denatale@freshfields.com,sheana.chandar@freshfields.com
- **Shane P. Sanders**
  ssanders@robbinsllp.com
- **Craig W. Smith**
  csmith@robbinsllp.com
- **Alithea Z. Sullivan**
  asullivan@ebbklaw.com

/s/ Shane P. Sanders
SHANE P. SANDERS *(pro hac vice)*