UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE TESLA INC. STOCKHOLDER DERIVATIVE LITIGATION | § § § § § § § § § § § § § § § | Lead Case No. 1:22-cv-00592-DAE |
| | | (Consolidated with Case No. 1:22-cv-00611-DAE) |
| This Document Relates To: | | **<u>REDACTED</u>** |
| All Cases | | |

**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS'
<u>AMENDED CONSOLIDATED COMPLAINT</u>**

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................1

II.     STATEMENT OF FACTS ......................................................................................2

      A.      Tesla's Discriminatory Workplace Policies and Practices Violate the Law ...........2

      B.      E. Musk Internally Fostered, Knew About, Encouraged, and Failed to
             Remedy Tesla's Pervasive and Unlawful Culture of Harassment and
             Discrimination.........................................................................................................4

III.    ARGUMENT ..........................................................................................................5

      A.      Legal Standards Applicable to the Instant Motion to Dismiss ...............................5

      B.      Plaintiff Has Adequately Alleged Demand Futility.................................................7

            1.      E. Musk Faces a Substantial Threat of Liability for Gross
                  Negligence ...................................................................................................7

                  a.      It Is Reasonable to Infer that E. Musk Knew of the
                        Systemic and Widespread Harassment and Discrimination ...........8

                  b.      E. Musk Admitted "Change Was Needed" but Was
                        Recklessly Indifferent to the Rampant Racial and Sexual
                        Harassment....................................................................................9

            2.      E. Musk Also Faces a Substantial Likelihood of Liability for
                    Breaching His Fiduciary Duty of Oversight ...............................................12

            3.      E. Musk Faces Liability for Violations of Section 14(a) ...........................14

            4.      The Entire Board, or At Least A Majority, Lack Independence
                  from E. Musk ...............................................................................................15

                    a.      Defendant E. Musk Controls and Dominates the Board................16

                  b.      There Is Reason to Doubt the Independence of at Least: K.
                        Musk, Gebbia, Straubel, and Ehrenpreis from E. Musk ...............18

IV.     CONCLUSION......................................................................................................20

# TABLE OF AUTHORITIES

**CASES**                                                                                          **PAGE(S)**

*Amalgamated Bank v. Yahoo! Inc.*,
132 A.3d 752 (Del. Ch. 2016)...........................................................................6

*Aronson v. Lewis*,
473 A.2d 805 (Del. 1984) ..............................................................................6

*Brehm v. Eisner*,
746 A.2d 244 (Del. 2000) ..............................................................................6

*Del. Cnty. Emps. Ret. Fund v. Sanchez*,
124 A.3d 1017 (Del. 2015) ...................................................................6, 12, 16

*Edwards v. McDermott Int'l, Inc.*,
2021 WL 1421603 (S.D. Tex. Apr. 13, 2021) .................................................14

*Hack v. Wright*,
396 F. Supp. 3d 720 (S.D. Tex. 2019) ............................................................6

*Harbor Fin. Partners v. Huizenga*,
751 A.2d 879 (Del. Ch. 1999).............................................................18, 19, 20

*IBEW Loc. Union 481 Defined Contribution Plan & Tr. on Behalf of GoDaddy, Inc. v.
Winborne*,
301 A.3d 596 (Del. Ch. 2023)..........................................................................6

*In re Baker Hughes Inc. Merger Litig.*,
2020 WL 6281427 (Del. Ch. Oct. 27, 2020) .........................................8, 11, 15

*In re BGC Partners, Inc.*,
2019 WL 4745121 (Del. Ch. Sept. 30, 2019) ..................................................6

*In re Caremark International Inc. Derivative Litigation*,
698 A.2d 959 (Del.Ch. 1996)..........................................................................12

*In re China Agritech, Inc. S'holder Derivative Litig.*,
2013 WL 2181514 (Del. Ch. May 21, 2013) ...................................................6

*In re Cornerstone Therapeutics Inc. S'holder Litig.*,
115 A. 3d 1173 (Del. 2015) ...........................................................................16

*In re Crimson Expl. Inc. S'holder Litig.*,
2014 WL 5449419 (Del. Ch. Oct. 24, 2014) ...................................................16

*In re Dow Chem. Co. Derivative Litig.*,
    2010 WL 66769 (Del. Ch. Jan. 11, 2010) ........................................................6

*In re EZCORP Inc. Consulting Agreement Derivative Litig.*,
    2016 WL 301245 (Del. Ch. Jan. 25, 2016) ...............................................15, 16

*In re Fitbit Inc. S'holder Derivative Litig.*,
    2018 WL 6587159 (Del. Ch. Dec. 14, 2018) ..................................................15

*In re Hansen Med., Inc. S'holders Litig.*,
    2018 WL 3025525 (Del. Ch. June 18, 2018) .................................................15

*In re Massey Energy Co.*,
    2011 WL 2176479 (Del. Ch. May 31, 2011) .................................................13

*In re McDonald's Corp. S'holder Derivative Litig.*,
    289 A.3d 343 (Del. Ch. 2023) .........................................................8, 10, 13

*In re McDonald's Corp. S'holder Derivative Litig.*,
    291 A.3d 652 (Del. Ch. 2023) .............................................................12, 14

*In re Mindbody, Inc., S'holder Litig.*,
    2023 WL 2518149 (Del. Ch. Mar. 15, 2023) ...............................................7, 11

*In re New Valley Corp.*,
    2001 WL 50212 (Del. Ch. Jan. 11, 2001) ....................................................19

*In re Oracle Corp. Derivative Litig.*,
    2018 WL 1381331 (Del. Ch. Mar. 19, 2018) .................................................18

*In re Pattern Energy Grp. Inc. S'holders Litig.*,
    2021 WL 1812674 (Del. Ch. May 6, 2021) ...................................................11

*In re PNB Holdings Co. S'holders Litig.*,
    2006 WL 2403999 (Del. Ch. Aug. 18, 2006) ................................................16

*In re Primedia Inc. Derivative Litig.*,
    910 A.2d 248 (Del. Ch. 2006) ..............................................................19

*In re Tesla Motors, Inc. S'holder Litig.*,
    2018 WL 1560293 (Del. Ch. Mar. 28, 2018) ...............................................16, 17

*In re Zhongpin Inc. S'holders Litig.*,
    2014 WL 6735457 (Del. Ch. Nov. 26, 2014) ................................................16

