UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| IN RE TESLA INC.<br><br>STOCKHOLDER DERIVATIVE<br><br>LITIGATION | Lead Case No.: 1:22-cv-00592-DAE<br><br><br>(Consolidated with Case No.<br><br>1:22-cv-00611-DAE)<br><br>**PUBLIC REDACTED** |
| This Document Relates To:<br><br><br>All Cases | |

**DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
SECOND AMENDED CONSOLIDATED COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................................... 1

FACTUAL BACKGROUND.................................................................................................... 3

ARGUMENT............................................................................................................................ 4

I.   PLAINTIFF'S THIRD COMPLAINT FAILS TO PLEAD ANY PARTICULARIZED
     FACTUAL ALLEGATIONS SUPPORTING A SUBSTANTIAL LIKELIHOOD OF
     LIABILITY FOR ELON MUSK.................................................................................5

   A.  Plaintiff Repeats Already-Dismissed Allegations of Liability as Director.......................5

   B.  Under Delaware Law, There Is No Oversight Liability for Officers Without
       Bad Faith.........................................................................................................................6

II.  NONE OF TESLA'S DIRECTORS LACKS INDEPENDENCE..........................................9

   A.  Mr. Musk Does Not Control Tesla...................................................................................10

     1. Tesla's Shareholders Overwhelmingly Chose to Support Mr. Musk.........................10

     2. None of Plaintiff's Allegations Establish Mr. Musk's Control Over Tesla.................11

   B.  Tesla's Directors Are Not Beholden to Elon Musk..........................................................14

III. PLAINTIFF FAILS TO ESTABLISH DIVERSITY JURISDICTION..............................18

   A.  Tesla Is Properly Aligned as a Plaintiff..........................................................................18

   B.  Because There Is No Diversity, There Is No Jurisdiction...............................................20

CONCLUSION.......................................................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                                                              **Page(s)**

*Beam v. Stewart*,
   845 A.2d 1040 (Del. 2004) …………………………………………….……………….. 10, 11

*Braddock v. Zimmerman*,
   906 A.2d 776 (Del. 2006) ……………………………………………………….. 14

*In re Cabot Oil & Gas Corp. Deriv. Litig.*,
   2024 U.S. Dist. LEXIS 143 (S.D. Tex. Jan. 2, 2024) ……………………………………….. 8

*In re Caremark Int'l Inc. Deriv. Litig.*,
   698 A.2d 959 (Del. Ch. 1996) …………….…………………………………………… 1, 6

*Chester Cty. Emps.' Ret. Fund v. New Residential Inv. Corp.*,
   2017 Del. Ch. LEXIS 767 (Oct. 6, 2017) ……………………………………...…………… 15

*In re Citigroup Inc. S'holder Deriv. Litig.*,
   964 A.2d 106 (Del. Ch. 2009) ……………………………………………………….5, 6

*In re Digimarc Corp. Deriv. Litig.*,
   549 F.3d 1223 (9th Cir. 2008) …………………………………...………………..19

*Duffey v. Wheeler*,
   820 F.2d 1161 (11th Cir. 1987) ……………………………………………….……….. 19

*Franklin v. State of Louisiana*,
   2001 U.S. App. LEXIS 31259 (5th Cir. 2001) ……………………………………… 18

*Freuler v. Parker*,
   803 F. Supp. 2d 630 (S.D. Tex. 2011) ……………………...…………………….4, 6, 17

*Gartner v. Pyatt*,
   2016 U.S. Dist. LEXIS 164281 (D. Nev. Nov. 29, 2016) …………………...………………. 20

*In re Goldman Sachs Grp., Inc. S'holder Litig.*,
   2011 Del. Ch. 151 (Oct. 12, 2011) ……………………………………….……………… 14

*Graybill v. Wells Fargo Bank, N.A.*,
   953 F. Supp. 2d 1091 (N.D. Cal. 2013) …………………………………………………… 6

*Hertz Corp. v. Friend*,
   559 U.S. 77 (2010) …………………...………………………………………….. 18

*Jernigan v. Ashland Oil Inc.*,
   989 F.2d 812 (5th Cir. 1993) ……………………………………………………….. **20**

**Cases**                                                                                              **Page(s)**

*Kaltman v. Sidhu*
   2004 U.S. Dist. LEXIS 2818 (N.D. Tex. Feb. 26, 2004) …………………………….. 17, 18

*Kandell v. Niv,*
   2017 Del. Ch. LEXIS 640 (Sept. 29, 2017) ……………………………………………… 10

*Kiger ex rel. Qualcomm Inc. v. Mollenkopf,*
   2021 U.S. Dist. LEXIS 220509 (D. Del. Nov. 15, 2021) ……………………………… 4

*Koster v. Lumbermens Mut. Cas. Co.*,
   330 U.S. 518 (1947) ……………………………………………………………………… 19

*In re Kraft Heinz Co. Deriv. Litig.*,
   2021 Del. Ch. LEXIS 295 (Dec. 15, 2021) ……………………………………… 15, 17

*Lee Constr. & Maint. Co. v. Ingram Indep. Sch. Dist.*,
   2020 U.S. Dist. LEXIS 247533 (W.D. Tex. Jan. 8, 2020) …………………………… 20

*In re Lendingclub Corp. Deriv. Litig.*,
   2019 Del. Ch. LEXIS 1347 (Oct. 31, 2019) …………………………………………… 14

*Lowe v. Ingalls Shipbuilding, Div. of Litton Sys., Inc.*,
   723 F.2d 1173 (5th Cir. 1984) ………………………………………………………… 19

*In re McDonald's Corp. S'holder Deriv. Litig.*,
   289 A.3d 343 (Del. Ch. 2023) ……………………………………………………… 2, 6, 7

*McElrath v. Kalanick*,
   2019 Del. Ch. LEXIS 107 (Apr. 1, 2019) …………………………………………… 14, 18

*MCG Cap. Corp. v. Maginn*,
   2010 Del. Ch. LEXIS 87 (May 5, 2010) …………………………….……...………. 16, 17

*Okla. Firefighters Pension & Ret. Sys. v. Corbat*,
   2017 Del. Ch. LEXIS 848 (Dec. 18, 2017) ……………………………….…………… 5

*Ontario Provincial Council of Carpenters' Pension Trust Fund v. Walton*
   2023 Del. Ch. LEXIS 92 (Apr. 26, 2023)…………………………………………… 7, 8

*In re Oracle Corp. Deriv. Litig.*,
   2011 U.S. Dist. LEXIS 129765 (N.D. Cal. Nov. 9, 2011) …………………………… 10

*Owens v. Mayleben*,
   2020 Del. Ch. LEXIS 59 (Feb. 13, 2020) …………………………………………….. 15

