UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE TESLA INC. STOCKHOLDER DERIVATIVE LITIGATION | § § § § § § § § § § § § § § § | Lead Case No. 1:22-cv-00592-DAE<br><br>(Consolidated with Case No. 1:22-cv-00611-DAE) |
| This Document Relates To:<br><br>All Cases | | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND
AMENDED CONSOLIDATED COMPLAINT**

## TABLE OF CONTENTS

I.  INTRODUCTION ..............................................................................................................1

II. RELEVANT PROCEDURAL HISTORY .........................................................................2

III. PLAINTIFF HAS ADEQUATELY PLEADED DEMAND FUTILITY...........................2

    A.  The Court Correctly Found that Demand on E. Musk Is Futile Because He Faces a Substantial Likelihood of Liability ............................................................4

    B.  There Is Reason to Doubt that at Least Three Directors are Independent from Defendant E. Musk, Rendering Demand Futile ...............................................8

        1.  E. Musk's "CEO Superstardom" Makes Even Independent Directors Unduly Deferential to Him, Rendering Demand Futile..............9

        2.  Kimbal and Murdoch Clearly Lack Independence from E. Musk.............12

        3.  Ehrenpreis and Denholm also Lack Independence from E. Musk.............14

        4.  Gebbia and Straubel also Lack Independence from E. Musk...................16

IV. PLAINTIFF PROPERLY PLED DIVERSITY JURISDICTION.....................................17

V.  CONCLUSION................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amalgamated Bank v. Yahoo! Inc.*,
132 A.3d 752 (Del. Ch. 2016)................................................................3

*Aronson v. Lewis*,
473 A.2d 805 (Del. 1984) ....................................................................9

*In re BGC Partners, Inc. Derivative Litig.*,
2019 WL 4745121 (Del. Ch. Sept. 30, 2019) ........................................17

*Brehm v. Eisner*,
746 A.2d 244 (Del. 2000) ....................................................................8

*Buckley Fam. Tr. v. McCleary*,
2020 Del. Ch. LEXIS 114 (Mar. 31, 2020) ........................................4, 6

*In re Cabot Oil & Gas Corp. Derivative. Litig.*,
2024 U.S. Dist. LEXIS 143 (S.D. Tex. Jan. 2, 2024) ............................7

*Del. Cnty. Emps. Ret. Fund v. Sanchez*,
124 A.3d 1017 (Del. 2015) ..................................................................3

*In re Digimarc Corp. Derivative Litig.*,
549 F.3d 1223 (9th Cir. 2008) ..................................................17, 18, 19

*Duffey v. Wheeler*,
820 F.2d 1161 (11th Cir. 1987) ............................................17, 18, 19, 20

*IBEW Loc. Union 481 Defined Contribution Plan & Tr. ex rel. GoDaddy, Inc. v.
Winborne*,
2023 WL 5444317 (Del. Ch. Aug 24, 2023) ........................................3

*Grace Bros., Ltd. v. UniHolding Corp.*,
2000 WL 982401 (Del. Ch. July 12, 2000)............................................13

*Johnson v. Preferred Prof. Ins. Co.*,
91 A.3d 994 (Del. Super. Ct. 2014) ......................................................7

*Kamen v Kemper Fin. Servs., Inc.*,
500 U.S. 90 (1991)................................................................................3

*Kaplan v. Wyatt*,
484 A.2d 501 (Del. Ch. 1984)..............................................................19

*Koster v. Lumbermens Mut. Cas. Co.*,
   330 U.S. 518 (1947)...........................................................................................18

*In re Katrina Canal Breaches Litig.*
   495 F.3d 191 (5th Cir. 2007))...............................................................................3

*In re McDonald's Corp. S'holder Derivative Litig.*,
   289 A.3d 343 (Del. Ch. 2023)...............................................................................7

*MCG Cap. Corp. v. Maginn*,
   2010 WL 1782271 (Del. Ch. May 5, 2010)..........................................................15

*Mizel v. Connelly*,
   1999 WL 550369 (Del. Ch. July 22, 1999)...........................................................13

*Morrison v. Berry*,
   2019 WL 7369431 (Del. Ch. Dec. 31, 2019)..........................................................4

*Grabski on behalf of Coinbase Glob., Inc. v. Andreessen*,
   2024 WL 390890 (Del. Ch. Feb. 1, 2024) .............................................................9

*Ontario Provincial Council of Carpenters' Pension Tr. Fund v. Walton*,
   2023 WL 3093500 (Apr. 26, 2023) ........................................................................7

*In re Oracle Corp. Derivative Litig.*,
   2018 WL 1381331 (Del. Ch. Mar. 19, 2018)........................................................16

*Orman v. Cullman*,
   794 A.2d 5 (Del. Ch. 2002)..................................................................................15

*Rales v. Blasband*,
   634 A.2d 927 (Del. 1993))......................................................................................3

*Segway Inc. v. Cai*,
   2023 WL 8643017 (Del. Ch. Dec. 14, 2023).........................................................7

*Smith v. Sperling*,
   354 U.S. 91 (1957)...............................................................................................17

*State v. Wright*,
   131 A.3d 310 (Del. 2016) .......................................................................................7

*In re Tesla Motors, Inc. S'holder Litig.*,
   2018 WL 1560293 (Del. Ch. Mar. 28, 2018)..........................................................9

*Tornetta v. Musk*,
   310 A.3d 430 (Del. Ch. 2024) .....................................................................*passim*

*United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*,
   262 A.3d 1034 (Del. 2021) ..................................................................................3

*U.S. ex rel. Vavra v. Kellogg Brown & Root, Inc.*,
   727 F.3d 343 (5th Cir. 2013) .............................................................................3

*Voigt v. Metcalf*,
   2020 WL 614999 (Del. Ch. Feb. 10, 2020) ....................................................15

## I.    INTRODUCTION

Plaintiff Alvin Janklow ("Plaintiff") brings this stockholder derivative action on behalf of nominal defendant Tesla, Inc. ("Tesla" or the "Company") to hold its Chief Executive Officer ("CEO") and director, Elon Musk ("E. Musk"), accountable for his role in fostering and permitting a multi-year pattern of harassment, discrimination, and retaliation against Tesla's employees.