*Int'l Equity Cap. Growth Fund, L.P. v. Clegg*,
    1997 WL 208955 (Del. Ch. Apr. 22, 1997) ..................................................20

*Ironworkers Dist. Council of Phila. & Vicinity Ret. & Pension Plan v. Andreotti*,
    2015 WL 2270673 (Del. Ch. May 8, 2015)...................................................................8

*Kamen v. Kemper Fin. Servs., Inc.*,
    500 U.S. 90 (1991).............................................................................................................6

*Leb. Cnty. Emps.' Ret. Fund v. Collis*,
    287 A.3d 1160 (Del. Ch. 2022).......................................................................................12

*Morrison v. Berry*,
    2019 WL 7369431 (Del. Ch. Dec. 31, 2019)....................................................................7

*Rales v. Blasband*,
    634 A.2d 927 (Del. 1993) ...........................................................................................6, 16

*Reiter v. Fairbank*,
    2016 WL 6081823 (Del. Ch. Oct. 18, 2016) ..................................................................12

*Sandys v. Pincus*,
    152 A.3d 124 (Del. 2016) ..........................................................................................15, 16

*Shapiro v. UJB Fin. Corp.*,
    964 F.2d 272 (3d Cir. 1992), *as amended* (May 27, 1992)............................................15

*Stone ex rel. AmSouth Bancorporation v. Ritter*,
    911 A.2d 362 (Del. 2006) ................................................................................................12

*United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund
    v. Zuckerberg*,
    262 A.3d 1034 (Del. 2021) ...............................................................................................7

*United States v. Causey*,
    2005 WL 2647976 (S.D. Tex. Oct. 17, 2005)..................................................................15

*Zucker v. Hassell*,
    2016 WL 7011351 (Del. Ch. Nov. 30, 2016), *aff'd*, 165 A.3d 288 (Del. 2017)............7, 10

## I.    INTRODUCTION

Plaintiff Alvin Janklow ("Plaintiff") brings this stockholder derivative action on behalf of Tesla, Inc. ("Tesla" or the "Company") to hold its Chief Executive Officer ("CEO") and director, Elon Musk ("E. Musk"), accountable for his role in fostering and permitting a multi-year pattern of harassment, discrimination, and retaliation against the Company's employees.

E. Musk is intimately involved in even low-level operations at Tesla factories where workers experienced widespread racial and sexual harassment.  Under the legal standards applicable to a motion to dismiss, Plaintiff has alleged ample factual support at the pleading stage to compel denial of Defendants' Motion to Dismiss Plaintiffs' Amended Consolidated Complaint (ECF Nos. 78 and 81) (the "Motion" or "MTD").[1]

The particularized allegations in the TAC,[2] and the reasonable inferences therefrom, support a pleading stage finding that E. Musk is substantially likely to be liable for the claims pleaded therein, rendering demand upon him futile.  Accordingly, to adequately plead demand futility as to the eight-member Board of Directors ("Board"), Plaintiff need only allege facts that create reason to doubt whether *three* other directors are sufficiently independent from E. Musk. As set forth below, Plaintiff has alleged sufficient facts to support that pleading stage finding.

Notably, in separate litigation involving Tesla,[3] Chancellor Kathaleen McCormick of the Delaware Court of Chancery, in a well-reasoned 200-page post-trial opinion dated January 30, 2024, voided and rescinded a $56 billion compensation package negotiated by E. Musk and Tesla's board.  *See* Ex. A to the Declaration of Shane P. Sanders in Support of Opposition to Defendants'

---

[1] "Defendants" refer to nominal defendant Tesla and defendant E. Musk.

[2] "TAC" refers to the Verified Amended Consolidated Stockholder Derivative Complaint for Breach of Fiduciary Duty and Violation of Securities Law filed on November 3, 2023 (ECF Nos. 73 and 76).

[3] *Tornetta v. Musk*, C.A. No. 2018-0408-KSJM (Del. Ch.) ("*Tornetta*").

Motion to Dismiss Plaintiffs' Amended Consolidated Complaint filed concurrently herewith ("Sanders Decl."). Chancellor McCormick found that Tesla's board (which included three current Board members relevant to the demand futility question presently before this Court) was controlled by, beholden to, and not independent from E. Musk. As Chancellor McCormick noted, "[i]n the face of a Superstar CEO, it is even more imperative than usual for a company to" have "staunchly independent directors." *Id.* at 120-22. Here, Plaintiff has alleged particularized facts supporting a ***pleading stage*** inference that there is reason to doubt whether at least three directors—together with E. Musk, half of Tesla's Board—are "staunchly independent" of E. Musk. Under applicable Delaware law, demand is futile in these circumstances, and the Motion must be denied.

## II.    STATEMENT OF FACTS

### A.    Tesla's Discriminatory Workplace Policies and Practices Violate the Law

Tesla is the most valuable electric vehicle manufacturer in the world, known for its technological idealism and forward-thinking rhetoric. ¶2.[4] The Company's electric vehicle lineup includes the Model S, Model X, Model 3, and Model Y. ¶¶2, 16. The Company publicly claims it is committed to workplace diversity, equity, and inclusion as a core value, and has touted itself as an open, respectful, and fair place to work.[5] ¶¶18-20.

As an employer operating in the state of California and nationwide, Tesla is subject to state and federal laws concerning the treatment of its employees, including laws that prohibit it from engaging in and permitting employment discrimination, harassment, and retaliation against its

---

[4] Unless otherwise indicated, paragraph references ("¶__" or "¶¶__-__") are to Plaintiff's TAC.

[5] For example, in its 2020 Diversity, Equity, and Inclusion Impact Report (the "DEI Report"), Tesla stated, among other things, that "[w]e insist on equitable practices ... because fair processes allow our team members to bring their whole selves to work[,]" and "[w]e value and include underrepresented communities at all levels of our company." ¶18. The DEI Report also included in a testimonial from the Company's former Vice President of People that Tesla is a "flat organization[,]" where "[a]nyone, anywhere in the company is empowered to connect with everyone, including Elon, if employees are facing roadblocks." ¶20.

employees on the basis of race, sex, and gender. Nevertheless, in direct contravention of these laws and Tesla's own statements regarding its purportedly inclusive workplace, regulatory investigations have revealed pervasive and persistent racial discrimination, sexual harassment, and retaliation at the Company. ¶¶22-49. California's Department of Fair Employment and Housing ("DFEH") conducted a nearly three-year investigation into the working conditions at Tesla's Fremont factory, which culminated in the DFEH filing suit against the Company in February 2022 and detailing evidence of rampant discrimination against black employees in virtually every aspect of employment. ¶¶4, 24-44. The investigation detailed a number instances where Black employees at Tesla's Fremont factory were subjected to a barrage of degrading and egregious racial slurs.[6] ¶¶26-34. The investigation also revealed that Black employees were exposed to racist writing and iconography (i.e., graffiti) written on the restroom walls, lockers, benches, workstations, in the break room, and even on Tesla machinery, which was left in plain view for months, with no one at Tesla bothering to remove it. ¶30.