**Cases**                                                                                                **Page(s)**

*Segway Inc. v. Cai,*
   2023 Del. Ch. LEXIS 643 (Dec. 14, 2023) …………………………………… 1, 6, 7, 9

*Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera,*
   119 A.3d 44 (Del. Ch. July 13, 2015) …………………………………………… 18

*In re Tesla Motors, Inc. S'holder Litig.,*
   2018 Del. Ch. LEXIS 102 (Mar. 28, 2018) ………….……………………… 12, 13

*In re Tesla Motors, Inc. S'holder Litig.,*
   2022 Del. Ch. LEXIS 94 (Apr. 27, 2022) …………………………………….. 13

*Texaco, Inc. v. Pennzoil Co.,*
   729 S.W.2d 768 (Tex. App. 1987) ………………………………………………… 11

*Tornetta v. Musk,*
   310 A.3d 430 (Del. Ch. 2024) ………………………………....……..11, 13, 16

*UFCW & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg,*
   250 A.3d 862 (Del. Ch. 2020) ………………………………………………… 16

*United Food & Commer. Workers Union v. Zuckerberg,*
   262 A.3d 1034 (Del. 2021) ……………………………………………….. 2, 10, 16

**Statutes**

8 Del. C. § 141(e) ………………………………………………………………….. 3, 6

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| ¶__ or Complaint | Verified Second Amended Consolidated Stockholder Derivative Complaint for Breach of Fiduciary Duty, *In re Tesla Inc. S'holder Deriv. Litig.*, No. 1:22-cv-00592-DAE (W.D. Tex. May 15, 2024), ECF No. 94 |
| CC Order | Order Granting Defendants' Motion to Dismiss Plaintiff's Consolidated Complaint, *In re Tesla Inc. S'holder Deriv. Litig.*, No. 1:22-cv-00592-DAE (W.D. Tex. Sept. 15, 2023), ECF No. 70 |
| Ex. __ | Exhibits to the Declaration of Gary Ewell in Support of Defendants' Motion to Dismiss Plaintiff's Second Amended Consolidated Complaint |
| MTD CC | Defendants' Motion to Dismiss Plaintiffs' Verified Consolidated Stockholder Derivative Complaint, *In re Tesla Inc. S'holder Deriv. Litig.*, No. 1:22-cv-00592-DAE (W.D. Tex. Nov. 7, 2022), ECF No. 45 |
| MTD FAC | Defendants' Motion to Dismiss Plaintiffs' Amended Consolidated Stockholder Derivative Complaint, *In re Tesla Inc. S'holder Deriv. Litig.*, No. 1:22-cv-00592-DAE (W.D. Tex. Dec. 18, 2023), ECF No. 78 |
| FAC Order | Order Granting Defendants' Motion to Dismiss Plaintiff's Amended Consolidated Complaint, *In re Tesla Inc. S'holder Deriv. Litig.*, No. 1:22-cv-00592-DAE (W.D. Tex. Apr. 11, 2024), ECF No. 93 |
| *Tesla Motors I* | *In re Tesla Motors, Inc. S'holder Litig.*, 2018 Del. Ch. LEXIS 102 (Del. Ch. Mar. 28, 2018) |
| *Tornetta* | *Tornetta v. Musk*, 310 A.3d 430 (Del. Ch. Jan. 30, 2024) |
| TSLA-Janklow __ | Bates-stamped documents in Tesla's books and records production to Plaintiffs pursuant to Section 220 of the Delaware General Corporation Law |

Nominal Defendant Tesla moves to dismiss Plaintiff's Second Amended Consolidated Complaint (the "Complaint") under Federal Rule of Civil Procedure 23.1 for failure to make pre-litigation demand, and therefore lack of standing.  Defendant Elon Musk moves to dismiss the Complaint under Federal Rules of Civil Procedure 12(b)(6) and 9(b) for failure to state a claim.

## INTRODUCTION

This is Plaintiff's fourth attempt to plead this shareholder derivative case.  Like the prior versions of his complaint, this too should be dismissed.

Once again, Plaintiff fails to show why his failure to make a litigation demand on Tesla's Board should be excused.  Rule 23.1, as well as Delaware law, requires Plaintiff to plead particularized facts showing that his demand would have been futile.  But Plaintiff has now conceded that the members of Tesla's Board face no personal liability in connection with his allegations.  Instead, he focuses on alleging liability for Mr. Musk, and claims that a majority of the Board is beholden to him—and presumably incapable of considering a demand.  Plaintiff's arguments are not supported by particularized facts.  He relies on the same flawed anecdotes and innuendo that characterized his prior complaints.

**No Liability.**  Plaintiff cannot show that Mr. Musk faces a substantial likelihood of personal liability.  Plaintiff claims Mr. Musk faces liability because he did not do more to prevent alleged instances of harassment or discrimination years ago at Tesla's California factory.  But Plaintiff conflates the duties of loyalty and care—two separate concepts of Delaware law.  Plaintiff does not allege a bad faith breach of the duty of loyalty on Mr. Musk's part, only a breach of the duty of care in Mr. Musk's discharge of his oversight responsibilities under *In re Caremark International Inc. Derivative Litigation*, 698 A.2d 959, 967 (Del. Ch. 1996).  Delaware law requires that duty of care violations must also be in bad faith to give rise to officer liability under *Caremark*.  *See Segway Inc.*

*v. Cai*, 2023 Del. Ch. LEXIS 643, at *2 (Dec. 14, 2023) ("[B]ad faith remains a necessary predicate to any *Caremark* claim."). In any event, Plaintiff's allegations plead neither bad faith nor gross negligence with the factual specificity required to show "an even greater showing than what is required to obtain a conviction for criminal negligence." *In re McDonald's Corp. S'holder Deriv. Litig.*, 289 A.3d 343, 372 n.17 (Del. Ch. 2023).

**The Board Is Independent.** With Mr. Musk not liable, the analysis can stop here. But even if Mr. Musk was personally liable, Plaintiff fails to show a majority of the Board is so beholden to him that their "discretion would be sterilized." *United Food & Commer. Workers Union v. Zuckerberg*, 262 A.3d 1034, 1060 (Del. 2021). Plaintiff enumerates banal aspects of corporate life and tries to cast them as evidence of control. Not only is Plaintiff factually incorrect, but he deliberately miscounts Mr. Musk's Tesla holdings to make him appear what he is not: a controller of the Company. Mr. Musk owns only 13% of Tesla's shares. He does not control Tesla.

**No Federal Jurisdiction.** The Complaint should also be dismissed for lack of subject matter jurisdiction. Plaintiff's artful pleading cannot overcome the general rule in derivative cases that diversity is defeated if the company and individual defendants are citizens of the same state.