This case has seen multiple rounds of motions to dismiss.  On the last motion to dismiss, the Court found demand futile as to E. Musk because, "in his capacity as an officer, [E.] Musk faces a substantial likel[ihood] of liability for breaching his duty of care."  ECF 93 at 13 ("Order").  The only issue left for the Court to decide at this stage is whether Plaintiff's second amended complaint ("SAC")[1] alleges facts that create a reason to doubt that at least three other Tesla directors are independent from E. Musk, such that demand on the Board would be futile.

In their brief, defendants ignore and fail to refute the particularized allegations in the SAC demonstrating E. Musk's domination and control of the Board of Directors ("Board") and creating reason to doubt the independence of at least three other directors; improperly seek to re-litigate whether demand on E. Musk himself is futile (which the Court already found after full briefing by the parties); and, for the first time, attack Plaintiff's jurisdictional allegations based on diversity of citizenship of the parties.  As set forth below, none of defendants' arguments support dismissal of this Action.  Plaintiff addresses and overcomes the one hurdle identified in the Court's Order by alleging particularized facts creating reason to doubt that at least three directors are independent from E. Musk.  Demand, therefore, is futile, and defendants' Motion to Dismiss must be denied.

---

[1] "SAC" refers to the Verified Second Amended Consolidated Stockholder Derivative Complaint for Breach of Fiduciary Duty and Violation of Securities Law filed on May 15, 2024 (ECF 94, 97).

## II.    RELEVANT PROCEDURAL HISTORY

On April 11, 2024, this Court held that Plaintiff had adequately alleged that demand on defendant E. Musk is futile because he faces a substantial likelihood of liability for breach of fiduciary duty, based on the allegations in Plaintiff's FAC.[2]  Order at 10-14.  The Court further held that Plaintiff had failed to allege facts sufficient to show that at least three other directors lack independence from E. Musk.  Order at 15-20.  The Court granted the motion to dismiss without prejudice and granted Plaintiff leave to amend his complaint.  *Id.* at 20.

On May 15, 2024, to comport with and address the perceived pleading deficiencies identified in the Court's Order, Plaintiff filed the SAC.[3]  On July 1, 2024, defendants filed a motion to dismiss ("MTD")[4] the SAC.  Plaintiff now opposes that motion.[5]

## III.    PLAINTIFF HAS ADEQUATELY PLEADED DEMAND FUTILITY

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In analyzing a motion to dismiss for failure to state a claim, the court "accept[s] 'all well pleaded facts as true, viewing them in the light most

---

[2] "FAC" refers to the Verified Amended Consolidated Stockholder Derivative Complaint for Breach of Fiduciary Duty and Violation of Securities Law filed on November 3, 2023 (ECF 73, 76).

[3] For the Court's convenience, attached hereto as Exhibit A to the Declaration of Shane P. Sanders in Support of Plaintiff's Opposition to Defendants' Motion to Dismiss Second Amended Consolidated Complaint filed simultaneously herewith is a "redline" of the SAC, showing the amendments made by Plaintiff in response to the Court's Order (hereinafter "Exhibit A").

[4] "MTD" refers to Defendants' Motion to Dismiss Plaintiff's Second Amended Consolidated Complaint filed on July 1, 2024 (ECF 100, 102).

[5] In the interest of brevity, for a substantive factual summary of Plaintiff's substantive allegations, Plaintiff respectfully refers the Court to pages 2-4 of his prior motion to dismiss opposition brief (ECF 84, 88) ("Opp MTD Amd Cpt"), and to paragraphs 1-276 of the SAC.  The pertinent facts for this narrow briefing, regarding demand futility and lack of independence, are discussed herein.

favorable to the plaintiff.'" *U.S. ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 727 F.3d 343, 346 (5th Cir. 2013) (quoting *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)).[6] Additionally, in the derivative context, the question under Rule 23.1(b) is "whether demand is excused because there is a reasonable doubt that the directors could have properly responded to a demand." *IBEW Loc. Union 481 Defined Contribution Plan & Tr. ex rel. GoDaddy, Inc. v. Winborne*, 2023 WL 5444317, at *12 (Del. Ch. Aug 24, 2023).[7]

In assessing whether a shareholder derivative plaintiff has sufficiently alleged demand futility, the court must consider all particularized allegations "in their totality[,]" accept the plaintiff's allegations as true, and draw all reasonable inferences in plaintiff's favor. *Del. Cnty. Emps. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1019 (Del. 2015); *see also IBEW*, 2023 WL 5444317, at *12-13; *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 798 (Del. Ch. 2016) (citing *Rales v. Blasband*, 634 A.2d 927, 931 (Del. 1993)).

Demand will be excused as futile if the particularized facts alleged, taken as true and with all reasonable inferences therefrom drawn in the plaintiff's favor, show that at least half of the directors either: (i) "face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand;" or (ii) "lack[] independence from someone who ... would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand." *United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021).

---

[6] Here, as throughout, all emphasis is added and citations and footnotes are omitted unless otherwise noted.

[7] Because Rule 23.1 does not specify substantive standards, the particularity of a plaintiff's pleadings is determined by the standards in the state of the company's incorporation. *Kamen v Kemper Fin. Servs., Inc.*, 500 U.S. 90, 92-99, 108-09 (1991).

If the Court agrees that the allegations in the SAC, considered in their totality and with all inferences therefrom being drawn in the Plaintiff's favor, create a reason to doubt that at least three other directors lack independence from E. Musk, demand is futile, and the defendants' motion to dismiss must be denied.  For the reasons discussed below, Plaintiff has adequately alleged demand futility in the SAC.