In July 2022, the EEOC issued a "cause finding" against the Company that "closely parallels the DFEH's allegations." ¶46. And in September 2023, the U.S. Equal Employment Opportunity Commission (the "EEOC") filed a complaint against Tesla for race harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964 (the "EEOC Complaint"), noting that since May 2015, Tesla "has subjected Black employees at its [Fremont factory] to severe or

---

[6] By way of example, Tesla employees referred to the Fremont factory as the "slave ship" and "the plantation," where Tesla production leads "crack[ed] the whip. ¶27. Some Black workers reportedly heard these racial slurs like the N-word as often as 100 times per day. *Id.* Further, Tesla leads, supervisors, and managers frequently referred to Black production workers as "that stupid [N-word] over there," and in reference to a group of workers, remarked that they were not "Tesla material." ¶¶28-29.

pervasive racial harassment and created and maintained a hostile work environment because of their race, in a continuing violation of Title VII."[7]  ¶¶47-49.

**B.    E. Musk Internally Fostered, Knew About, Encouraged, and Failed to Remedy Tesla's Pervasive and Unlawful Culture of Harassment and Discrimination**

E. Musk is a self-described "nano-manager," and his actions and public statements evince that he is exponentially more hands-on than the average CEO.  ¶¶65-69.  E. Musk was frequently on the floor of Tesla's Fremont factory and was personally involved in even the most low-level tasks at the same time Tesla employees were experiencing open and widespread instances of harassment, discrimination, and retaliation.  *Id.*  Indeed, E. Musk has stated that he leads Tesla "from the front lines."  ¶68.  While E. Musk was essentially living at the Fremont factory to help solve Tesla's production issues, myriad Fremont factory workers were continuing to report to regulators that they experienced near daily instances of cruel, open, and racist harassment at the hands of their coworkers and superiors, including by being exposed to racist graffiti prominently displayed in common areas that E. Musk frequented.[8]  Through his hands-on leadership and intimate involvement with even floor level operations at Tesla's factories, E. Musk would have been and was well aware of the racist images throughout the Fremont factory and the systemic racism and discrimination exhibited by Tesla's supervisors and managers.  ¶69.

---

[7] The EEOC Complaint detailed the same allegations in the DFEH complaint, which described a work environment where Black employees were bombarded with racial epithets and slurs, repeatedly and openly harassed by supervisors and coworkers alike, and then ignored or retaliated against when they brought their concerns to the attention of Tesla management.  ¶49.

[8] *See* ¶4 (noting the hundreds of employee complaints describing systemic racial discrimination and harassment at the Fremont factory received by DFEH prior to its 2019 investigation); *see also* ¶¶30, 35, 48, 90, 95-96, 102, 115, 273 (describing numerous instances from 2015 through 2019 where Black employees were exposed to racist graffiti, including swastikas and the N-word, that were explicitly left in plain view for months on restroom walls, toilet stalls, lockers, workstations, in the breakroom, and even on Tesla machinery).

Not only was E. Musk personally aware of the culture of racial harassment and discrimination that existed at Tesla, he also promoted it through communications directed to members of the public and Tesla employees.  ¶70.  Indeed, ████████████████████████

████████████████████████████████████████████

████████████████████  *See generally*, ¶¶71-72, 301 (including the E. Musk "change [was] needed" admission); *see also* ¶¶46-47, 78, 80-82, 85-86, 288-90.

Despite these persistent warnings and his own acknowledgement that systemic change was needed to address the employee relations issues at Tesla, E. Musk failed to institute or otherwise ensure the implementation of any meaningful changes to halt and remediate the known issues. Instead, he fanned the flames by issuing flippant and vulgar remarks through official Company channels,[9] which employees heard and replicated themselves.  ¶¶74-77, 249, 310.  Tesla employees internalized the remarks and reiterated their sexually explicit nature to coworkers, who later complained of sexual harassment.  ¶¶76-77, 249, 310.  These reckless statements minimized the seriousness of the discrimination and harassment at Tesla, discouraged employees from speaking out, and normalized sexually explicit commentary and remarks in the workplace. *Id.*[10]

## III.    ARGUMENT

### A.    Legal Standards Applicable to the Instant Motion to Dismiss

To satisfy Rule 23.1 of the Federal Rules of Civil Procedure, "a shareholder derivative complaint [must] state with particularity '(A) any effort by the plaintiff to obtain the desired action

---

[9] In its press releases and public disclosures, Tesla has previously directed investors seeking official sources of information about the Company to follow E. Musk's and Tesla's Twitter accounts.  ¶74.

[10] In addition, despite knowing of Tesla's longstanding and unlawful discriminatory workplace practices and systemic human capital relations issues, defendant E. Musk reviewed, approved, and caused Tesla to file the misleading 2021 Proxy.  ¶¶278-80.

from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort.'" *Hack v. Wright*, 396 F. Supp. 3d 720, 732 (S.D. Tex. 2019).[11]  Under Delaware law,[12] "the purpose of the particularity requirement is not to prevent derivative actions from going forward, but rather 'to ensure only derivative actions supported by a reasonable factual basis proceed.'" *In re China Agritech, Inc. S'holder Derivative Litig.*, 2013 WL 2181514, at *16 (Del. Ch. May 21, 2013) (citing *In re Dow Chem. Co. Derivative Litig.*, 2010 WL 66769, at *6 (Del. Ch. Jan. 11, 2010)).  Derivative plaintiffs are not required to plead evidence.  *China Agritech*, 2013 WL 2181514, at *14.  To plead demand futility, Plaintiff need only allege particularized facts that "create a reasonable doubt that ... the board … could have properly exercised its independent and disinterested business judgment in responding to a demand."  *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993); *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000); *In re BGC Partners, Inc.*, 2019 WL 4745121, at *6 (Del. Ch. Sept. 30, 2019).