Stepping back, this lawsuit shows why disagreements by a single shareholder should not be allowed to supplant the business judgment of Tesla's elected Board. Just weeks ago, in a historic vote, 72% of Tesla's disinterested voting shares were voted in favor of Mr. Musk's compensation as Tesla's leader. 84% of disinterested voting shares were voted in favor of Tesla's redomiciliation from Delaware to Texas. If Mr. Musk had somehow controlled Tesla, these votes would have been unnecessary. More importantly, his fellow shareholders would have delivered a sharp rebuke. Instead, they confirmed their support for Mr. Musk's vision of Tesla's future. This lawsuit should be dismissed.

**FACTUAL BACKGROUND**

From 2010 to 2024, Tesla has grown from 899 employees in 2010 and a single manufacturing facility to more than 100,000 employees working in factories in Texas, Nevada, New York, California, Germany, and China.  Its internal controls have grown alongside it.  This includes Legal and Human Resources departments focused on culture and compliance issues across Tesla's millions of square feet of manufacturing space.  Those departments report to the Board, including Mr. Musk as both a director and CEO.  The Board relies on that reporting and good faith, as Delaware permits.  *See* 8 Del. C. § 141(e).

Through these reports, Mr. Musk and his fellow directors learned of Tesla's successes, challenges, and ongoing efforts to remediate workplace issues.  Directors were reminded that ▮▮▮



▮▮▮▮ TSLA-Janklow 220_000351; MTD CC at 14–15, MTD FAC at 6.  Management detailed the Company's ▮▮▮▮

▮▮▮▮ TSLA-Janklow 220_000353; MTD CC at 10; MTD FAC at 6–7.  Mr. Musk and his fellow directors learned that the Employee Relations team ▮▮▮▮

TSLA-Janklow 220_000728; MTD CC at 7.

Knowing that dedicated teams were focused on improving Tesla's culture of compliance (and reporting their progress), Mr. Musk was able to focus on *his* role at Tesla.  As Tesla's CEO, his

responsibility is to drive Tesla's mission forward.  He is deeply involved in Tesla's product development, strategic direction, and operations.  As Plaintiff admits, Mr. Musk is focused on building cars, working day and night, and even sleeping on the factory floor.  ¶ 285.  This focus—along with the efforts of Tesla's employees—has brought EVs to the mainstream. Consumers now have freedom to choose an American-made EV that helps build a greener future.

Just last month, Tesla's shareholders gave Mr. Musk and his vision for Tesla a resounding vote of confidence.  *72% of disinterested voting shares* were voted in favor of ratifying Mr. Musk's compensation package.  Even more voters supported redomiciling Tesla from Delaware to its home in Texas: *84% of disinterested voting shares* were voted in favor.  These margins excluded Mr. Musk's and Mr. Kimbal Musk's voting shares, representing 13% of outstanding Tesla stock. Plaintiff was entitled to vote his shares—how many or how few that is, he does not plead.

## ARGUMENT

The Court is already familiar with the "stringent requirements of factual particularity" that Delaware law and Federal Rule of Civil Procedure 23.1 impose on derivative claims.  *Freuler v. Parker*, 803 F. Supp. 2d 630, 638 (S.D. Tex. 2011); MTD CC at 8.  As with his prior failed attempts, Plaintiff must establish that "demand [on the Board] is excused because the directors are incapable of making an impartial decision regarding such litigation."  *Freuler*, 803 F. Supp. 2d at 636.  He can only do this by showing that a majority of directors either (1) are self-interested because they "face[] a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand" or (2) "lack[] independence from" an interested party.  *Kiger ex rel. Qualcomm Inc. v. Mollenkopf*, 2021 U.S. Dist. LEXIS 220509, at *14–15 (D. Del. Nov. 15, 2021).  Plaintiff now contends only that Mr. Musk faces a substantial likelihood of liability.  As a result, he must show that Mr. Musk faces a substantial likelihood of liability and that a majority of directors are beholden

-4-

to him so that they would be unable to consider a demand.  Plaintiff fails to make this showing.

I.    **PLAINTIFF'S THIRD COMPLAINT FAILS TO PLEAD ANY PARTICULARIZED FACTUAL ALLEGATIONS SUPPORTING A SUBSTANTIAL LIKELIHOOD OF LIABILITY FOR ELON MUSK**

A.    **Plaintiff Repeats Already-Dismissed Allegations of Liability as Director**

Plaintiff again fails to plead particularized facts showing that Mr. Musk faces a substantial likelihood of liability in his capacity as a director.  Tesla's Certificate of Incorporation exculpates directors, including Mr. Musk, from liability for all but breaches of the duty of loyalty.  Ex. 1 at 302.  Negligence alone cannot be the basis for "breaches of the duty of loyalty [which are] preconditioned on a finding of bad faith."  *Okla. Firefighters Pension & Ret. Sys. v. Corbat*, 2017 Del. Ch. LEXIS 848, at *45 (Dec. 18, 2017).  Plaintiff must plead Mr. Musk's bad faith "by alleging with particularity that [he] *knowingly* violated a fiduciary duty or failed to act in violation of a *known* duty to act, demonstrating a *conscious* disregard for [his] duties."  *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 125 (Del. Ch. 2009).

Yet, Plaintiff's deficient pleadings still "do not establish that Musk in his capacity as a director acted in bad faith towards allegations of discrimination and harassment," FAC Order at 10, and therefore, "fail to establish the *Caremark* claim against Musk."  FAC Order at 7; *see* MTD CC at 9–15; MTD FAC at 4–9.  Where "[t]he factual allegations are unchanged" and "there is no new basis for [Plaintiff's] claim," a court may "dismiss[] it again for the same reasons."  *Graybill v. Wells Fargo Bank, N.A.*, 953 F. Supp. 2d 1091, 1108 (N.D. Cal. 2013) (dismissing fraud allegations in amended complaint).  These unchanged allegations continue to rely on Audit Committee meetings (that Mr. Musk did not attend) and selectively quote Board materials to omit discussions of remedial measures.  MTD CC at 11–13; MTD FAC at 5–7.  Moreover, Plaintiff again has no answer to Delaware law's holding that directors are "fully protected in relying in good faith" on "information,

opinions, reports or statements presented to the corporation by any of the corporation's officers or employees[.]"  8 Del. C. § 141(e); *see also Citigroup*, 964 A.2d at 135 (directors may "rely[] in good faith on the opinions and statements of the corporation's officers and employees").

These allegations failed to "meet [the] stringent requirements of factual particularity" imposed by Delaware law and Rule 23.1 in the first two attempts; their repetition here adds nothing. *Freuler*, 803 F. Supp. 2d at 638.  They again fail as a matter of law.