### A. The Court Correctly Found that Demand on E. Musk Is Futile Because He Faces a Substantial Likelihood of Liability

This Court has already determined that demand on defendant E. Musk is futile because, "in his capacity as an officer," he "faces a substantial likel[ihood] of liability for breaching his duty of care." *See* Order at 13.  In reaching that determination, the Court found that Plaintiff "adequately pled numerous avenues and reasons as to why [E.] Musk likely knew about discrimination occurring at Tesla," and "that [E.] Musk's response was recklessly indifferent to the discrimination by failing to take such accusation seriously and indeed criticized employees who took legal action." Order at 13-14.[8]  The Court correctly noted that E. Musk may not be exculpated for actions taken "solely in his capacity as an officer," and that "'[u]nder Delaware law, the standard of care applicable to the fiduciary duty of care of ... a[n] officer is gross negligence.'"  Order at 12 (quoting *Buckley Fam. Tr. v. McCleary*, 2020 Del. Ch. LEXIS 114, at *25 (Mar. 31, 2020)); *see Morrison v. Berry*, 2019 WL 7369431, at *22 (Del. Ch. Dec. 31, 2019) (same).

Because the Court has found that E. Musk faces a substantial likelihood of liability based on the facts alleged, Plaintiff did not amend his complaint with respect to the alleged wrongdoing (Exhibit A, ¶¶11-276), and, instead, amended only the allegations that concern the Board's

---

[8] As discussed above, the Court separately found that Plaintiff's allegations were insufficient to show that E. Musk acted in **bad faith** in his capacity **as a director**.  Order at 5-10.

independence from E. Musk in the context of demand futility (Exhibit A, ¶¶292-350).[9] Nonetheless, defendants—unhappy with the outcome last time around—improperly seek to re-litigate the issue of E. Musk's likelihood of liability and tardily ask the Court to reconsider its prior ruling.  The Court should reject defendants' thinly-veiled motion for reconsideration as to E. Musk's likelihood of liability, which is both improper in this posture and baseless in any event.

Defendants do not, because they cannot, dispute the Court's finding that Plaintiff's allegations are sufficient to plead that E. Musk breached his duty of care in his capacity as an officer.  MTD at 6-10.  Instead, defendants now apparently seek to transmute Plaintiff's allegations that E. Musk breached his duty of care as an officer—i.e., through his personal actions (and inaction) that caused, fostered, and encouraged the rampant and un-remediated culture of discrimination and harassment at the Company—into a standard director-officer oversight claim under *Caremark* requiring a showing of bad faith.  *Id*.  But this issue was thoroughly briefed by the parties in the last round of motion work and was resolved by this Court.  *See* PMTD[10] at 9-11 (defendants addressing Plaintiff's allegations concerning E. Musk's gross negligence / due care breaches in his capacity as an officer); Opp MTD Amd Cpt[11], § III.B.1 (Plaintiff addressing E. Musk's likelihood of liability for gross negligence, separate and apart from alleged bad faith director-officer *Caremark* oversight failures); Reply[12] at 4-6 (defendants addressing Plaintiff's

---

[9] Consistent with the Court's Order, Plaintiff also removed his Section 14(a) disclosure claim and allegations relating solely thereto.  *See* Exhibit A, ¶¶7-8, 356.

[10] "PMTD" refers to defendants' previous Motion to Dismiss Plaintiffs' Amended Consolidated Complaint filed on December 18, 2023 (ECF 78, 81).

[11] "Opp MTD Amd Cpt" refers to Plaintiff's Opposition to Defendants' Motion to Dismiss Plaintiffs' Amended Consolidated Complaint filed on February 15, 2024 (ECF 84).

[12] "Reply" refers to defendants' Reply in Further Support of Defendants' Motion to Dismiss Plaintiffs' Amended Consolidated Complaint filed on March 21, 2024 (ECF 89, 91).

allegations concerning E. Musk's gross negligence / due care breaches in his capacity as an officer); Order at 7 (Court: "In this case, it is important that the Court distinguish between Musk's action as a Director and as an Officer."), 12 (Court: "Plaintiff need not show bad faith [in the context of *officer* liability for duty of care] as it required to hold Musk liable as a *Director*."), 13-14 (Court finding that Plaintiff adequately pled that E. Musk breached his duty of care by acting with gross negligence).

In fact, on the last round of motion to dismiss briefing, Defendants explicitly acknowledged that officers face liability and may not be exculpated for breaches of the duty care where they act with gross negligence. *See, e.g.*, PMTD at 9 (defendants acknowledging that E. Musk may not be exculpated if "Plaintiffs can make particularized allegations about actions he took 'solely in [his] capacity as an officer'"), 10 ("'Under Delaware law, the standard of care applicable to the fiduciary duty of care of ... a[n] officer is gross negligence.'") (quoting *Buckley*, 2020 Del. Ch. LEXIS 114, at *25); Reply at 4-6 (defendants acknowledging that Plaintiff need only plead gross negligence with respect to actions E. Musk took solely in his capacity as an officer).

In the instant motion to dismiss, defendants ignore the Court's well-reasoned Order, which outlines the bases for its pleading-stage finding that E. Musk faces a substantial threat of liability for breach of the duty of care in his capacity as an officer, and seek to relitigate the issue strictly as a *Caremark* oversight claim. But defendants may not rewrite Plaintiff's complaint. The SAC—with identical allegations to the FAC before it—alleges distinct breaches of the duty of care by E. Musk in his capacity as an officer; the parties fully briefed the issue; the Court determined that E. Musk faces a substantial likelihood of liability for breach of the duty of care as an officer; and defendants never moved for reconsideration of the Court's Order. There have been no factual changes or revisions to the allegations concerning E. Musk's liability, and there has been no change

in Delaware law. Accordingly, there is no basis for relitigating the identical issue the Court has already resolved.