In assessing whether a stockholder plaintiff has sufficiently alleged that demand is futile, the court considers all particularized allegations "in their totality," drawing all inferences in plaintiff's favor.  *Del. Cnty. Emps. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1019 (Del. 2015); *see also IBEW Loc. Union 481 Defined Contribution Plan & Tr. on Behalf of GoDaddy, Inc. v. Winborne*, 301 A.3d 596, 618 (Del. Ch. 2023).  All of plaintiff's "particularized factual allegations [must be] accepted as true."  *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 798 (Del. Ch. 2016) (citing *Rales*, 634 A.2d at 931).

---

[11] Here, as throughout, all emphasis is added and citations and footnotes are omitted unless otherwise noted.

[12] Because Tesla is a Delaware corporation, Delaware law applies to the demand futility analysis. *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108-09 (1991).

### B.    Plaintiff Has Adequately Alleged Demand Futility

Demand on a board of directors will be excused as futile if the facts pled, taken as true, show that at least half of the directors either: (i) "face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand;" or (ii) "lack[] independence from someone who ... would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand." *United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021). Here, the Company's Board at the time the TAC was filed consisted of eight directors (the "Demand Board").[13] Demand is excused because defendant E. Musk faces a substantial likelihood of liability, and non-defendant board members K. Musk, Gebbia, Straubel, and Ehrenpreis, lack independence from E. Musk.

### 1.    E. Musk Faces a Substantial Threat of Liability for Gross Negligence

E. Musk, as an officer of Tesla, owed a duty of care to the corporation and its stockholders. *See In re Mindbody, Inc., S'holder Litig.*, 2023 WL 2518149, at *31 (Del. Ch. Mar. 15, 2023). Tesla's Certificate of Incorporation does not exculpate officers under 8 *Del. Code* §102(b)(7) for breaches of the duty of care.[14] Therefore, liability for breaches of the duty of care can be premised on gross negligence, and a showing of bad faith is not required. *Id.* at *40; *Morrison v. Berry*, 2019 WL 7369431, at *22 (Del. Ch. Dec. 31, 2019) (a breach of the duty of care exists if an officer acted with gross negligence). In order to plead gross negligence, a plaintiff must allege "conduct that constitutes **reckless indifference** or actions that are without the bounds of reason." *Zucker v.*

---

[13] The "Demand Board" is comprised of defendant E. Musk, and non-defendants Kimbal Musk ("K. Musk"), Jeffrey Brian Straubel ("Straubel"), Robyn Denholm ("Denholm"), Ira Ehrenpreis ("Ehrenpreis"), Joe Gebbia ("Gebbia"), James Murdoch, and Kathleen Wilson-Thompson.

[14] Tesla's operative Certificate of Incorporation signed on July 2, 2010 (and amended on February 1, 2017), under Article VIII, Section 8.1, titled "Limitation of Personal Liability," provides that only directors, not officers, are exculpated from breaches of the duty of care.

*Hassell*, 2016 WL 7011351, at *7 (Del. Ch. Nov. 30, 2016), *aff'd*, 165 A.3d 288 (Del. 2017) (quoting *Ironworkers Dist. Council of Phila. & Vicinity Ret. & Pension Plan v. Andreotti*, 2015 WL 2270673, at *26 n.254 (Del. Ch. May 8, 2015)).[15]   At this early stage in the proceedings, it is reasonable to infer from Plaintiff's particularized factual allegations that E. Musk faces a substantial likelihood of liability for breaching his duty of care.[16]

### a.     It Is Reasonable to Infer that E. Musk Knew of the Systemic and Widespread Harassment and Discrimination

E. Musk is a self-described "nano-manager" who led "from the front lines" and was exponentially more hands-on than the average CEO.   ¶¶65-69.   E. Musk intimately involved himself in even the lowest level operations at Tesla's Fremont factory and Gigafactory.   For example, in early 2016, upon hearing about a drag on Model X production at the Fremont factory, E. Musk marched down the line and mandated that the team solve the parts shortages by moving pallets closer to the line and bringing in more parts.   ¶66.   In April 2018, E. Musk described how he would work and sleep on the factory floor to ensure operational issues were handled, leaving no time to "go home and shower."   ¶67.   And while E. Musk was essentially living at the Fremont factory, myriad Fremont factory workers continued to report to regulators that they experienced

---

[15] *See In re Baker Hughes Inc. Merger Litig.*, 2020 WL 6281427, at *15 (Del. Ch. Oct. 27, 2020) (noting that, for officers, a substantial likelihood of liability can also be demonstrated by pleading that the officer engaged in "'conduct that constitutes reckless indifference'" in breach of his fiduciary duty of care).

[16] Defendants seem to confuse an "oversight claim" in the context of a breach of the fiduciary duty of loyalty requiring bad faith, with a breach of the duty of care, which is premised on gross negligence.   Motion at 9-10.   *McDonald's*, like this case, involved alleged issues in the workplace (there, sexual harassment by an executive officer).   Unlike this case, however, the plaintiff in *McDonald's* alleged breaches of fiduciary duty solely based on an oversight theory.   *In re McDonald's Corp. S'holder Derivative Litig.*, 289 A.3d 343, 358 (Del. Ch. 2023).   Here, while Plaintiff alleges that E. Musk breached his oversight duty by failing to respond to red flags and take necessary remedial action (*see* III.B.2, *infra*), Plaintiff also alleges that E. Musk breached his duty of care through his personal actions (and inaction) that caused, fostered, and encouraged the rampant and un-remediated culture of discrimination and harassment at the Company.

*near daily* instances of harassment, including racist iconography and **graffiti** written on the same common areas and machines that E. Musk frequented.  ¶¶30, 35, 48, 90, 95-96, 102, 115, 273.

E. Musk was also often seen on the floor of Tesla's Gigafactory, in Sparks, Nevada, working to correct production delays—such as in 2017—when he led the Gigafactory from the "front lines" and stated he was "personally on that line, in that machine, trying to solve problems personally where I can."  ¶68.  ██████████████████████████████████ ████████████████████████ where Tesla employees were suffering racial and sexual harassment on a *near daily* basis.  ¶¶81, 110-21.  The same racist images and iconography that covered **nearly every** restroom of the Fremont factory were also present at the Gigafactory.  ¶115.