> **B.    Under Delaware Law, There Is No Oversight Liability for Officers Without Bad Faith**

Plaintiff's fiduciary duty claim is a classic *Caremark* claim, alleging that Mr. Musk "allowed a situation to develop and continue which exposed the corporation to enormous legal liability and that in so doing [] violated a duty to be [an] active monitor[]" of the corporation.  *Caremark*, 698 A.2d at 967.  Plaintiff's theory fails because it "rests on the misimpression that an oversight claim pursued against an officer is easier to plead than one against a director.  Irrespective of the defendant's corporate title, a *Caremark* claim is 'possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment.'"  *Cai*, 2023 Del. Ch. LEXIS 643, at *10.

Just as with directors, "oversight liability for officers requires a showing of bad faith.  The officer must consciously fail to make a good faith effort to establish information systems, or the officer must consciously ignore red flags."  *McDonald's*, 289 A.3d at 375.  Plaintiff has failed to allege with particularity that Mr. Musk overlooked any red flags in bad faith, and, under Delaware law, "[t]he allegation that [Mr. Musk's] conduct breached the duty of care is insufficient."  *Id.*  This Court has already determined that none of the allegations against Mr. Musk in his capacity as a director adequately pleaded bad faith.  *See* CC Order at 9–11; FAC Order at 7–10.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████  FAC Order at 13 (emphasis added).

But under Delaware law, as *McDonald's* plainly states, a "breach [of] the duty of care is insufficient" to state an oversight claim.  289 A.3d at 375; *see also Cai*, 2023 Del. Ch. LEXIS 643, at *2 ("[B]ad faith remains a necessary predicate to any *Caremark* claim.").

There are no facts—particularized or otherwise—in the present lawsuit to suggest Mr. Musk acted in bad faith in his capacity as an officer.  A few examples provide helpful context for the level of conduct and factual pleading required to clear this standard.

In *McDonald's*, the court found that a shareholder sufficiently pleaded bad faith against the restaurant chain's Chief Human Resources Officer, "the executive officer with day-to-day responsibility for overseeing the human resources function and promoting a safe and respectful environment."  289 A.3d at 378.  The court found bad faith where the officer turned a "blind eye" to two rounds of highly public, "coordinated EEOC complaints[,]" a *thirty-city* walk-out, and another one-day strike in *ten cities*.  *Id.*  Moreover, *the officer himself* repeatedly "engaged in acts of sexual harassment[,]" *id.* at 350, including "committ[ing] a third act of sexual harassment . . . after spending the prior year focusing with the rest of the management team on ways to address the Company's problems with sexual harassment and misconduct."  *Id.* at 379.

*Ontario Provincial Council of Carpenters' Pension Trust Fund v. Walton* similarly underscores the severity of conduct needed to plead a *Caremark* claim against an officer.  2023 Del. Ch. LEXIS 92 (Apr. 26, 2023).  In *Walton*, a shareholder adequately alleged *Caremark* claims against Walmart's "principal compliance officers" responsible for overseeing a settlement between the U.S. Drug Enforcement Agency and Walmart, as well as Walmart's compliance with the Controlled Substances Act in the wake of the opioid crisis.  *Id.* at *149.  Despite this responsibility, the officers "did not make a sufficient effort to report to the [b]oard regarding Walmart's shortcomings."  *Id.*  Instead, the officers reported to the board "a feel-good message that everything

is fine[,]" all while Walmart dispensed "billion[s of] opioid pills" across "over 5,000 pharmacies[.]" *Id.* at *1–2, 43. As a result of the officers' failure of oversight, "Walmart currently faces thousands of lawsuits from private litigants, state attorneys general, and the U.S. [DOJ]" and ultimately "announced that it had agreed to a \$3.1 billion nationwide opioid settlement[.]" *Id.* at *2.

Judge Rosenthal recently dismissed *Caremark* allegations against the officers and directors of a fracking company for failure to plead bad faith despite their alleged awareness of "hundreds" of violation notices from an environmental regulator, followed by a grand jury indictment and "fifteen criminal charges" against the company, "includ[ing] nine felonies[.]" *In re Cabot Oil & Gas Corp. Deriv. Litig.*, 2024 U.S. Dist. LEXIS 143, at *4, 8 (S.D. Tex. Jan. 2, 2024). After reviewing corporate reports to those defendants—including "that Cabot had plans in place to remediate the alleged violations"—Judge Rosenthal concluded that "[a]t most, the Section 220 documents support the conclusion that the defendants 'responded in a weak, inadequate, or even grossly negligent manner' to the [alleged red flags], which is not enough for *Caremark* liability." *Id.* at *48.

Plaintiff's allegations against Mr. Musk are far from the allegations in *McDonald's* or *Walton*. Nor do they even rise to the level of *Cabot*, in which the court dismissed *Caremark* claims against officers. Giving the most generous reading, Plaintiff has alleged that Mr. Musk must have been aware of instances of discrimination and harassment because he spent time at Tesla's 5.2 million square-foot Fremont factory and because he personally viewed an employee's casefile related to one complaint. ¶¶ 68, 285–286. Plaintiff also speculates that Mr. Musk made statements that must have negatively influenced Tesla's culture and criticized individuals who sued the Company. ¶¶ 72–73. On these facts, Plaintiff claims that Mr. Musk must have known about systemic discrimination and harassment issues at Tesla's factories and was recklessly indifferent to those issues. ¶¶ 61, 354. But these allegations do not show bad faith. Unlike in *McDonald's*, Plaintiff does not allege that Mr.

Musk himself committed any acts of harassment or discrimination.  Unlike in *Walton*, Plaintiff does not allege that Mr. Musk painted a falsely rosy picture of compliance to the Board, abdicating his oversight responsibilities.  Rather, like in *Cabot*, Plaintiff alleges Mr. Musk was, at most, aware of *some instances* of harassment and discrimination reported up through functioning oversight mechanisms *and* he was also aware of the Company's remedial responses.  *See* MTD CC at 14 (detailing remedial action in response to reporting); MTD FAC at 6–7 (same).  That is far from bad faith.  Perhaps Plaintiff would have acted differently.  Perhaps Mr. Musk would have acted differently with more information.  But these issues did not rise to the level of willful action that caused the *McDonalds* and *Walmart* courts to deny motions to dismiss.

Accepting Plaintiff's allegations would make precisely the error *Segway* warned of: lowering the bar for *Caremark* liability simply based on "the defendant's corporate title[.]"  *Cai*, 2023 Del. Ch. LEXIS 643, at *10.  Having failed to allege bad faith with particularity, Plaintiff has not established that Mr. Musk faces a substantial likelihood of liability for Plaintiff's oversight claim.