Moreover, defendants' own cases confirm the Court's legally sound conclusion that a breach of the duty of care exists if an officer acted with gross negligence. *See* Order at 12; *Segway Inc. v. Cai*, 2023 WL 8643017, at *3 n.36 (Del. Ch. Dec. 14, 2023) (acknowledging that the plaintiff would only need to show "gross negligence" if plaintiff had brought claim based on a breach of the officer's duty of care); *In re McDonald's Corp. S'holder Derivative Litig.*, 289 A.3d 343, 375 (Del. Ch. 2023) (concluding that while "***oversight liability for officers*** [i.e., under *Caremark*] requires a showing of bad faith," Delaware law provides that officers are liable for breach of the duty of care "***when they act in a grossly negligent (i.e., reckless) manner***").[13]

There is simply no legal or factual basis for the Court to reconsider, let alone reach a different determination with respect to, defendant E. Musk's likelihood of liability for breach of the duty of care.[14] As the Court found, demand on defendant E. Musk is futile.

---

[13] The cases on which defendants rely are distinguishable because they all involved *Caremark* oversight claims requiring a showing of bad faith or knowing misconduct—not, as here, solely breaches of the duty of care alleging gross negligence in an officer capacity based on the defendant's personal actions and inaction. *See McDonald's*, 289 A.3d at 375 ("plaintiffs claim that [defendant] breached his "duty of care ***by exercising inadequate oversight*** [i.e., *Caremark*]...."); *Segway*, 2023 WL 8643017, at *3 (plaintiff was "adamant that it ***only intend[ed] to advance a claim for breach of [defendant's] duty of loyalty***—specifically, her oversight obligation"); *Ontario Provincial Council of Carpenters' Pension Tr. Fund v. Walton*, 2023 WL 3093500, at *30-34 (Apr. 26, 2023) (the plaintiffs' three oversight-based claims the "*Massey* Claim, a Red-Flags Claim, and an Information-Systems Claim each rest on the same concept: a breach of the duty of loyalty grounded on bad faith action"); *In re Cabot Oil & Gas Corp. Derivative. Litig.*, 2024 U.S. Dist. LEXIS 143, at *4, 8 (S.D. Tex. Jan. 2, 2024) (evaluating demand futility in the context of "***Caremark liability***").

[14] This is consistent with the policies underlying the "law of the case doctrine," through which courts promote a more streamlined and consistent judicial process that adheres to previously decided issues, and enhance the efficiency and predictability of its legal proceedings. *See State v. Wright*, 131 A.3d 310, 321 (Del. 2016). The "law of the case" doctrine prevents courts from revisiting issues in matters such as this, where no new law or new facts are cited. *Johnson v. Preferred Prof. Ins. Co.*, 91 A.3d 994, 1009 (Del. Super. Ct. 2014). Here, there have been no

**B.      There Is Reason to Doubt that at Least Three Directors are Independent from Defendant E. Musk, Rendering Demand Futile**

As of the filing of the SAC, Tesla's Board was comprised of the following eight directors: (1) defendant E. Musk, and non-defendants (2) Kimbal Musk ("Kimbal"), (3) James Murdoch ("Murdoch"), (4) Ira Ehrenpreis ("Ehrenpreis"), (5) Robyn Denholm ("Denholm"), (6) Joe Gebbia ("Gebbia"), (7) Jeffrey Brian Straubel ("Straubel"), and (8) Kathleen Wilson-Thompson.  *See* Exhibit A, ¶283; *see also* Order at 16.  As discussed above, Plaintiff has already adequately pled that director defendant E. Musk faces a substantial likelihood of liability, in his capacity as an officer, for breaching his duty of care, thus rendering demand upon him futile.  *See* Order at 13-15.  As such, all that remains to render demand futile in this instance is that the Plaintiff "*allege facts that create reason to doubt whether three other directors are sufficiently independent from [E.] Musk*."  Order at 15; *see also Brehm v. Eisner*, 746 A.2d 244, 257 (Del. 2000) (the issue is, "were [the directors] incapable, due to personal interest or domination and control, of objectively evaluating a demand[?]").  Plaintiff has done so here.  The SAC sufficiently alleges facts showing domination and control, as well as a lack of independence, at least at the pleading-stage, to find that at least three other directors are incapable of objectively evaluating a demand adverse to E. Musk, rendering demand futile in this action.[15]

---

changes to the facts concerning E. Musk's liability, and there have been no relevant changes to the applicable Delaware law on demand futility.

[15] *See* Exhibit A, ¶¶293-306, ¶¶308-09 (relating to allegations of control and influence), *see also* ¶¶310-17 (relating to newly added allegations regarding the lengthy *Tornetta* opinion and the effect of some of its holdings on this present action); *see also* Exhibit A, ¶¶319-322 & ¶¶342-45 (newly added allegations in the SAC relating specifically to Kimbal's and Murdoch's lack of independence from E. Musk); *see id.*, ¶¶323-28 & ¶¶337-41 (Ehrenpreis's and Denholm's lack of independence from E. Musk); *see also id.*, ¶¶346-50 & ¶¶329-36 (Gebbia's and Straubel's lack of independence from E. Musk).

1. **E. Musk's "CEO Superstardom" Makes Even Independent Directors Unduly Deferential to Him, Rendering Demand Futile**

An officer's domination and control of the board is sufficient to plead demand futility where a plaintiff alleges stock ownership plus other facts evidencing control sufficient "to demonstrate that the Board could not have exercised its independent business judgment." *Aronson v. Lewis*, 473 A.2d 805, 810 (Del. 1984). "CEO superstardom" (defined as when directors and others believe the CEO makes a unique contribution to company value—as is alleged in the case at hand) is relevant to control issues because the belief in the CEO's singular importance shifts the balance of power to the CEO. *See Tornetta v. Musk*, 310 A.3d 430, 507 (Del. Ch. 2024); *see also In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at *13 (Del. Ch. Mar. 28, 2018).[16] "When directors believe a CEO is uniquely critical to the corporation's mission, ***even independent*** actors are likely to be ***unduly deferential***." *Tornetta*, 310 A.3d at 507.