At the pleading stage, it is reasonable to infer that E. Musk frequented the same common areas, saw the same racist images in the common areas that Tesla failed to remove, worked with some of the same employees and managers that were harassing factory workers, and heard some of the racist and sexual remarks alleged in the Complaint.

> **b.    E. Musk Admitted "Change Was Needed" but Was Recklessly Indifferent to the Rampant Racial and Sexual Harassment**

Despite working on the factory floors as Tesla's CEO to personally quell operational issues, E. Musk failed to take any meaningful action to stop and remedy the rampant racial and sexual harassment occurring at the Fremont factory and Gigafactory.  ¶¶65-69.  Company policies—e.g., those included in Tesla's ████████████████████████████████████████ ████████████████████████████████████—offered no help to employees and made a mockery of serious issues.  ¶¶53-56.  The particularized factual allegations in the TAC support a reasonable inference that, despite knowledge of the serious issues at Tesla's factories, E. Musk failed to meaningfully address the illegal conduct and actually took affirmative actions that exhibited reckless indifference to the rampant illegal conduct and its inevitable adverse impact on

the Company, its employees, and its shareholders.

For example, just two months after personally reviewing a former employee's lawsuit against Tesla for violations of the Fair Employment and Housing Act ("FEHA") detailing the employee's experiences with unlawful racist discrimination, sexual harassment, and retaliation at the Fremont factory and admitting that "change was needed," E. Musk ***sent an e-mail*** titled "Doing the Right Thing" ***that minimized*** the severity of the racism and discrimination allegations.  ¶¶71-73, 301.  In the e-mail, E. Musk told employees to be "thick skinned" in the face of racism and to accept a harasser's apology and criticized employees who had previously sued the Company, calling their decision to take legal action "obviously not cool."  *Id.*

E. Musk also exacerbated the problem by making flippant and vulgar remarks through official Company channels, demonstrating reckless indifference to the known systematic and widespread discrimination and harassment.  ¶¶74-77, 249, 310.[17]  E. Musk's reckless remarks were read, internalized, and reiterated by Tesla employees who harassed and discriminated against other factory workers.  ¶¶76-77, 249, 310.  For example, two former Tesla employees stated that E. Musk's sexually suggestive messaging—which he broadcast on Twitter—directly influenced the harassment they received from coworkers and managers.  ¶¶76-77, 249.

Moreover, E. Musk was aware of (i) the DFEH investigation and impending lawsuit into systemic racial harassment and discrimination at Tesla in February 2022; (ii) the EEOC's "cause finding" in July of 2022, which parallels the DFEH's allegations; and (iii) the recent EEOC

---

[17] For example, E. Musk's messaging on Twitter referenced sexual acts and sexual objectification, such as when he proposed starting a "**T**exas **I**nstitute of **T**echnology and **S**cience," and noted that it would be "universally admired."  ¶75.  Or when E. Musk made frequent references to the number "69" and announced that the "Model S price changes to $69,420 tonight."  *Id.*  E. Musk even tweeted that Tesla's line of vehicles, the models S, 3, X, and Y intentionally spell out the word "SEXY."  *Id.*  Tesla has instructed shareholders and the public to follow E. Musk's and Tesla's Twitter accounts for updates on the Company.  ¶74.

complaint, filed in September of 2023, against Tesla for violations of Title VII of the Civil Rights Act of 1964. ¶¶46-47, 78. Yet, despite persistent warnings and first-hand acknowledgement of the issues at Tesla's Fremont factory, E. Musk failed to appropriately address the illegal conduct and personally issued public statements that exhibited a reckless indifference for the consequences. E. Musk's statements did not quell the rampant discrimination and harassment at Tesla, and instead, led to devastating consequences for the Company and its employees. At the pleading stage, and in light of the allegation that, in his role as CEO, E. Musk participated in fostering Tesla's toxic workplace culture, the Court may infer that he faces liability.

Defendants' argument that holding E. Musk accountable for his role as Tesla's CEO who involved himself in the day-to-day operations of Tesla would "turn[] American Corporate law on its head" is hyperbolic and baseless. MTD at 11. The TAC alleges with particularity how E. Musk acted with knowledge and reckless indifference in responding to the egregious and widespread wrongdoing. Plaintiff's allegations never purport to require "omniscience" from E. Musk (MTD at 11), but rather maintain that E. Musk must adhere to and fulfill his basic fiduciary duties to the Company—a concept that is entirely consistent with established law.[18]

The particularized facts in the TAC support a reasonable inference that E. Musk was (at least) grossly negligent and breached his fiduciary duty of care by knowing about systemic and widespread racial and sexual harassment and discrimination at Tesla, minimizing the severity of the problems while instructing employees to be "thick skinned" in the face of egregious conduct, failing to adequately remedy Tesla's employee relations issues, and fanning the flames of Tesla's

---

[18] *See, e.g.*, *Mindbody*, 2023 WL 2518149, at *40; *In re Pattern Energy Grp. Inc. S'holders Litig.*, 2021 WL 1812674, at *66 (Del. Ch. May 6, 2021) ("An officer's compliance with the duty of care is evaluated for gross negligence."); *Baker Hughes*, 2020 WL 6281427, at *15 ("Under Delaware law, the standard of care applicable to the fiduciary duty of care of an officer is gross negligence.").

toxic culture by issuing flippant and vulgar remarks through official Company channels.  ¶¶65-69, 53-56, 72, 74-77, 249, 310.  Accordingly, E. Musk faces a substantial likelihood of liability for breaching his duty of care, creating reason to doubt his disinterestedness under Delaware law.[19]

### 2.    E. Musk Also Faces a Substantial Likelihood of Liability for Breaching His Fiduciary Duty of Oversight

Under *In re Caremark International Inc. Derivative Litigation*, 698 A.2d 959, 967 (Del.Ch. 1996), fiduciaries may be held liable to the company if particularized facts in the complaint show either that (1) "the directors utterly failed to implement any reporting or information system or controls, *or* [(2)] having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."  *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006).  *Caremark's* second prong, commonly referred to as a "Red-Flags Claim," establishes that "corporate fiduciaries cannot consciously ignore evidence indicating that the corporation is suffering or will suffer harm."[20]  Framed in terms of the pleading standard for a "Rule 12(b)(6) motion, the plaintiffs must plead facts supporting an inference that the red flags came to the attention of the [] [d]efendants, as well as facts supporting an inference that the [] [d]efendants consciously failed to take action in response to the red flags."  *McDonald's II*, 291 A.3d at 677.