## II.    NONE OF TESLA'S DIRECTORS LACKS INDEPENDENCE

The Court already rejected Plaintiff's argument that Mr. Musk controls a majority of the Demand Board so as to render demand futile.  FAC Order at 15-20.  Nothing has changed.  Plaintiff once again argues that Mr. Musk somehow controls the whole of Tesla.  In support, Plaintiff miscalculates and misstates Mr. Musk's stock holdings, hyperbolizes Mr. Musk's role at Tesla, relies on irrelevant court rulings, and doubles down on dated, vague anecdotes.  This sits in stark contrast to the overwhelming vote of confidence that Tesla's shareholders gave Mr. Musk just last month.  Finally, Plaintiff adds a smattering of old, irrelevant business dealings and tabloid gossip to his already-deficient allegations that a majority of Tesla's Board is "so 'beholden' to [Mr. Musk] . . . that

[their] 'discretion would be sterilized.'" *Zuckerberg*, 262 A.3d at 1060.[1]

### A.    Mr. Musk Does Not Control Tesla

Having failed twice to allege that Mr. Musk controls a majority of the Board, Plaintiff instead asks this Court to accept that Mr. Musk controls *the entirety of Tesla*.  This theory ignores reality.  Mr. Musk is important to Tesla—that is true.  But without "particularized allegations . . . demonstrating that the directors are beholden to the [controlling] stockholder[,]" demand cannot be excused.  *Beam v. Stewart*, 845 A.2d 1040, 1054 (Del. 2004); *see* FAC Order at 16–17 n.1.  Plaintiff's "conclusory allegations of domination and control are insufficient to excuse pre-suit demand."  *Kandell v. Niv*, 2017 Del. Ch. LEXIS 640, at *44 (Sept. 29, 2017).

### 1.    Tesla's Shareholders Overwhelmingly Chose to Support Mr. Musk

Plaintiff's control theory is based on the notion that Mr. Musk is somehow *coercing* his fellow directors and shareholders into taking his favored courses of action.  Shareholder democracy proves Plaintiff dead wrong.  Just last month, *84% of the disinterested voting shares* were voted in favor of redomesticating Tesla to Texas and *72% of disinterested voting shares* were voted in favor of ratifying Mr. Musk's compensation.  Ex. 2 at 451–52.  The Board had fully delegated to an independent Special Committee the determination of whether to recommend redomestication and ratification.  Ex. 1 at 37.  The Special Committee was empowered to make its decision using its business judgment and working with independent counsel and experts.  *Id.* at 34.  Mr. Musk recused himself from considering and adopting these proposals, and his votes were *excluded* from the voting threshold when these proposals were put to the shareholders.  *Id.* at 40, 87.  And yet, a supermajority of disinterested voting shares were voted in favor.  Tesla's directors and shareholders do not need to

---

[1] The Court need not address the Board's independence, because Plaintiff remains unable to plead that Mr. Musk is interested.  *See In re Oracle Corp. Deriv. Litig.*, 2011 U.S. Dist. LEXIS 129765, at *20 (N.D. Cal. Nov. 9, 2011) (dismissal where plaintiff failed to "show[] that one or more board members is disqualified as interested, there is no reason to evaluate" directors' independence).

be coerced.  They believe in Tesla's and Mr. Musk's vision and voted for it.

The reality of this emphatic support for Mr. Musk's vision reveals another fact inconvenient to Plaintiff's control theory.  If Mr. Musk somehow controlled Tesla, why would he need the support of the remaining shareholders?  He could approve whatever he wished.  The Board's scrupulous decision-making process, the empowerment of a Special Committee with plenary and final decision-making authority, and the historic support of a supermajority of unaffiliated shareholders, all point to the opposite of a controlled company.  This is shareholder democracy at its finest, whether Plaintiff agrees with the outcome or not.

### 2.  None of Plaintiff's Allegations Establish Mr. Musk's Control Over Tesla

Plaintiff offers a patchwork of allegations in attempts to plead that Mr. Musk controls Tesla and that demand therefore should be excused.  None of these allegations support Plaintiff's claim—not alone, nor together.

***Stock Ownership.***  Far from a controlling majority, Mr. Musk currently owns 13% of outstanding Tesla stock.  Ex. 1 at 166–67.  Plaintiff erroneously counts an additional 7.5% of stock options, which are the subject of active litigation.  ¶ 295; *see generally Tornetta v. Musk*, 310 A.3d 430 (Del. Ch. 2024).  But even if Mr. Musk had owned 20% of Tesla's outstanding stock, that would still be insufficient to deem him a controller.  *See Stewart*, 845 A.2d at 1054 (affirming dismissal despite director owning 94.4% of voting shares); *Texaco, Inc. v. Pennzoil Co.*, 729 S.W.2d 768, 807 (Tex. App. 1987) (40.2% ownership of stock "d[id] not support Texaco's implication that Gordon Getty had de facto control of Getty Oil").[2]  Moreover, Plaintiff's allegation that Mr. Musk's 13% of

---

[2] Plaintiff's allegation that Mr. Musk is "effectively extorting shareholders" to purportedly gain a 25% ownership stake is both wrong *and* undercuts his own argument.  ¶ 309.  First, shareholders do not need to be "extorted" to support greater stock ownership for Mr. Musk; 72% of disinterested voting shares were in favor of ratifying his compensation package just last month.  *See supra* at 10.  Second, Plaintiff's allegation begs the question: If Mr. Musk already controls Tesla, why would he need to "extort" shareholders to gain marginally more control?

outstanding stock gives him "an effective blocking position" is irrelevant.  ¶ 295.  Plaintiff does not

elaborate—because he cannot—how a 13% shareholder can somehow have a blocking position.

Even still, Tesla's limited supermajority requirement applied only to certain amendments to its

certificate of formation, *not* litigation demands or other Board decisions.  Ex. 1 at 187.

      ***Mr. Musk's Role at Tesla.***  Next, Plaintiff argues that, because Mr. Musk acts like Tesla's

CEO, he must thereby be a controller.  That "one analyst" described him as "extremely hands-on in

the development process" and "lead[ing] all product design, engineering and global manufacturing"

does not indicate that Mr. Musk controls Tesla—it is the job description of any technology and

manufacturing company CEO.  ¶¶ 293–94.  By Plaintiff's lights, then every CEO controls the

company he or she leads—that is not the law and boards do fire CEOs all the time.  Plaintiff also

argues that Mr. Musk's purported control may be inferred from the risk factors in Tesla's annual

report that describe Mr. Musk's role and impact on Tesla.  ¶ 296.  Far from "conce[ding]" Mr.

Musk's "powerful influence," *id.*, that is standard practice for public companies and, in particular,

technology companies and EV manufacturers.[3]  Plaintiff's thrice-repeated assertion that "Mr. Musk

is the face of Tesla," ¶ 293, "is not dispositive of the controller question."  *See In re Tesla Motors,*

*Inc. S'holder Litig.*, 2018 Del. Ch. LEXIS 102, at *37 (Mar. 28, 2018).