Here, the SAC clearly and adequately alleges E. Musk's significant stock ownership, plus other factors evidencing the effect of his domination and control over the Board. E. Musk owns approximately 20% of the Company's stock, making him the largest individual shareholder.[17] *See* SAC, ¶¶293-94 (E. Musk is the face of Tesla, he has occupied the most important roles at the

---

[16] Defendants note that, while the court in *Tesla Motors* found at the pleading stage that E. Musk dominated and controlled Tesla's board, it reached a different conclusion later in the litigation. MTD at 13. But, as the court in *Tornetta* acknowledged, the *Tesla Motors* court, after a trial, held that even if Musk were a controller so as to trigger entire fairness, the transaction at issue in that case was entirely fair. *Tornetta*, 310 A.3d at 501-02. Accordingly, "it was unnecessary to make a post-trial finding on whether Musk controlled Tesla." *Id*.

[17] Defendants argue that 7.5% of E. Musk's 20% stock ownership is "the subject of active litigation." MTD at 11. At this stage, however, the inferences are drawn in Plaintiff's (not defendants') favor. *See Grabski on behalf of Coinbase Glob., Inc. v. Andreessen*, 2024 WL 390890, at *1 (Del. Ch. Feb. 1, 2024) ("drawing the plaintiff-friendly inferences called for at [the pleading] stage of the litigation, the court concludes that plaintiff has met the demand requirement and stated a well-pled claim.").

Company).  Through public filings, the Company concedes that it is "highly dependent" on E. Musk (Exhibit A, ¶296), acknowledges the king-like power held by E. Musk, and recognizes E. Musk's unilaterally appointed title of "Technoking" (*Id.*, ¶298).  Reputable business articles and analysts concur, referring to Tesla as E. Musk's "personal kingdom" (*see id.*, ¶297).  One analyst recently noted that to mitigate the risk of E. Musk's dominant role at Tesla, the Company would need to significantly enhance the independence of its Board and/or nominate new independent directors who do not have strong ties to E. Musk.  *See id.*, ¶299.  E. Musk and Tesla are so intertwined that E. Musk's persona is attached to Tesla, and vice versa, with E. Musk describing the Company as his own.  *Id.*, ¶312.  The Company and E. Musk both concede that the Company is highly dependent on E. Musk.  *Id.*  E. Musk makes all decisions for the hiring, firing, and compensation for high-level positions, and all financial plans must be approved by him.  *Id.*  E. Musk "operates as if free of Board oversight."  *Id.*  He has ignored specific Board directives and made significant surprise announcements on behalf of the Company, all without Board knowledge. *Id.*  He also uses Company resources to address projects at other companies he owns, without being challenged by anyone on the Board.  *Id.*

Defendants point to the recent shareholder vote approving E. Musk's pay package as an example of "[s]hareholder democracy prov[ing] Plaintiff dead wrong."  MTD at 10-11.  But the essence of shareholder democracy is the freedom to vote one's shares as one sees fit, without undue influence or coercion.  In this instance, not only was the vote required in the aftermath of *Tornetta*, but E. Musk also threatened and coerced shareholders to secure a favorable outcome.  SAC at ¶309.  He made statements to investors, suggesting that he might take his ideas elsewhere if they rejected a recent proxy proposal to reapprove his 2018 pay package.  *Id.*  The entire shareholder vote is ineffective because it was orchestrated entirely by E. Musk using a coercive process in

which he, in effect, extorted the favorable votes under threat of further stripping Tesla of its artificial intelligence and robotics capabilities. There is now an avalanche of allegations in the SAC supporting at least a reasonable inference of defendant E. Musk's domination and control over the Tesla Board (not specifically connected to the compensation plan issue discussed in *Tornetta*).

The above-listed allegations reflect E. Musk's "CEO superstardom," and domination and control, at Tesla.[18] *See generally Tornetta*, 310 A.3d at 506-07. It is undeniable that E. Musk "wields unusually expansive managerial authority, equaling or even exceeding the imperial CEO's of the 1960's." *Id.* E. Musk's domination and control of Tesla's Board, and the directors' "[f]aith in [E. Musk as the] Superstar CEO[,] changes the dynamics of corporate decision making ... for ***all*** corporate decisions," not just corporate decisions relating to CEO compensation, but ***all*** corporate decisions. *Id.* at 507. While the court did make clear that nowhere is corporate decision-making more affected by CEO superstardom than in instances involving a "Superstar CEO's compensation" (as was the instance in *Tornetta*), the court also acknowledged that "where the Superstar CEO's interests are directly concerned" (as is the instance in the case at hand), the risks of directors being unduly deferential to superstar CEOs (such as E. Musk) are higher in those instances as well. *Id.*

Thus, because of E. Musk's CEO superstardom, as supported by the detailed allegations in the SAC, it is at least reasonable to doubt whether the board can objectively evaluate any demand

---

[18] None of the above allegations are exclusively applicable to the compensation plan at-issue in *Tornetta*. Instead, as noted in the *Tornetta* opinion, and in the SAC, "[t]his evidence, though not exhaustive, demonstrates the scope of [E.] Musk's influence as a member of management ***and in the Boardroom***." Exhibit A, ¶313. E. Musk "exercised managerial authority over all aspects of Tesla[,]" and he did so "often without regard to Board authority, rendering Tesla highly dependent on him." *Id.*, ¶311.

that **directly concerns** defendant E. Musk's interests—particularly here, where defendant Musk has been found to face a substantial likelihood of liability in the context of serious allegations of sexual and racial discrimination.  To be clear, Plaintiff is **not** contending that Tesla's Board would lack independence in every conceivable act, but rather in instances such as here, where the Board action being demanded of the directors would require those directors to consider taking legal action that directly concerns defendant E. Musk's personal liability (which has been found at the pleading stage to be substantially likely).  Demand is futile in this action because E. Musk's personal liability is at-issue, and there is reason to doubt that at least three other directors would be able to impartially consider a such a demand where E. Musk's interests are directly concerned.