---

[19] As discussed in section III.B.2, *infra*, E. Musk also faces a substantial likelihood of liability for his failure to fulfill his oversight duties, rendering demand upon him futile on that ground as well. While Plaintiff submits that the Court should find that E. Musk faces a substantial likelihood of liability for breach of the duty of care and need not even reach the oversight allegations/breach of the duty of loyalty, demand on E. Musk is futile under both theories.

[20] *Leb. Cnty. Emps.' Ret. Fund v. Collis*, 287 A.3d 1160, 1175 (Del. Ch. 2022); *see also In re McDonald's Corp. S'holder Derivative Litig.*, 291 A.3d 652, 677 (Del. Ch. 2023) (hereinafter "*McDonald's II*") (citing *Reiter v. Fairbank*, 2016 WL 6081823, at *8 (Del. Ch. Oct. 18, 2016)) (stating that to plead a Red-Flags Claim, "a plaintiff 'must plead particularized facts that the board knew of evidence of corporate misconduct—the proverbial red flag—yet acted in bad faith by consciously disregarding its duty to address that misconduct.'").

Of course, corporate officers—just like directors—owe "a duty of oversight" under Delaware law, as the "same policies that motivated [the court] to recognize the duty of oversight for directors apply equally, if not to a greater degree, to officers." *McDonald's*, 289 A.3d at 349-50 ("The Delaware Supreme Court has held that under Delaware law, corporate officers owe the same fiduciary duties as corporate directors, which logically include a duty of oversight.").

Here, as discussed in detail in section III.B.1-2, *supra*, E. Musk is both an officer and a director of Tesla, and in both roles received information regarding Tesla's systemic racial and sexual harassment issues at its factories.  As an officer, E. Musk (among other things) personally reviewed a former employee's discrimination lawsuit and admitted change was needed, told employees in an email that they should be "thick skinned" in the face of harassment, and became aware of the regulatory investigations by the DFEH and EEOC—both of which were initiated in 2019 and culminated in lawsuits against the Company on behalf of hundreds of Tesla employees in 2022 and 2023, respectively.  ¶¶4, 24-25, 46-47, 71-73, 78, 301. ██████████████

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
█████████████████████████████████████████

Despite his personal knowledge of the rampant discrimination and harassment at Tesla, █
████████████████████████████ [21]  ¶¶80-86, 288-90, 302.  Where, as here, "a red flag

---

[21] Allegations that corporate fiduciaries failed to take reasonable steps to remediate known compliance issues are sufficient to establish bad faith conduct—even under heightened pleading standards.  *See, e.g.*, *In re Massey Energy Co.*, 2011 WL 2176479 (Del. Ch. May 31, 2011).

concerns a central compliance risk, then it is easier to draw an inference that a failure to respond meaningfully resulted from bad faith." *McDonald's II*, 291 A.3d at 680. Employee relations issues are a central compliance risk for Tesla. Yet, E. Musk consciously failed to remedy the issues threatening the Company and, in fact, meaningfully contributed to the problem by making sexually charged remarks on Twitter—remarks that were subsequently reiterated by individuals who harassed Tesla employees. ¶¶74-77, 249, 310.

### 3.    E. Musk Faces Liability for Violations of Section 14(a)

Demand is also futile based on a substantial likelihood of liability for violations of Section 14(a) because "(1) [E. Musk] misrepresented or omitted a material fact in a proxy statement; (2) [E. Musk] acted at least negligently in distributing the proxy statement; and (3) the false or misleading proxy statement was an essential link in causing the corporate actions." *Edwards v. McDermott Int'l, Inc.*, 2021 WL 1421603, at *5 (S.D. Tex. Apr. 13, 2021).

Despite knowing of Tesla's longstanding and unlawful discriminatory workplace practices and systemic human capital relations issues, E. Musk reviewed, approved, and caused Tesla to file the misleading 2021 Proxy,[22] in which the Company claimed that (1) Tesla's workplace policies provided employees with a respectful and safe working environment; (2) Tesla did not tolerate workplace discrimination or harassment of employees; and (3) the Board's oversight of its human capital issues was adequate. ¶¶278-80. These statements misrepresented and failed to disclose that: (i) the DFEH and EEOC had been investigating the Company for systemic and unlawful racial discrimination since 2019; (ii) racial discrimination and sexual harassment were rampant and worsening at Tesla, ███████████████████████; and (iii) Tesla's Board-level oversight

---

[22] The "2021 Proxy" refers to the Proxy Statement on Form DEF 14A issued in connection with the Company's 2021 Annual Meeting of Stockholders, filed with the U.S. Securities and Exchange Commission ("SEC") on August 26, 2021.

as to human capital management practices was inadequate. ¶¶281-91.[23]

Further, Plaintiff's Section 14(a) claim easily satisfies the "essential link" element because the false proxy is linked to the harm Tesla sustained. Had E. Musk and the Board disclosed the Company's true state of affairs regarding its employee relations issues, shareholders would not have rejected the stockholder proposals designed to improve oversight and reporting in those areas and stem the tide of litigation against the Company from regulators and employees.

Finally, E. Musk signed the 2021 Proxy in his capacity as CEO and faces a substantial likelihood of liability for the misleading statements.[24]

### 4.    The Entire Board, or At Least A Majority, Lack Independence from E. Musk

"The goal of a demand futility analysis is to determine 'whether the board that would be addressing the demand can impartially consider its merits without being influenced by improper considerations.'" *In re Fitbit Inc. S'holder Derivative Litig.*, 2018 WL 6587159, at *11 (Del. Ch. Dec. 14, 2018); *see Sandys v. Pincus*, 152 A.3d 124, 128 (Del. 2016). Plaintiff need not plead evidence or facts sufficient to create a judicial finding of the lack of independence and must only show he "has a ***reasonable belief*** that the board lacks independence.'" *In re EZCORP Inc.*

---

[23] These statements misrepresented the true state of affairs at the Company and omitted material facts concerning the rampant and ongoing discrimination and retaliation at Tesla. *See United States v. Causey*, 2005 WL 2647976, at *8 (S.D. Tex. Oct. 17, 2005) (statements about a company's corporate affairs are actionable misrepresentations if the statement is "inconsistent with the existence of the mismanagement"). Due to the potential impact on the Company and its employees, a reasonable shareholder would have wanted to know the true state of affairs at the Company before voting against potential solutions to the Company's human management issues. *See id.*, at *7 ["[W]here a defendant affirmatively characterizes management practices as 'adequate,' … and the like, the subject is 'in play' under the securities laws."); *see also Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992), *as amended* (May 27, 1992) ("By addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to a reasonable shareholder, and thus is bound to speak truthfully.").