      ***Settlements and Litigation.***  Plaintiff's reliance on a regulatory settlement and state court

litigation is similarly misplaced.  He again misleadingly cites *Tesla Motors I* to support his flawed

theory that Mr. Musk controls Tesla, ¶ 302, when, in fact, the court ultimately ruled in favor of

---

[3] *Compare* ¶ 298, *with e.g.*, Ex. 3 at 462 ("We are highly dependent on the services of our founder, Michel Detheux, Ph.D., who serves as our Chief Executive Officer and President[.]"); Ex. 4 at 473 ("We are highly dependent on the services of Peter Rawlinson, our Chief Executive Officer and Chief Technology Officer."); Ex. 5 at 486 ("[W]e are highly dependent on the services of Craig F. Courtemanche, Jr., our founder, President, and Chief Executive Officer, who is critical to our ability to achieve our vision and strategic priorities."); Ex. 6 at 498 ("We are highly dependent on the services of David Michery, our founder and Chief Executive Officer.").

Tesla's directors and found that "*The Tesla Board was Not 'Dominated' By Elon.*'"  *In re Tesla Motors, Inc. S'holder Litig.*, 2022 Del. Ch. LEXIS 94, at *66–67 (Apr. 27, 2022).[4]  Plaintiff also relies even more extensively on *Tornetta* to allege that Mr. Musk exercised "general control . . . over the board[.]"  ¶ 313.  But *Tornetta*, which is pending appeal, *declined* to hold that Mr. Musk held "general control" over Tesla.  *Tornetta*, 310 A.3d at 501.  In any event, this Court already found "that *Tornetta* [does not] govern the present action" because "[t]hat ruling was limited to Musk's compensation plan" and "[t]here is no connection between Musk's compensation and this case."  FAC Order at 17.  Plaintiff's additional copying-and-pasting from *Tornetta* does not alter that finding.  *See* ¶¶ 312–16.  Finally, Plaintiff points to Tesla's and Mr. Musk's 2018 settlement with the SEC as evidence of control.  *Id.* ¶¶ 304–05.  But, far from expanding Mr. Musk's influence, Tesla's settlement imposed "mandatory procedures and controls to oversee all of [Mr.] Musk's communications regarding [Tesla] made in any format[.]"  Ex. 7 at 506.

        ***Vague, irrelevant, and dated anecdotes.***  Finally, Plaintiff offers a hodgepodge of allegations purportedly showing control, such as an anonymous individual who purportedly witnessed Mr. Musk having dinner with an unidentified person, ¶ 297; an accusation that *seventeen years ago* Mr. Musk held a Board meeting without giving proper notice to Tesla's then-CEO, ¶ 301;[5] anonymous allegations that Mr. Musk yelled at an employee six years ago, ¶¶ 306, 308; and, perplexingly, allegations about Mr. Musk's conduct at another company entirely.  ¶ 307.

        Plaintiff's theory of general control lacks a single particularized factual allegation and cannot be the basis to undermine any Board member's independence.

---

[4] Should Plaintiffs wish to invoke *Tesla Motors I*, they cannot ignore that the allegations were only tested under the permissive 12(b)(6) standard.  2018 Del. Ch. LEXIS 102, at *28 n.193, 30 (defendants did "not move to dismiss under Court of Chancery Rule 23.1").
[5] Even if relevant, none of Tesla's current directors save Mr. Musk and Mr. Kimbal Musk were on Tesla's Board in 2007.  *See* Ex. 1 at 24–30.

### B.    Tesla's Directors Are Not Beholden to Elon Musk

Even if Mr. Musk controlled Tesla (which he does not), that does not mean he controls its

Board.  Indeed, this Court already has ruled that Tesla's directors are independent.  *See* FAC Order at

15–20.  Plaintiff's new allegations, addressed here, are similarly deficient.[6]  First, Plaintiff "fail[s] to

assert argument" against Ms. Wilson-Thompson, conceding her independence.  *See* FAC Order at

18; *In re Lendingclub Corp. Deriv. Litig.*, 2019 Del. Ch. LEXIS 1347, at *38 (Oct. 31, 2019)

(dismissing complaint).  As to the other directors, Plaintiff repeats failed allegations.

***Kimbal Musk.***  Just last month, ***79%*** of voting shareholders reelected Mr. Kimbal Musk to

Tesla's Board.  Ex. 2 at 451.  Unable to plead that their familial relationship alone renders Mr.

Kimbal Musk not independent (*see* FAC Order at 18), Plaintiff contends that this demand is

somehow unique because it "is a direct attack on E. Musk's name and personal reputation."  ¶ 319.

But *Mr. E. Musk* is not accused of personally committing any of the misconduct alleged in the

Complaint; to the contrary, he has denounced it.  *See* Ex. 8 at 510.  Plaintiff's implied character

attacks are nothing but "conclusory assertion[s]" lacking "[]sufficient specificity to support a claim

that the two have such a close personal relationship that [Mr. Kimbal Musk] lacks independence."

*McElrath v. Kalanick,* 2019 Del. Ch. LEXIS 107, at *48–49 (Apr. 1, 2019) (finding allegations that

directors are "confidants" and "allies" insufficient to plead demand futility).

Plaintiff next tries to strip Mr. Kimbal Musk of his directorial autonomy by attributing his

professional successes to Mr. E. Musk.  *See* ¶¶ 320–21.  That Mr. Kimbal Musk's "initial work

---

[6] "[T]he Rule 23.1 demand inquiry must be assessed by reference to the board in place at the time when the amended complaint is filed."  *Braddock v. Zimmerman,* 906 A.2d 776, 786 (Del. 2006). For an even-numbered board, a plaintiff must show that at least half of its members were either interested or not independent.  *In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 Del. Ch. LEXIS 151, at *24 n.75 (Oct. 12, 2011).  As of May 15, 2024, Tesla's Board was comprised of Elon Musk, Robyn Denholm, Ira Ehrenpreis, Joe Gebbia, James Murdoch, Kimbal Musk, JB Straubel, and Kathleen Wilson-Thompson.  Plaintiff must plead that three of those directors are beholden to Mr. Musk.

experience"—dating some thirty years ago—"consist[ed] of companies founded by E. Musk," ¶ 320, "fails to plead with particularity how [Mr. Kimbal Musk] would not be able to use his independent business judgment to consider a demand" ***today***. *Chester Cty. Emps.' Ret. Fund v. New Residential Inv. Corp.*, 2017 Del. Ch. LEXIS 767, at *19 (Oct. 6, 2017) (rejecting allegation that parties "shared a significant business relationship" over twelve years ago). It also erases Mr. Kimbal Musk's own entrepreneurial success, including as co-founder of a restaurant group and an urban farming enterprise, and CEO of a search engine acquired by Walmart. Ex. 1 at 28.