## 2. <u>Kimbal</u> and <u>Murdoch</u> Clearly Lack Independence from E. Musk

The *Tornetta* ruling, although a unique circumstance involving allegations concerning defendant E. Musk's executive compensation grant, is a post-trial opinion that contains numerous factual findings directly relevant to the demand futility issues in this case, which are not at all dependent on or connected to the compensation grant issue relevant in that case.  *See generally Tornetta.*  For example, the *Tornetta* court found that, defendant "[E.] Musk wield[ed] considerable power in the boardroom by virtue of his high-status roles and managerial supremacy." *Tornetta*, 310 A.3d at 504.  This finding is fact-based and not at all connected to or limited by the compensation grant discussed in *Tornetta*.

Similarly, in the context of summarizing defendant E. Musk's influence over the directors in *Tornetta* (only four of which are relevant to this case—Kimbal, Murdoch, Ehrenpreis, and Denholm) the *Tornetta* court found that defendant E. Musk's "*ties* to three of the ... directors [including Kimbal and *Murdoch*] rendered those directors *beholden to him*."  *See id.* at 502.  The opinion goes on to state that "[*t]he rest* of the fiduciaries [, including *Ehrenpreis* and *Denholm,*] <u>*acted*</u> beholden to [defendant E.] Musk *in the process of* leading to *the [compensation] Grant.*"

*Id.* This is critical because the court found that *Kimbal* and *Murdoch* were beholden to defendant E. Musk based on their ties, and relationships with each other—they were not just "acting" beholden in the context of the compensation grant transaction.

The SAC contains newly added allegations specifically relating to Kimbal's and Murdoch's lack of independence from defendant E. Musk, which are consistent with *Tornetta*. *See* Exhibit A, ¶¶319-22 (regarding Kimbal's close familial relationship as brothers with defendant E. Musk, their numerous business ties, their substantial financial ties, etc.); *see also id.*, ¶¶342-45 (regarding Murdoch's longtime friendship with defendant E. Musk, his repeated family vacations with E. Musk, etc.). *Tornetta*, consistent with the SAC allegations, states that "[b]efore [Murdoch] joined the Board, Murdoch, and [E.] Musk took family vacations together to Israel, Mexico, and the Bahamas ... [on] one of these trips [Kimbal] also attended." *Tornetta*, 310 A.3d at 459.

As the court found it "easy to conclude" in *Tornetta*, this Court should likewise conclude here that "based on the nature of [Kimbal's 's and Murdoch's] relationships with [defendant E.] Musk, that [Kimbal] ... and Murdoch lacked independence from [E.] Musk." *Id.* at 510. These findings in *Tornetta*, together with the allegations in the SAC, are fact-based findings unrelated to the compensation grant transaction in *Tornetta* and going to the broader independence issues relevant to this Action. The allegations in the SAC, consistent with the findings in *Tornetta*, are more than sufficient to create a reason to doubt Kimbal's and Murdoch's ability to impartially consider a demand that is adverse to defendant E. Musk.[19]

---

[19] *See Grace Bros., Ltd. v. UniHolding Corp.*, 2000 WL 982401, at *10 (Del. Ch. July 12, 2000) (finding reasonable doubt about whether a director impartially could consider a demand adverse to the interests of his brother-in-law); *see also Mizel v. Connelly*, 1999 WL 550369, at *4 (Del. Ch. July 22, 1999) ("While there is nothing wrong with family members serving together on a board, ... a 'reasonable doubt' is raised when a demand would require a director to support a suit contrary to the interests of a close family member.") ("The existence of a very close family

3.    **Ehrenpreis** and **Denholm** also Lack Independence from E. Musk

There is reason to doubt whether Ehrenpreis could impartially consider a demand against E. Musk due to their longstanding personal and professional ties coupled with E. Musk's domination and control. *See* Exhibit A, ¶¶323-28. As explained in *Tornetta*, Ehrenpreis, although not as connected to defendant E. Musk as Kimbal and Murdoch, had "extensive business and personal relationships with [E.] Musk ... [and] held interests worth at least $75 million in Musk-controlled companies other than Tesla and had invested in [Kimbal's] business ventures. *Tornetta*, 310 A.3d at 509. "Ehrenpreis also had longstanding personal and professional relationships with [E.] Musk and [Kimbal] that Ehrenpreis admitted had a 'significant influence' on his professional career." *Id.*

With regard to Ehrenpreis, in the context of the compensation grant at issue in that case, the *Tornetta* court concluded that Ehrenpreis's relationship with E. Musk was not only "weighty" but "too weighty." *Id*. Thus, *Tornetta* held that Ehrenpreis's "actions *in connection with the Grant* demonstrate that he was *beholden for that purpose*." *Id.* It is critical to note, however, that *Tornetta* also conceded that "one could debate whether [Ehrenpreis's extensive and weighty] ties [to defendant E. Musk] rendered Ehrenpreis *beholden to [E.] Musk in general*" (as *Tornetta* found in regards to Kimbal and Murdoch). *Id.* That is exactly what Plaintiff is alleging here, at the pleading stage, based on the arguments and SAC allegations referenced herein—i.e., it is at least reasonable to doubt Ehrenpreis's ability to impartially consider a demand that is adverse to defendant E. Musk.

---

relationship between directors should, without more, generally go a long (if not the whole) way toward creating a reasonable doubt").