[24] *In re Hansen Med., Inc. S'holders Litig.*, 2018 WL 3025525, at *11 (Del. Ch. June 18, 2018) (officer who signed proxy and presented the information to stockholders may be held liable for material misstatements); *see also Baker Hughes*, 2020 WL 6281427, at *15-16 (CEO liable for breach of the duty of care for deficient proxy where CEO signed misleading proxy).

*Consulting Agreement Derivative Litig.*, 2016 WL 301245, at \*33 (Del. Ch. Jan. 25, 2016). "It would be fundamentally unfair to make a pleading stage determination turn on information that the plaintiffs simply cannot obtain." *Id.* at 35:13-15. Thus, Plaintiff is "only required to plead facts supporting an inference—or in the words of *Rales*, 'create a reasonable doubt'—that a director cannot act impartially." *Sandys*, 152 A.3d at 130. In analyzing demand futility at the pleading stage, Delaware courts apply a "contextual" analysis that considers allegations "in their totality and not in isolation from each other, and draw all reasonable inferences from the totality of those facts in favor of the plaintiffs." *Sanchez*, 124 A.3d at 1019 (Del. 2015).

### a.    Defendant E. Musk Controls and Dominates the Board

At the pleading stage, Plaintiff need only "show it is ***reasonably conceivable*** that [E. Musk] controlled [Tesla]." *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at \*17 (Del. Ch. Oct. 24, 2014). Here, the TAC alleges particularized facts showing that E. Musk controls and dominates Tesla, including the Board. ¶¶307-10. Thus, because the Board (or at least a majority of the Board) lacks independence from E. Musk, demand must be excused in this case.

E. Musk "is the 'face of Tesla'," and that "cannot meaningfully be disputed." *In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at \*15 (Del. Ch. Mar. 28, 2018) ("*Tesla Motors I*"). E. Musk is Tesla's single largest individual stockholder[25] who has consolidated power at the

---

[25] E. Musk currently owns approximately 17% of the Company's stock which gives him an effective blocking position given Tesla's supermajority voting requirements. ¶307. Nevertheless, "there is no absolute percentage of voting power that is required in order for there to be a finding that a controlling stockholder exists." *In re PNB Holdings Co. S'holders Litig.*, 2006 WL 2403999, at \*9 (Del. Ch. Aug. 18, 2006). Indeed, a stockholder's "[a]ctual control over business affairs may stem from sources extraneous to stock ownership." *In re Zhongpin Inc. S'holders Litig.*, 2014 WL 6735457, at \*8 (Del. Ch. Nov. 26, 2014), *rev'd on other grounds sub nom. In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A. 3d 1173 (Del. 2015); *see also Tesla Motors I*, 2018 WL 1560293, at \*14 (rejecting defendants' argument that E. Musk cannot be deemed a controlling stockholder because his "voting power is inadequate to dominate a contested election").

Company in himself.  ¶307.  In its 2021 Form 10-K, the Company acknowledges that it is "highly dependent on the services of [E.] Musk, Technoking of Tesla and our [CEO]."  *Id.*  Tesla is E. Musk's "personal kingdom where the boundaries of home and work are blurred," and where E. Musk directly involves himself in every aspect of the Company's operations.  ¶¶65-69, 307.

The TAC alleges with particularity that E. Musk has used the Company's dependence on him to exert his influence over the entire Board.  ¶¶308-10.[26]  E. Musk "has [even] demonstrated a willingness to facilitate the ouster of senior management when displeased, as evidenced by the fact that he 'forced founder and then-CEO Eberhard out of the Company and thereafter appointed himself CEO.'"  *Tesla Motors I*, 2018 WL 1560293, at *15; ¶309.

It bears noting that Chancellor McCormick found in *Tornetta* that E. Musk "controlled" Tesla, citing his "equity stake," the fact that he is the "paradigmatic 'Superstar CEO,' who held some of the most influential corporate positions (CEO, Chair, and founder)," his "thick ties with the directors" and his "dominat[ion]" over the process that led to board approval of his compensation plan.  Sanders Decl., Ex. A at 2.  She also found that E. Musk "exercised managerial authority over all aspects of Tesla"—"often without regard to Board authority" (*id.* at 116-17), and "wields unusually expansive managerial authority, equaling or even exceeding the imperial CEOs of the 1960s" (*id.* at 120); *see id.* at 117-20 (listing a dozen examples of E. Musk's exercise of control over management and directors).

Chancellor McCormick further noted in her post-trial opinion that "[w]hen directors believe a CEO is uniquely critical to the corporation's mission, even independent actors are likely

---

[26] For example, E. Musk "[p]ersistently [p]resent[ed] the SolarCity [t]ransaction to the Board[,]" a company previously founded by E. Musk, at a time when it faced a liquidity crisis.  ¶308.  Despite the Board conditioning the acquisition on approval by a majority of disinterested stockholders, the Delaware Chancery Court found the Board inexplicably allowed E. Must to participate in the deal process.  *Id.*

to be unduly deferential[,]" and, "[i]n the face of a Superstar CEO, it is even more imperative than usual for a company to" have "staunchly independent directors." *Id.* at 120-22. She determined in that case that the members of Tesla's board "were not staunchly independent—quite the opposite[.]" *Id.* at 122.[27] Likewise here, Plaintiff has alleged facts sufficient to infer that at least a majority of the Demand Board lacks independence from E. Musk due to the foregoing facts evidencing his domination of the Board, in combination with the Board-level relationships discussed below. *See In re Oracle Corp. Derivative Litig.*, 2018 WL 1381331, at *16 (Del. Ch. Mar. 19, 2018) (even in the absence of control, plaintiff raised reasonable doubt that board members could independently consider a demand against minority stockholder where stockholder was both director and executive, had a "firm grip on [the company's] day-to-day operations," and showed "a willingness to remove directors and officers who cross him.").