Mr. Kimbal Musk's unspecified "pattern of investing in E. Musk's ventures" also fails to suffice. ¶ 320. For example, Plaintiff identifies Mr. Kimbal Musk's 1999 investment in X.com, but provides "no further context" to show whether his investment was material to X.com, or whether Mr. Kimbal Musk "remained invested in X.com when this litigation was filed" (unlikely, as X.com ceased to exist in 2000). *In re Kraft Heinz Co. Deriv. Litig.*, 2021 Del. Ch. LEXIS 295, at *17 (Dec. 15, 2021) ("Without that information, it is not possible to infer that [director] lacks independence"). Nor does tabloid gossip from 2008 about Mr. Kimbal Musk's purported near-"bankruptcy" and subsequent investment in Tesla reach the requisite particularity. ¶ 320. As for Mr. Kimbal Musk's financial stake in Tesla, Delaware law does not "infer a lack of director independence simply because that director owns stock in the company on whose board he sits[.]" *Owens v. Mayleben*, 2020 Del. Ch. LEXIS 59, at *24–25 (Feb. 13, 2020) (noting this "dynamic is common and is generally regarded as a desirable alignment of incentives between fiduciaries and beneficiaries").

Finally, Mr. Kimbal Musk's independence under stock exchange rules, ¶ 322, "carr[ies] little weight given the dearth of particularized allegations suggesting that [he] is beholden to [Mr. Elon Musk]." *See Kraft Heinz*, 2021 Del. Ch. LEXIS 295, at *24–25 (stock exchange independence inquiry "does not operate as a surrogate for" demand futility's independence inquiry). "There is [no]

reason to believe that the familial relationship, coupled with other important facts, is so thick that [they] should be treated as essentially a voting group."  FAC Order at 18–19.

   ***Ira Ehrenpreis.***  Plaintiff adds no particularized factual allegations to challenge Mr. Ehrenpreis's independence.  The Court already rejected Plaintiff's argument that "Ehrenpreis lacks independence based on [Mapbox's] relationship with [Tesla]," because "Plaintiff fail[ed] to allege that Tesla's contract with Mapbox 'was material to [Mapbox's] business interests."  FAC Order at 18.  The same reasoning applies to Plaintiff's repeated allegation that Mr. Ehrenpreis's Tesla directorship is a "benefit in fundraising[.]"  ¶ 326; *see MCG Cap. Corp. v. Maginn*, 2010 Del. Ch. LEXIS 87, at *76 (May 5, 2010) (plaintiff failed to plead "that [directors'] objective judgment would be impaired by the threat of losing their . . . compensation").  Plaintiff adds a vague allegation that Mr. Ehrenpreis "has other connections with E. Musk, in addition to the above[.]"  ¶ 327.  But those "other connections" are left unexplained.  Generically alleging that Mr. Ehrenpreis has "strong admiration for E. Musk," ¶ 325, in no way suggests that he is so "under [Mr. Musk's] influence" as to raise "doubt that [he] could bring [his] impartial business judgment to bear on a litigation demand."  *Zuckerberg*, 262 A.3d at 1049; *see UFCW & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 250 A.3d 862, 899 (Del. Ch. 2020) (statement that director was "proud to be a small part of [Zuckerberg's] life" suggested only a "collegial relationship").

   ***Robyn Denholm.***  Plaintiff alleges that, according to *Tornetta*, Ms. Denholm lacks independence because she received "'life-changing' compensation" as a Tesla director."  ¶ 339.  But the *Tornetta* court never ruled that Ms. Denholm lacked independence.  *See Tornetta*, 310 A.3d at 509–10.  Even so, the more logical interpretation is that her sales of Tesla options *insulate* her from Mr. Musk's influence.  Ms. Denholm does not depend on her board position because she is already financially secure.  Mr. Musk cannot affect stock options that Ms. Denholm has already exercised.

*See Maginn*, 2010 Del. Ch. LEXIS 87, at *76 (no beholdeness absent allegations "to suggest that [money] is, in fact, personally material"); *see supra* at 16.  It is irrelevant that "Institutional Shareholder Services recommended against [Ms.] Denholm's [Board] reelection" due to an investment by one of her business ventures in a company that contracted with SpaceX.  ¶ 341.  That has nothing to do with Tesla; it is the exact type of "attenuated business relationship" that "is not enough to imply [a director's] lack of independence."  FAC Order at 20.

    **Joe Gebbia.**  Plaintiff now contends that Mr. Gebbia is unable to consider a litigation demand against Mr. Musk because he removed himself from the Special Committee reviewing Mr. Musk's compensation package.  ¶ 350.  But Mr. Gebbia "explained that he was stepping down from the Special Committee out of an abundance of caution because of the potential for *unfair* attacks [on his independence] . . . *not because of any concern by the Special Committee regarding his independence*."  Ex. 1 at 34 (emphasis added).  Crucially, the Special Committee's advisors, comprised of a multinational law firm, experienced Delaware counsel, an investment bank, and a "corporate law and governance expert," concluded that "[Mr.] Gebbia was in fact independent" for all aspects of the Special Committee's mandate.  *Id.* at 34, 248.

    **James Murdoch.**  68% of voting shareholders recently reelected Mr. Murdoch to the Board.  Ex. 2 at 451.  Aside from again relying on *Tornetta*, ¶ 345, Plaintiff simply alleges that Mr. Murdoch and Mr. Musk are "longtime friend[s]" who "repeatedly vacationed" with each other.  ¶ 344.  "Not all friendships, or even most of them, rise to the level of raising a reasonable doubt whether a director can independently consider a demand."  *Freuler*, 803 F. Supp. 2d at 646 n.24; *see Kraft Heinz*, 2021 Del. Ch. LEXIS 295, at *18 (finding director independent despite that controller "walked [her] down the aisle at her wedding").  In *Kaltman v. Sidhu*, the court found that a director was independent despite co-owning a yacht with a 27% stockholder.  *See* 2004 U.S. Dist. LEXIS

2818, at *15 (N.D. Tex. Feb. 26, 2004) (rejecting allegation of directors' "close personal ties").  As in *Kaltman*, Plaintiff here fails to "particularize[] any circumstances of control and domination to overcome the presumption of [Mr. Murdoch's] independence[.]"  *Id.*  Additionally, that Mr. Musk reportedly recruited Mr. Murdoch to the Board on one such vacation, ¶ 344, "does not overcome his presumed independence."  *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 60 (Del. Ch. July 13, 2015) (rejecting "loyalty appointment" allegation "without additional evidence"); *Kalanick*, 2019 Del. Ch. LEXIS 107, at *51 (allegation that controller unilaterally "appointed [director] during a power struggle" "[in]sufficient to undermine [his] independence").