14

Just like Ehrenpreis was found to be "beholden for [the limited] purpose [of the compensation grant]," the *Tornetta* court held that "*the same is true of Denholm*[.]"  *Id.*  *Tornetta* found that Denholm received compensation as a Tesla director that was "life-changing."[20] *Tornetta*, 310 A.3d at 509; *see also* Exhibit A, ¶¶337-41 (regarding Denholm receiving $280 million from Tesla in 2021 and 2022, etc.).  As noted in the *Tornetta* opinion, in the context of the lack of independence analysis, "[b]oth past and future rewards are relevant to this analysis." *Tornetta*, 310 A.3d at 508.  Like with Ehrenpreis, although Denholm was not found to beholden to defendant E. Musk generally (like with Kimbal and Murdoch), that issue is at debatable, and thus, reasonable to infer at the pleading stage based on the totality of the allegations in the SAC. Moreover, the seriousness of the allegations against defendant E. Musk relate to his personal liability; thus, it is not unreasonable to doubt whether Denholm could impartially consider a demand that is adverse to defendant E. Musk.  With regard to both Ehrenpreis and Denholm, the SAC allegations and supporting arguments are more than sufficient to support at least a pleading stage "inference of beholden-ness."[21]  *Tornetta*, 310 A.3d at 509.

---

[20] Defendants claim that "Ms. Denholm does not depend on her board position because she is already financially secure[,]" but $280 million is material to any person.  MTD at 16.  To cite Defendants' authority, "[f]or director compensation to create independence problems, [ ] it must be shown that the compensation is material to the director."  *MCG Cap. Corp. v. Maginn*, 2010 WL 1782271, at *20 (Del. Ch. May 5, 2010) (citing *Orman v. Cullman*, 794 A.2d 5, 25 n.50 (Del. Ch. 2002)).  In *Orman*, it was found that a $75,000 consulting payment was material enough to find a lack of independence.  794 A.2d at 30.  Furthermore, $3.3 million was material enough to contribute to a lack of independence.  *Id.* at 30-33.  Here, Denholm received approximately $280 million dollars.  Not only is this amount much more than the material amount in *Orman*, but, objectively, $280 million dollars is a material amount for any person.

[21] *See Voigt v. Metcalf*, 2020 WL 614999, at *15 (Del. Ch. Feb. 10, 2020) (plaintiff alleged that a "nominally independent" director was appointed to the board by the controller, and that the director had previously "worked for" certain of the controller's other "portfolio companies or served on their boards."  The court found that these facts "suggest[] a persistent and ongoing relationship" that "[a]t the pleading stage" was sufficient to "support an inference of beholden-ness.").

#### 4.    <u>Gebbia</u> and <u>Straubel</u> also Lack Independence from E. Musk

The SAC contains some newly added allegations regarding Gebbia's lack of independence from E. Musk (*see* Exhibit A, ¶¶346-50) and one with regard to Straubel (*see id.* ¶329; *see also id.* ¶¶330-36).  While perhaps less facially compelling as the lack of independence allegations related to Kimbal, Murdoch, Ehrenpreis, and Denholm, there is also reason to doubt whether Gebbia and Straubel could impartially consider a demand that is adverse to defendant E. Musk.

Gebbia served as a director for Airbnb in 2016, when it partnered with a company, Solar City, that had defendant E. Musk and Straubel on its board.  *Id.*, ¶347.  In 2022, Gebbia joined Tesla as a director under circumstances that caused some to state that the appointment "sounds like more of the same.  More of the bros of [defendant] E. Musk rather than someone new and different."  *Id.*, ¶348.  Perhaps most significantly, Gebbia "*removed himself*" from a special committee formed to review the compensation package of defendant E. Musk "*for his apparent close ties with [Defendant E.] Musk.*"  *Id.*, ¶350.  Gebbia, stated, "in examining [his] own independence ... [he disclosed that he has] a personal relationship with Elon Musk, as well as [a] potential business transaction."  *Id.*

Like Gebbia, Straubel also has close ties with defendant E. Musk.  Straubel is one of the co-founders of Tesla, along with defendant E. Musk.  *See id.*,¶¶329-33.  He and E. Musk traveled together to Japan for business, they served together as directors on other companies, and Straubel founded a company that does business with Tesla.  *See id.*, ¶¶334-36.  Thus, it is at least debatable, or reasonable to doubt, whether directors Gebbia or Straubel could impartially consider a demand adverse to defendant E. Musk.[22]

---

[22] *See In re Oracle Corp. Derivative Litig.*, 2018 WL 1381331, at *17 (Del. Ch. Mar. 19, 2018) (even when a plaintiff did "not allege with particularity that these connections are significant" to the director, the court nonetheless found that "***the combined effect***" "create[s] [a] reasonable doubt

## IV.     PLAINTIFF PROPERLY PLED DIVERSITY JURISDICTION

As a last-ditch effort to secure a dismissal of this Action in the face of Plaintiff's particularized demand futility allegations in the SAC, defendants argue—for the first time—that Plaintiff has not adequately pleaded diversity jurisdiction.  MTD at 18-20.  Section 1332 of Title 28 confers jurisdiction on federal courts where there is diversity of citizenship between plaintiffs and defendants.  Here, the SAC (like the FAC before it) properly alleges diversity jurisdiction.  SAC, ¶¶11-13 (alleging that Plaintiff is a California citizen and E. Musk is a Texas citizen).

Defendants contend that diversity of citizenship does not exist because Tesla—the nominal defendant in the case—should be "aligned as a plaintiff" and has its "principal executive offices" in Texas (where E. Musk is a citizen).  MTD at 18-20.  But, as defendants' own authorities make clear, a nominal defendant corporation in a shareholder derivative case may ***not*** be realigned as a plaintiff "when a corporation's officers or directors are 'antagonistic' to the interests of the shareholder plaintiff(s)."  *In re Digimarc Corp. Derivative Litig.*, 549 F.3d 1223, 1234-35 (9th Cir. 2008); *see also Duffey v. Wheeler*, 820 F.2d 1161, 1163 (11th Cir. 1987) (nominal defendant corporation in shareholder derivative case cannot be realigned as a plaintiff "whenever antagonism is evident on the face of the pleadings and by the nature of the controversy").  While "[t]he ultimate interest of the corporation made defendant may be the same as that of the stockholder made plaintiff," the "corporation may be under a control antagonistic to him, and made to act in a way detrimental to his rights."  *Smith v. Sperling*, 354 U.S. 91, 95-96 n. 3 (1957).  "A corporation is