### b.    There Is Reason to Doubt the Independence of at Least: K. Musk, Gebbia, Straubel, and Ehrenpreis from E. Musk[28]

**K. Musk.**    Defendants do not meaningfully dispute Plaintiff's allegations concerning director K. Musk's lack of independence from his brother, E. Musk. Plaintiff has alleged facts sufficient to infer that K. Musk lacks independence from E. Musk because of their close familial relationship as brothers, in addition to their numerous business and financial ties. ¶311; *see Harbor*

---

[27] In addition to the beholden nature of these directors with respect to E. Musk, Chancellor McCormick also found that the directors ***acted*** in ways indicating that they were beholden to E. Musk. Sanders Decl., Ex. A at 127-46.

[28] While the Court need not even reach the question of Denholm's independence from E. Musk, Plaintiff alleges facts sufficient to create a pleading stage inference that there is reason to doubt Denholm's independence. ¶320. Indeed, in *Tornetta*, Chancellor McCormick highlighted the "life-changing" compensation Denholm received as Tesla director and Denholm's "lackadaisical approach to her oversight obligations" in finding that Denholm was beholden to E. Musk. Sanders Decl., Ex. A at 126. In the event it becomes necessary, Plaintiff will seek to amend his operative pleading to include these additional facts relevant to Denholm's lack of independence from E. Musk.

*Fin. Partners v. Huizenga*, 751 A.2d 879, 886-89 (Del. Ch. 1999) (finding lack of independence based on familial relationship between CEO and brother-in-law, and because brother-in-law sat on boards of other companies controlled by CEO).  The 2021 Proxy admits that K. Musk is not independent (*id.*), further supporting demand futility as to him based on a lack of independence.[29]

**Gebbia.**  There is reason to doubt whether Gebbia could impartially consider a demand against E. Musk due to his longstanding personal and professional ties with E. Musk.  ¶¶308, 321-23.  In July 2022, for example, Gebbia retired from his full-time involvement at Airbnb and Musk tweeted a congratulatory response, just two months later Gebbia was appointed as a Tesla director. *Id.*  Delaware courts have found that similarly close and business relationships warrant a pleading stage inference that a director lacks independence.[30]  Taken together, the facts alleged create reason to doubt that Gebbia could independently assess a demand against E. Musk.

**Straubel.**  There is also reason to doubt whether director Straubel could impartially consider a demand against E. Musk due to their longstanding personal and professional ties. ¶¶316-19.  Straubel is a co-founder of Tesla along with E. Musk and three other individuals, and was the last remaining co-founder at the Company other than E. Musk following the tense departures of three other co-founders.  ¶316.  Straubel and E. Musk have a longstanding relationship, dating back to when E. Musk and Straubel first discussed the idea of commercializing electric vehicles during lunch in 2003.  *Id.*

---

[29] In *Tornetta*, Chancellor McCormick found that K. Musk lacked independence from E. Musk—and it was not a close call.  Sanders Decl., Ex. A at 123, 127.

[30] *See, e.g.*, *In re Primedia Inc. Derivative Litig.*, 910 A.2d 248, 261 n.45 (Del. Ch. 2006) (finding in context of motion to dismiss that directors who had "substantial past or current relationships, both of a business and of a personal nature, with [a controller]" were not independent); *In re New Valley Corp.*, 2001 WL 50212, at *7 (Del. Ch. Jan. 11, 2001) (considering allegations of interest and lack of independence and finding that "[t]he facts alleged in the complaint show that all the members of the current Board have current or past business, personal, and employment relationships with each other and the entities involved").

**Ehrenpreis.**  There is reason to doubt whether Ehrenpreis could impartially consider a demand against E. Musk due to their longstanding personal and professional ties.  ¶¶312-15.[31] Ehrenpreis has made substantial investments in E. Musk's companies before they were public, and Tesla has contracted with Mapbox, Inc., where Ehrenpreis is both a director and investor, to provide millions of dollars in services to Tesla.  *Id*.  Ehrenpreis also openly credits E. Musk as a "significant influence on [his] professional career," while Ehrenpreis's directorship has, by his own admission, significantly boosted his fundraising efforts.  *Id*.  Taken together, the facts alleged create reason to doubt that Ehrenpreis could independently assess a demand against E. Musk.[32]

## IV.    CONCLUSION

The Motion should be denied.  In the event the Court grants the Motion, Plaintiff requests leave to amend, which is particularly appropriate given the January 2024 post-trial opinion by Chancellor McCormick finding that Tesla's board (which included a number of directors on the current board) was controlled by, beholden to, and not independent of E. Musk, as well as the continuing developments in the pending cases arising from the same underlying facts as this derivative action.[33]

Dated: February 15, 2024                            ROBBINS LLP

                                                                    */s/ Shane P. Sanders*
                                                                    SHANE P. SANDERS (admitted *pro hac vice*)
                                                                    BRIAN J. ROBBINS
                                                                    CRAIG W. SMITH (admitted *pro hac vice*)
                                                                    5060 Shoreham Place, Suite 300
                                                                    San Diego, CA 92122

---

[31] *See Int'l Equity Cap. Growth Fund, L.P. v. Clegg*, 1997 WL 208955, at *5-7 (Del. Ch. Apr. 22, 1997) (holding on a motion to dismiss that there was reason to doubt independence of directors based on history of dealing and overlapping governance relationships).

[32] In *Tornetta*, Chancellor McCormick found that Ehrenpreis's relationship with E. Musk was "weighty," and determined that he was "beholden" to E. Musk.  Sanders Decl., Ex. A at 125.

[33] *See, e.g.*, *EEOC v. Tesla, Inc.*, No. 3:23-cv-04984 (N.D. Cal.); *Pierce v. Tesla, Inc.*, No. 3:22-cv-03177 (N.D. Cal.); *Frank v. Tesla, Inc. et al*, No. 2:22-cv-01590 (C.D. Cal.); *Diaz v. Tesla, Inc.*, No. 23-3334 (9th Cir.); *DFEH v. Tesla, Inc.*, No. 22CV006830 (Cal. Super. Ct.-Alameda Cnty.).

Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsllp.com
       csmith@robbinsllp.com
       ssanders@robbinsllp.com

KENDALL LAW GROUP, PLLC
JOE KENDALL
State Bar No. 11260700
3811 Turtle Creek, Blvd., Suite 825
Dallas, TX 75219
Telephone: (214) 744-3000
Facsimile: (214) 744-3015
E-mail: jkendall@kendalllawgroup.com

*Co-Lead Counsel for Plaintiff*

1655125

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 15, 2024, that I have served a true and correct copy of the foregoing document upon each attorney of record.

*/s/ Shane P. Sanders*
SHANE P. SANDERS