> **JB Straubel.**  Plaintiff simply repeats his already-dismissed allegations against Mr. Straubel. ¶¶ 330–36.  His only addition is to state that Mr. Straubel and Mr. Musk "have a long and close history."  ¶329.  Such conclusory pleading is plainly insufficient, as this Court has already found. *See* FAC Order at 20 (citing *Kalanick*, 2019 WL 1430210, at *19–20).

## III.    PLAINTIFF FAILS TO ESTABLISH DIVERSITY JURISDICTION

Having finally abandoned his attempt to conjure federal jurisdiction out of a flawed Section 14(a) claim, Plaintiff now tries to fabricate jurisdiction by invoking diversity jurisdiction.  ¶ 8.

"[F]ederal courts must be assured of their jurisdiction and may question it *sua sponte* at any stage of a proceeding."  *Franklin v. State of Louisiana*, 2001 U.S. App. LEXIS 31259, at *1–2 (5th Cir. 2001).  Plaintiff claims diversity is satisfied because Mr. Musk is a Texas citizen, while Plaintiff is a California citizen.[7]  ¶ 8.  This is not enough in the derivative lawsuit context, which is brought on behalf of the company, the real party in interest.

---

[7] Plaintiff pleads that Tesla's "principal executive offices" are located in Austin, Texas.  ¶ 12. Because its "nerve center" is in Texas, Tesla is a Texas citizen.  *See Hertz Corp. v. Friend*, 559 U.S. 77, 92–94 (2010) (corporation's headquarters establishes citizenship for diversity jurisdiction).

**A.      Tesla Is Properly Aligned as a Plaintiff**

In determining whether diversity jurisdiction exists, the court is not bound by the way plaintiff formally aligns the parties in his original pleading. *Lowe v. Ingalls Shipbuilding, Div. of Litton Sys., Inc.*, 723 F.2d 1173, 1177 (5th Cir. 1984). It has long been "the general rule" that in a shareholder derivative suit, "the corporation is properly realigned as a plaintiff since it is the real party in interest." *Duffey v. Wheeler*, 820 F.2d 1161, 1163 (11th Cir. 1987) (*citing Koster v. Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 522–23 (1947)). "Cases in which courts have condoned retaining the corporation as a party defendant occur only where the corporation has been found to be 'actively antagonistic' to the plaintiff's interests." *Wheeler*, 820 F.2d at 1163. However, "[t]his exception has been narrowly constructed." *Id*.

Here, Plaintiff has not pleaded that Tesla's Board is "actively antagonistic" to this suit; to the contrary, multiple factors weigh against a finding of antagonism. "[S]everal courts have considered the absence of a demand letter," as is found here, "persuasive in finding no antagonism." *In re Digimarc Corp. Deriv. Litig.*, 549 F.3d 1223, 1237 (9th Cir. 2008) (collecting cases). Plaintiff chose not to make demand and therefore opted not even to ask whether the Board would consider his claims. "[S]ome courts have refrained from finding antagonism where the corporation, although it has not yet filed suit against its officers and directors, has 'reserved the right to take control of the action' or otherwise 'retain[s] neutrality in its responses to [the shareholder's] complaints.'" *Id*. Here again, the Board has always retained the right to consider a litigation demand concerning Plaintiff's claims and—if it determines that prosecution of such claims is in the best interest of the Company—may yet choose to prosecute them. Indeed, each of the remaining directors "retain[s] neutrality," *id*., with respect to Plaintiff's claims: If Plaintiff's claims are proven, then none of the non-defendant directors would face any personal liability as a result.

"[C]ourts generally abstain from finding antagonism when the corporation is no longer controlled by the directors and officers named in the complaint[.]"  *Gartner v. Pyatt*, 2016 U.S. Dist. LEXIS 164281, at *9 (D. Nev. Nov. 29, 2016).  *Gartner* illustrates the shortcomings of Plaintiff's jurisdictional gambit.  Like here, the *Gartner* shareholder "d[id] not allege that he made a formal demand to the [company's] board."  *Id.* at *7.  "[O]nly three of the eleven individual board member defendants remain[ed] on the board and, as a board minority, they [could not] fairly be said to control the corporation."  *Id.* at *9.  The shareholder's "allegations [were] insufficient to show that the controlling [board] members . . . were antagonistic to [the company] at the time [the shareholder] filed [his] lawsuit."  *Id.*  Similarly here, only one director (Mr. Musk) remains a defendant.  He did not control Tesla when this suit was filed, and does not control Tesla now.  *Supra* at 11–13.  The "general rule" that a corporation is aligned as a plaintiff in a shareholder derivative suit should apply.

### B.    Because There Is No Diversity, There Is No Jurisdiction

"It is axiomatic that diversity jurisdiction, the alleged basis of this court's jurisdiction [here], requires complete diversity between plaintiffs and defendants.  In other words, for diversity jurisdiction to exist, no plaintiff may be a domiciliary of the same state as any defendant."  *Jernigan v. Ashland Oil Inc.*, 989 F.2d 812, 814 (5th Cir. 1993).  Because Tesla, properly aligned as a plaintiff, and Mr. Musk, named as a defendant, are both Texas citizens, diversity jurisdiction does not exist.  "The failure to adequately allege the basis for diversity jurisdiction mandates dismissal."  *Lee Constr. & Maint. Co. v. Ingram Indep. Sch. Dist.*, 2020 U.S. Dist. LEXIS 247533, at *4 (W.D. Tex. Jan. 8, 2020) (Ezra, J.).

### CONCLUSION

The Court should dismiss Plaintiff's lawsuit for failure to make demand with prejudice.

Dated: July 1, 2024                                Respectfully submitted,

*/s/ Boris Feldman*

Boris Feldman (*pro hac vice*)
Doru Gavril (*pro hac vice*)
Jennifer Loeb (*pro hac vice*)
Rebecca Lockert (*pro hac vice*)
Olivia Rosen (*pro hac vice*)

FRESHFIELDS BRUCKHAUS
DERINGER US LLP
855 Main Street
Redwood City, California 94063
Telephone: (650) 421-8200
Facsimile: (212) 277-4001
E-mail: boris.feldman@freshfields.com
        doru.gavril@freshfields.com
        jennifer.loeb@freshfields.com
        rebecca.lockert@freshfields.com
        olivia.rosen@freshfields.com

Gary Ewell (SBN: 06752800)
EWELL, BROWN, BLANKE & KNIGHT LLP
111 Congress Avenue, Suite 2800
Austin, Texas 78701
Telephone: (512) 770-4000
Facsimile: (877) 851-6384
E-mail:  gewell@ebbklaw.com

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

    I hereby certify that I have caused to be served a true and correct copy of this motion upon each attorney of record and the original upon the Clerk of Court on this the 1st day of July, 2024.

*/s/ Boris Feldman*          

Boris Feldman (*pro hac vice*)