---

that [the director] could impartially consider ***whether to sue*** [the other director]."); *see also In re BGC Partners, Inc*. *Derivative Litig.*, 2019 WL 4745121, at *12 (Del. Ch. Sept. 30, 2019) (after "[t]aking into consideration the totality of the Complaint's allegations" regarding a director's personal and professional ties to a controller and his family, the Court determined that "Plaintiffs have adequately pled a 'constellation of facts' that create a reasonable doubt about [the director]'s independence from [the controller] for purposes of deciding whether or not to bring a lawsuit against [the controller].").

generally antagonistic to a shareholder plaintiff where 'management is aligned against the stockholder and defends a course of conduct which he attacks,'" or "merely where 'management— for good reasons or for bad—is definitely and distinctly opposed to the institution of [the derivative] litigation[.]'" *In re Digimarc*, 549 F.3d at 1235; *see Duffy*, 820 F.2d at 96-97 ("'antagonism exists where 'it is plain that the stockholder and those who manage the corporation are completely and irrevocably opposed'"); *see Koster v. Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 522-23 (1947) ("jurisdiction is saved in [derivative] cases by a special dispensation because the corporation is in antagonistic hands").

In *Digimarc*, the court found antagonism between the plaintiff and the company's controlling members because it was "in the pecuniary interest of the[] controlling board members to oppose the derivative action, and all would be significantly harmed by an adverse judgment," and noted that "[n]o court has failed to find antagonism under similar factual circumstances." 549 F.3d at 1237. Here, E. Musk controls Tesla and its Board (as discussed above), it is in his interest to oppose the derivative action (indeed, he has moved to dismiss this Action), and an adverse judgment in this case would harm him. Notably, the court in *Duffey* found antagonism despite the fact that the company there "did take steps to address the shareholders' complaints," including "creat[ing] [a special litigation committee] to investigate the allegations." *Id.* at 1238. Tesla and its Board have not even taken those steps in response to Plaintiff's complaint(s). The court in *Duffey* also highlighted examples of where other courts have found a lack of antagonism and thus realigned nominal defendants as derivative plaintiffs, such as where "the corporation was no longer controlled by" the officer or director defendant, and "where the plaintiff, rather than the defendants, controls the corporation." *Id.* at 1237. None of those circumstances exist here.

18

Defendants' arguments that E. Musk and Tesla are not "antagonistic" to Plaintiff's derivative claims fail.  MTD at 18-20.  For example, the fact that Plaintiff filed a complaint alleging demand futility, rather than first making a pre-suit litigation demand, is irrelevant.  "[W]here a derivative action is brought pursuant to Rule 23.1 without a demand first being made upon the board of directors because of reasons set forth in the complaint, the board, if it so desires, may appoint an independent committee to investigate the allegations of wrongdoing against the corporation as contained in the complaint."  *Kaplan v. Wyatt*, 484 A.2d 501, 506 (Del. Ch. 1984). In other words, E. Musk and Tesla could have formed a special litigation committee to impartially investigate Plaintiff's allegations (as was the case in *Digimarc*).  Instead, they have repeatedly moved to dismiss the Action in its entirety, confirming their "antagonism" with respect to the derivative claims.

Defendants' argument that there is no antagonism here because Tesla is no longer controlled by the alleged wrongdoers also is meritless.  MTD at 20.  As discussed above, E. Musk—who the Court already found faces a substantial likelihood of liability for breach of fiduciary duty—continues to dominate and control Tesla's Board and has directed the filing of motions to dismiss on Tesla's behalf, confirming that "antagonism is evident on the face of the pleadings[,]" and "the stockholder [Plaintiff] and those who manage [Tesla] are completely and irrevocably opposed."  *See Duffey*, 820 F.2d at 1163 (citing *Smith*, 354 U.S. at 96-97).

Finally, defendants' reliance on *Duffey* is misplaced.  In *Duffey*, the companies at issue apparently were so deadlocked that they "failed to respond to the complaint and a default judgment was rendered against them," and it was the plaintiff who sought to realign one of the defendant companies as a party plaintiff.  *See Duffey*, 820 F.2d at 1162-63.  In contrast here, E. Musk—"who

control[s] the corporation"—has been and continues to be "actively antagonistic" to Plaintiff's shareholder derivative action. *Id.*

## V.    CONCLUSION

For the reasons set forth above, Plaintiff has alleged particularized facts showing defendant E. Musk's domination and control over the Board and creating reason to doubt the independence of his fellow directors. When properly considered alongside E. Musk's constellation of business connections, familial relations, personal connections, and domination and control factors, the allegations in the SAC are sufficient to create reason to doubt that at least three (if not six) of the directors could impartially consider a demand adverse to defendant E. Musk. Demand, therefore, is futile. Defendants' motion to dismiss should be denied in its entirety.

Dated: August 22, 2024                    Respectfully submitted,

ROBBINS LLP

*/s/ Shane P. Sanders*

SHANE P. SANDERS (*pro hac vice*)
BRIAN J. ROBBINS
CRAIG W. SMITH (*pro hac vice*)
5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsllp.com
            csmith@robbinsllp.com
            ssanders@robbinsllp.com

KENDALL LAW GROUP, PLLC
JOE KENDALL
State Bar No. 11260700
3811 Turtle Creek, Blvd., Suite 1450
Dallas, TX 75219
Telephone: (214) 744-3000
Facsimile: (214) 744-3015
E-mail: jkendall@kendalllawgroup.com

*Co-Lead Counsel for Plaintiffs*

1671080

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify on August 22, 2024, a copy of the foregoing document was served on defense counsel via e-mail.

*/s/ Shane P. Sanders*
SHANE P. SANDERS